# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Judine E. Slaughter, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:07-cv-02201 (JMF) |
| | ) | ECF |
| Mary E. Peters, Secretary | ) | |
| U.S. Department of Transportation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S MOTION TO DISMISS

Pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure (Fed.R.Civ.P),

Mary E. Peters, Secretary, U.S. Department of Transportation (Defendant), in her official

capacity and through counsel, respectfully submits her motion for an order dismissing this case

for lack of subject matter jurisdiction and failure to state a claim on which relief may be granted,

because Plaintiff failed to exhaust her administrative remedies.   The grounds for this motion are

set forth in the accompanying Memorandum of Points and Authorities in Support of Motion to

Dismiss.

Respectfully submitted,

/s/
_____
JEFFREY A. TAYLOR, DC Bar #489610
United States Attorney


/s/
_____
RUDOLPH CONTRERAS, DC Bar #434122
Assistant United States Attorney


/s/
_____
Raymond A. Martinez Tx Bar #13144015
Special Assistant United States Attorney

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Judine E. Slaughter, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:07-cv-02201 (JMF) |
| | ) | ECF |
| Mary E. Peters, Secretary | ) | |
| U.S. Department of Transportation, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

## <u>INTRODUCTION</u>

Plaintiff alleges that the agency discriminated against her on the basis of race (African American) when: (1) she became aware that her duties pertaining to the Automated Exemption System (AES) were being reassigned to Ms. Nancy Trembly (Office of Rulemaking, Caucasian, GS-14 employee), and (2) when the Plaintiff received the results of a desk audit which did not support an upgraded position. (<u>See</u> Complaint p.1, Ct. Doc.1)  However, Plaintiff failed to timely exhaust her administrative remedy by contacting an EEO counselor within 45 days of the alleged discrimination. (<u>See</u> 29 CFR §1614.105 (a)(1)).  Therefore, Plaintiff's complaint should be dismissed either for lack of subject matter jurisdiction (Fed.R. Civ.P. 12(b)(1)) or for failure to state a claim (Fed. R. Civ. P. 12(b)(6))[1].

---

[1]There exists some uncertainty within this District regarding whether a failure to properly exhaust administrative remedies is properly brought in a Rule 12(b)(1) motion, as a jurisdictional defect, or in a 12(b)(6) motion.  <u>Compare Mills v. Billington</u>, Civ. A. No 04-2205 (HHK), 2006 WL 1371683, at *2 (D.D.C. May 16, 2006) ("It is well-settled that a plaintiff's failure to exhaust her administrative remedies will deprive a district court of subject matter jurisdiction[.]");

## PROCEDURAL BACKGROUND

On June 13, 2006, Plaintiff contacted an EEO Counselor. (See Ex.1, EEO counselor's report).  During this initial contact, she raised the following allegations of discrimination based on race (African American) due to the assignment of duties: 1) on June 8, 2006, she learned that a grade 12 employee served as a point-of-contact (POC) for a rule; 2) on May 16, 2006, she learned that a GS-14 employee would be working on the Automation Exemption System (AES); and 3) she requested a desk audit because of inconsistencies and discrepancies in the distribution of grades and work duties in her organization. (See id).  When the informal complaint was not resolved, on August 29, 2006, Plaintiff filed a formal discrimination complaint with the Departmental Office of Civil Rights (DOCR). (See Ex. 2, Plaintiff's administrative complaint). By letter dated November 17, 2006, the DOCR accepted the following allegations for investigation:

> Were you discriminated against based on race (African American) when:
>
> 1)     you became aware on May 16, 2006 that your duties pertaining to the Automation Exemption System   (AES) were being reassigned to a GS-14 employee; and
>
> 2)     in April 2006, you received the results of a desk audit which did not support an upgrade of your position.  (See Ex. 3 DOCR Letter of Acceptance).

---

Williams v. Chertoff, Civ. A. No. 05-0211 (RCL), 2005 WL 3200794, at *1 (D.D.C. Nov. 1, 2005) (same); with Holmes v. PHI Serv. Co., 437 F. Supp. 2d. 110, 118-23 (D.D.C. 2006) (Walton, J.) (failure to timely exhaust is not a jurisdictional defect); see also Rann v. Chao, 346 F.3d 192, 195 (D.C. Cir. 2003) (recognizing that prior D.C. Cir. decisions have reached conflicting answers as to whether a failure to exhaust is jurisdictional, but declining to decide the matter); Mianegaz v. Hyatt Corp., 319 F. Supp. 2d 13, 17 (D.D.C. 2004) (Urbina, J.) (same); but see Carter v. Wash. Metro. Transit Auth., 451 F. Supp. 2d 150, 153 (D.D.C. 2006) (Leon, J.) (rejecting *Holmes*), rev'd on ot. grounds, 503 F.3d 143 (D.C. Cir. 2007).  However, much like in Rann, the distinction for purposes of this Motion is academic as dismissal is appropriate regardless of whether the court relies on rule 12(b)(1) or rule 12 (b)(6).

In the same letter, DOCR acknowledged that Plaintiff had withdrawn the allegation about her becoming aware on June 8, 2006 that a grade 12 employee served as POC for a rule and plaintiff had performed the duties previously without recognition. (See id., pg.2).

On April 23, 2007, Plaintiff requested that DOCR issue a final agency decision (FAD). (See Ex. 4). By letter dated May 25, 2007, DOCR issued a FAD dismissing the complaint based upon untimely EEO contact under 29 CFR 1614.107(a)(2). (See Ex. 5). Specifically, DOCR concluded that Ms. Trembley served as the Action Manager for the Program Management Staff from November 2004 to the end of March 2005. Therefore, any discriminatory acts undertaken by Ms. Trembley, when she was Acting Manager, including any alleged assumption of Plaintiff's duties, would have occurred prior to March 2005 or more than one year prior to Plaintiff's initiation of contact with an EEO Counselor. (See id. pg. 6). Similarly, DOCR dismissed Plaintiff's second allegation due to untimely EEO contact. (See id. pg.7) In Plaintiff's "long version" documenting "an unofficial timeline of the EEO complaint," she specified that the desk audit came back in January 2006. DOCR concluded that Plaintiff was aware in January that her position would not be reclassified, but she waited until June 16, 2006 to initiate EEO Counselor contact. (See id. pg 7).

On June 22, 2007, Plaintiff filed an appeal of the FAD with the Office of Federal Operations (OFO) of the Equal Employment Opportunity Commission (EEOC). (See Ex. 6 & 6a). In her appeal, Plaintiff contended that she did not become aware that duties had been reassigned to Ms. Trembley until May 18, 2005. (See. Ex. 6, pg. 2) She further contended that although she was aware of the desk audit results on January 25, 2006, the results were not final until Tony Fazio, Director of the Office of Rulemaking, concurred or rejected the results of the

audit.(See id. Pg.3).   The OFO affirmed the Agency's dismissal of the complaint because

Plaintiff's contact with an EEO Counselor was untimely since it occurred beyond the 45-day

limitation period and she had failed to provide sufficient justification to extend the time

limitation period. (See Ex. 7).

Plaintiff filed a request for reconsideration on October 4, 2007. (See Ex.15 part 1 & 2).

The Defendant opposed the request.  By order dated November 6, 2007, the OFO denied the

request for reconsideration of the Agency's decision. (See Ex. 8 OFO decision).

On December 7, 2007, Plaintiff filed the above captioned complaint of race

discrimination.  Specifically, she alleged that she was discriminated against when: 1) on May 16,

2006, she became aware that her duties pertaining to the Automated Exemption System (AES)

were reassigned to Ms. Nancy Trembley (Office of Rulemaking, Caucasian) GS-14 employee;

and 2) in April 2006, she received the desk audit performed by Agnes R. Brooks that did not

support an upgrade of her position.  She also raised an allegation that she was discriminated

against on June 8, 2006, when she became aware that a GS-12 employee served as a point of

contact for a rule and she had performed the duties without any recognition. (See Complaint, pg.

1, Ct. Doc 1).  Lastly, in attachment K to her Complaint, Plaintiff alleged that she was

discriminated against in the following areas:

    1)    she remained a temporary employee for 4 years;
    2)    she worked side by side with her white peers while they received  a higher salary
          for the same tasks;
    3)    she worked as a team lead with her white peers while they received a higher
          salary for the same tasks;
    4)    "I have been given the opportunity for promotion or have the equivalent or more
          training, however task was assigned to my white peers;" and
    5)    "I have performed the tasks as my white peers, and then the job is not available
          for promotion when I only have the task."

It is in response to these allegations that the Defendant files its motion.

**FACTS**

Plaintiff is a trained EEO Counselor who performs the function of an EEO Counselor for the FAA on a collateral basis. (See Ex.9)  She had read a copy of the desk audit conducted by Alfredia Brooks for her position on January 26, 2006.  (See Ex.10 & 10a pg. 4).  The desk audit clearly reflected that the position that Plaintiff held was properly classified as a GS-11.  (See Exhibit 11)

Plaintiff and Nancy Trembley did not perform the same functions.  Ms. Trembley was responsible for mapping the system architecture of the Automated Exemption System (AES) software.  (See Exhibit 12).  Plaintiff never performed this function; therefore Plaintiff's duties were never reassigned.  (Id.).

Nonetheless, Plaintiff contends that in November 2004 when Nancy Trembley became the Acting Manager of the Program Analysis Staff, she assumed responsibility for the AES.  (See Ex. 13, pg. 2).  Plaintiff also contends that upon Ms. Trembley's assumption of the Acting Manager role, she assisted the secretaries with their concerns and problems with the AEA instead of Plaintiff. (Id.).  Additionally, Plaintiff contends that Ms. "Trembley's fact finding and making recommendations to improve the functionality of the database was (sic) very similar to the duties [she] provided when the exemption data was migrated from the previous database to AES."  (See Ex.13a  pg.2).

**STANDARD OF REVIEW**

I.    **Motion to Dismiss (Fed.R.Civ.P. 12(b)(1) and 12(b)(6))**

Defendant moves for dismissal under Rule 12(b)(1), as the Court lacks jurisdiction over

certain of Plaintiff's claims, and Rule 12(b)(6), as Plaintiff fails to state any claim upon which

relief can be granted.  "In reviewing a motion to dismiss for lack of subject-matter jurisdiction

under Federal Rule of Civil Procedure 12(b)(1), the court must accept the complaint's well-pled

factual allegations as true and draw all reasonable inferences in the plaintiff's favor."  Thompson

v. Capitol Police Board, 120 F. Supp.2d 78, 81 (D.D.C. 2000) (citations omitted).  "The court is

not required, however, to accept inferences unsupported by the facts alleged or legal conclusions

that are cast as factual allegations."  Rann v. Chao, 154 F. Supp.2d 61, 64 (D.D.C. 2001), aff'd,

346 F.3d 192 (D.C. Cir. 2003), cert. denied, 125 S.Ct. 35 (Oct. 4, 2004).  In addition, "[on] a

motion to dismiss pursuant to Rule 12(b)(1), the plaintiff bears the burden of persuasion to

establish subject-matter jurisdiction by a preponderance of the evidence."  Thompson, 120 F.

Supp.2d at 81.

    A court may resolve a motion to dismiss for lack of subject matter jurisdiction under Rule

12(b)(1) in either of two ways.  First, the court may determine the motion based solely on the

complaint.  Herbert v. National Acad. Of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992).

Alternatively, to determine the existence of jurisdiction, a court may look beyond the allegations

of the complaint, consider affidavits and other extrinsic information, and ultimately weigh the

conflicting evidence.  See id.; Rann, 154 F. Supp.2d at 64.

    When considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court will

dismiss a claim if Plaintiff's complaint fails to plead  "enough facts to state a claim for relief that

is plausible on its face." Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007)

(clarifying the standard from Conley v. Gibson, 355 U.S. 41, 47 (1957)); see also In re Sealed

Case, 494 F 3d 139, 145 (D.C. Cir 2007) (citing Twombly).  Hence, the focus is on the language

6

in the complaint, and whether that language sets forth sufficient factual allegations to support

plaintiff's claim for relief.   The Court must construe the factual allegations in the complaint in

the light most favorable to Plaintiff and must grant Plaintiff the benefit of all inferences that can

be derived from the facts as they are alleged in the complaint.  <u>Barr v. Clinton</u>, 370 F 3d 1196,

1199 (D.C. Cir. 2004) (citing <u>Kowal v. MCI Comm'ns Corp</u>., 16 F. 3d 1271, 1276 (D.C. Cir.

1994)).  However the Court need not accept any inferences or conclusory allegations that are

unsupported by the facts pleaded in the complaint. <u>Kowal</u>, 16 F.ed at 1276.  Moreover, the Court

need not "accept legal conclusions cast in the form of factual allegations." <u>Id</u>.   If, after

reviewing the complaint, the Court finds that the plaintiff fails to plead "enough facts to state a

claim for relief that is plausible on its face," the Court must dismiss the complaint. Generally

speaking, the Court should not consider matters beyond the pleadings without converting the

motion to a motion for summary judgment.  <u>See</u> Fed. R. Civ. P. 12(b)(6).


## <u>ARGUMENT</u>

**A.**    **The complaint must be dismissed due to Plaintiff's failure to timely contact an EEO**

**Counselor within 45 days of the assignment of duties**

Generally, federal employees must exhaust remedies available through administrative

processes before calling on the federal courts for aid.   <u>See generally</u> <u>National Railroad</u>

<u>Passenger Corp. v . Morgan,</u> 536 U.S. 101 (2002); <u>Bayer v. US Department of Treasury</u>, 956

F.2d 330, 332 (D.C. Cir. 1992).  Accordingly, a plaintiff must bring an administrative complaint

to an EEO Counselor within 45 days of the alleged personnel action or risk losing the right to

bring that claim before a federal court.  <u>Nurriddin v. Goldin</u>, 382 F. Supp. 2d. 79, 92- 93 (D.D.C.

7

2005). The trigger for the 45 day period is when the individual discovers the injury, i.e, knew or through the exercise of reasonable diligence should have known of the discriminatory nature of the practice, it is the actual or constructive knowledge of the practice that triggers the 45 days. See Delaware State College v. Ricks, 449 US 250, 257 (1980) (finding that injury occurred when notified of denial of tenure decision and not when actually terminated).

In this case, Plaintiff contends that in November 2004 when Nancy Trembley became the Acting Manager of the Program Analysis Staff, Ms. Trembly assumed responsibility for the AES.  (See Ex.13 pg.2 ¶2).  In addition, Plaintiff contends that upon Ms. Trembley's assumption of the Acting Manager role, she assisted the secretaries with their concerns and problems with the AEA instead of Plaintiff.  (Id.)  Moreover, in her rebuttal to Ms. Trembley's assertion of not having reassigned and/or performed any of Plaintiff's duties, Plaintiff contended that  Ms. "Trembley's fact finding and making recommendations to improve the functionality of the database was (sic) very similar to the duties plaintiff provided when the exemption data was migrated from the previous database to AES."  (See Ex. 13a pg 2. ¶2.).  In other words, Plaintiff clearly believed prior to March 2005, when Ms. Trembley was no longer the Acting Manager of the Program Analysis Staff, that Ms. Trembley had assumed her responsibilities with regard to the AES system.  This belief is evidence of Plaintiff's awareness of an alleged injury.   See e.g., Delaware State College, 449 US at 257 (finding that injury occurred when notified of denial of tenure decision and not when actually terminated).  The staff meeting in May 2005, where Plaintiff alleges that Ms. Trembley announced that she wanted the AES software installed on her computer only served to confirm what Plaintiff already suspected.  Plaintiff was under an obligation to exercise due diligence and protect her rights upon becoming aware of an alleged injury.  She failed to do so.  As a result, she has failed to properly exhaust her administrative

8

remedies since she did not timely contact an EEO Counselor upon becoming aware of her alleged injury; therefore, her claim may not be considered by this Court. Nurridin, supra, 382 F. Supp. 2d at 92-93.[2]   Additionally, Mrs. Trembly was Acting Manager for the Program Management Staff from November 2004 to March 2005. (See Ex. No.14).  The latest time that Plaintiff could have reassigned Plaintiff's duties would have been March 2005.  Plaintiff did not contact the EEO office until June 13, 2006 more than a year later, rendering her complaint untimely. (See Ex.1 pg. 2 EEO counselor's report).

**B.      The complaint must be dismissed due to the her failure to contact an EEO counselor within 45 days in regards to the desk audit.**

On January 26, 2006, Plaintiff read the desk audit report for her position. (See  Ex.2) The report clearly stated that the functions that Plaintiff was performing were properly classified as a FG-343-11. (See Ex. 3)  In other words, a reading of the report provided ample notice that she would not receive a promotion based on the results of the desk audit.  See e.g., Delaware State College, 449 US at 257 (finding that injury occurred when notified of denial of tenure decision and not when actually terminated).  Yet, Plaintiff waited more than six months or more than 135 days beyond the 45 day period after receiving this notice to contact an EEO Counselor. Therefore, Plaintiff's contact with the EEO Counselor was untimely.  See e.g. Nurriddin, 382 F. Supp. 2d. at 92- 93 (holding that a plaintiff must bring an administrative complaint to an EEO Counselor within 45 days of the alleged personnel action or risk losing the right to bring that claim before a federal court.)

---

[2]Moreover, Plaintiff's duties with regard to the AES were not reassigned to Ms. Trembly. Plaintiff and Ms. Trembly performed distinctly different functions.  As a result, Plaintiff has failed to demonstrate an injury or that she was otherwise aggrieved since her duties were not reassigned.  Therefore, she has failed to state a claim.

**C. The allegations of harassment in the complaint must also be dismissed due to the Plaintiff's failure to contact an EEO counselor within 45 days**

Plaintiff makes a general assertion that she has been subjected to harassment by Tony Fazio, Caucasian Male, from June 2000-November 2005.   She expounds on this allegation in the document identified as Attachment K to her Complaint.  Specifically, plaintiff alleges that she was discriminated against in the following areas:

1) she remained a temporary employee for 4 years;

2) she worked side by side with her white peers while they received  a higher salary for the same tasks;

3) she worked as a team lead with her white peers while they received a higher salary for the same tasks;

4) "I have been given the opportunity for promotion or have the equivalent or more training, however task was assigned to my white peers;" and

5) "I have performed the tasks as my white peers, and then the job is not available for promotion when I only have the task."

None of these allegations were raised or presented to an EEO Counselor.  (See Ex.2). In addition, they were not included in the issues accepted for investigation by DOCR or referenced in any of Plaintiff's administrative appeals.  (See Ex.3).  Therefore, by her inaction, Plaintiff has failed to give the Agency proper notice of these allegations and has failed to exhaust her administrative remedies.

10

## **CONCLUSION**

For the above reasons, Defendant requests that Plaintiff's Complaint be dismissed with

prejudice.                              Respectfully submitted,

                                        /s/

                                 JEFFREY A. TAYLOR, DC Bar #489610
                                 United States Attorney

                                        /s/
                                 RUDOLPH CONTRERAS, DC Bar #434122
                                 Assistant United States Attorney

                                        /s/
                                 Raymond A. Martinez, Tx. Bar No. 13144014
                                 Assistant United States Attorney
                                 Judiciary Center Building - Civil Division
                                 555 Fourth Street, N.W. - Room E-4218
                                 Washington, D.C. 20530
                                 (202) 514-9150
                                 Counsel for the Defendant

.

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of May I caused the foregoing Motion to be served on Plaintiff, **Judine Slaughter,** via first class mail, postage prepaid addressed as follows:

Judine Slaughter
6104 Osborn Rd.
Cheverly, MD. 20785

Raymond A. Martinez
\_\_/s/_____
Raymond A. Martinez
Special Assistant United States Attorney
555 4th Street, NW
Washington, DC 20530
(202) 514-9150

12

# EEO COUNSELOR'S REPORT

**DATE:**    **AUGUST 15, 2006**

**FROM:**    **PHYLLIS A. SEAWARD, EEO COUNSELOR**

## Case Details

**Case Number: 2006-20595-FAA**

### I. General Information

Listed below is the general information for case number 2006-20595-FAA.

| Complaint Type | Initial Contact Date | Case Manager |
|---|---|---|
| Informal | 06/13/2006 | Phyllis Seaward |

| Subject |
|---|
| Judine Slaughter |
| FAA: AWA-ARM |
| FAA: CR Region assigned AWA |
| FAA: RMO LOB AVS |

| Processor | Assignment Date |
|---|---|
| Phyllis Seaward | 06/14/2006 |
| Gail Rollins | 06/13/2006 |

### II. Complainant(s)

#### Restricted Information

| Name | Unique ID | eMail | Series/Grade |
|---|---|---|---|
| Ms. Judine E. Slaughter | AWA-00-4033 | | 0343/ST-11 |
| Additional Complainant Information: Region: | | AWA | |
| State: | | DC | |
| Line of Business (LOB): | | AVS-ARM | |
| Facility: | | AWA HEADQUARTERS | |

**Home Address**
6104 Osborn Rd

Cheverly MD 20785
**Phone:** (301) 386-4033 **Fax:** Not Entered **Cell:** (301) 814-4547



GOVERNMENT EXHIBIT

**Work Address**
800 Independence Ave. SW

Washington DC 20591
**Phone:** (202) 493-4698 **Fax:** Not Entered **Cell:** Not Entered

## III. Complaint Contacts

| Type | Name | eMail | Address | Deleted |
|------|------|-------|---------|---------|
| Responsible Management Official | Mr. Tony Fazio | | | |
| OA Counselor | Phyllis Seaward | phyllis,seaward@faa.gov | | |

## IV. Claims

Listed below are the claims that have not been formally alleged for this case.

| Claim | Incident Date | Comments | Bases |
|-------|---------------|----------|-------|
| Assignment of Duties | 06/08/2006 | | Race: Black |

## V. Statutes

Title VII

## VI. Events

| Event Type: PreComplaint Counseling | | | | |
|------|------|------|------|------|
| **Start** | **Activity** | **Created By** | **Claim** | **Comment** |
| 06/13/2006 | PRE:Notified RMO/POC of Pre-Complaint | Gail Rollins | | |
| 06/13/2006 | PRE: Summary of Issue | Gail Rollins | | Summary: On 6/8/06 the Aggrieved Person learned that a grade 12 employee served as a point-of-contact (POC) for a rule. The employee works in the Rulemaking organization. The Aggrieved Person alleges that she was a POC at one time and she was never given any recognition for it. On 5/16/06 the Aggrieved Person found out that a GS 14 employee would be working on the Automation Exemption System (AES). The Aggrieved Person indicates she served this function as the Team Lead for the input of the data and |

| | | | |
|---|---|---|---|
| | | | requirements for this system at the GS-7 level. The Aggrieved Person requested a desk audit and she believes there is some inconsistent and discrepancies in the distribution of grades and work duties in her organization. |
| 06/13/2006 | PRE: Remedies requested | Gail Rollins | Remedies: 1) Promotion to GS-15, with 3 years retroactive pay 2) Letter stating she has been working at a GS-15 for the past 3 years 3) Transfer to another agency 4) $300,000 for discrimination damages |
| 06/13/2006 | PRE:Initial Contact | Gail Rollins | Autogenerated |
| 06/14/2006 | PRE:Interview with Respondent(s) | Phyllis Seaward | I met with the Aggrieved Person to clarify the bases, issues, and remedies. Issued the R&R memo and completed EEO counselor's checklist. |
| 06/14/2006 | PRE: Notes | Phyllis Seaward | I schedule a meeting on Tony Fazio's calendar on 6/21/06 - at 1:00 p.m. to conduct the limited inquiry. |
| 08/15/2006 | PRE:Final Interview | Phyllis Seaward | |
| 08/15/2006 | PRE: Notified RMO/POC of unresolved discrimination | Phyllis Seaward | |

**Event Type: Informal ADR**

| Start | Activity | Created By | Claim | Comment |
|---|---|---|---|---|
| 06/13/2006 | PRE:Informal ADR Offered | Gail Rollins | | |
| 06/14/2006 | PRE:Rejected By Complainant | Phyllis Seaward | | |
| 07/25/2006 | PRE:ADR Accepted | Phyllis Seaward | | Management agreed after complainant rejected resulting in change of mind by complainant from her previous decision to reject mediation. |
| 08/04/2006 | PRE:Schedule mediation | Phyllis Seaward | | Mediation begins on August 4, 2006 but ends early due to parties belief that Tony Fazio should be participating. |
| 08/08/2006 | PRE:Mediation rescheduled | Phyllis Seaward | | Mediation rescheduled for August 14, 2006 to include Tony Fazio. |
| 08/14/2006 | PRE:Informal ADR/Mediation Ended | Keith Gilmore1 | | |
| 08/14/2006 | PRE:ADR Failed | Keith Gilmore1 | | |

**Event Type: Informal Closure**

| Start | Activity | Created | Claim | Comment |
|---|---|---|---|---|

| | | By | |
|---|---|---|---|
| 08/15/2006 | PRE:Right to File Memo Issued | Phyllis Seaward | |

# ATTACHMENT #1

## EEO COUNSELOR CHECKLIST

*(signature)* Tichne Slaughter                    6/13/16

(Aggrieved)                                        (Date)

At the initial counseling session, counselors must advise individuals in writing of their rights and responsibilities. At a minimum those rights include the following: (check items discussed)

1. _____ The right to *anonymity* in the counseling phase of the complaint process unless waived.

2. _____ The right to *representation* throughout the complaint process including the counseling stage.

3. _____ The right to choose between the agency's *Alternative Dispute Resolution (ADR)* process or traditional EEO counseling and information about each procedure. The Federal Aviation Administration uses *Mediation* as its ADR process.

4. _____ The possible election requirement between a *negotiated grievance procedure* and the EEO complaint procedure.

   Where an agency is covered by 5 USC § 7121(d)[1] and where the negotiated procedure and the statute[2] cover the alleged discrimination, the aggrieved individual would be required to elect either

   1) The statutory procedure for discrimination (the internal agency EEO process) or
   2) The negotiated grievance procedure, but not both.

   This election is not made until the Aggrieved decides to file a formal complaint.

5. _____ The right to elect to proceed through the EEO complaint process with a *mixed case complaint* or to file an appeal to the *Merit Systems Protection Board (MSPB)*. Claims of discrimination that has to do with demotion, removal, suspension for more than 14 days, furlough for more than 30 days, or separation through reduction-in-force can be appealed to the MSPB. Participation in the EEO informal counseling is not considered an election. Filing a formal EEO complaint constitutes an election.

6. _____ The right to receive EEO counseling and, when accepted by the Departmental Office of Civil Rights (DOCR), an investigation into *complaints based on sexual orientation*. However since this right derives from Department of Transportation policy as opposed to law, there is no right to a hearing before EEOC. Complaints based on sexual orientation will receive a final agency decision (FAD).

---

[1] U.S. Postal Service, the Postal Rate Commission, and the Tennessee Valley Authority are among the few agencies not covered.

[2] The following statutes, collectively, protect on the bases of race, color, sex, religion, national origin, handicap, and age: Title VII of the Civil Rights Act of 1964, as amended, 42 USC § 2000e-16; Sections 501 and 505 of the Rehabilitation Act of 1973, as amended, 29 USC §§ 791 and 794a; and Section 15 of the Age Discrimination in Employment Act of 1967, as amended, 29 USC § 633a, The Equal Pay Act of 1963, 29 USC 206(d).

CR-4
Revised 07/00

Motions for reconsideration of the dismissal of a complaint or of the findings in a FAD may be filed with the Director, DOCR. Compensatory damages are not available for complaints of discrimination based on sexual orientation.

7. _____ The requirement that the aggrieved person *file a complaint within 15 calendar days* of receipt of the counselor's notice of final interview and right to file a formal complaint in the event (s)he wishes to file a formal complaint at the conclusion of counseling.

8. _____ The right to file a *notice of intent to sue when age is alleged as a basis for discrimination* and of the right to file a lawsuit under the ADEA instead of an administrative complaint of age discrimination, pursuant to section 1614.201(a).

9. _____ The right to *go directly to U.S. district court on claims of sex-based wage discrimination* under the Equal Pay Act even though such claims are also cognizable under Title VII,[3] and in connection with the Equal Pay Act claim advise of the availability of liquidated damages for a willful violation.

10. _____ The right to a *hearing before an EEOC AJ after 180 days* or after completion of the investigation, whichever comes first. (except for complaints based on sexual orientation).

11. _____ The right to *go to U.S. district court 180 days* after filing a formal complaint or 180 days after filing an appeal. (except for complaints based on sexual orientation).

12. _____ The *duty to mitigate damages*, e.g., that interim earnings or amounts which could be earned by the individual with reasonable diligence generally must be deducted from an award of back pay.

13. _____ The duty to *keep the agency and EEOC informed of current mailing address* and to serve copies of the appeal papers on the agency.

14. _____ The *right to receive* in writing within 30 calendar days of the first counseling contact (unless the time period is extended by complainant's prior written consent) *a notice terminating counseling* and informing the aggrieved of
1) the right to file a formal complaint within 15 calendar days of receipt of the notice,
2) the appropriate official with whom to file a formal complaint, and
3) the complainant's duty to immediately inform the agency if the complainant retains counsel or a representative.

Any extension of time for counseling may not exceed an additional 60 days. Where notice is not provided and no extension is secured, the complainant has the right to file a formal complaint after the 30th day. Exception: Where complainant agrees to participate in an established alternative dispute resolution program, the written notice terminating the counseling period will

---

[3] Sex-based claims of wage discrimination may also be raised under Title VII; individuals so aggrieved may thus claim violations of both statutes simultaneously. Equal Pay Act complaints may be processed under Part 1614. In the alternative, a complainant may go directly to U.S. District Court.

CR-4
Revised 07/00

be issued upon completion of the dispute resolution process or within 90 days of the first contact whichever is earlier.

15. _____ Only claims raised at the counseling stage or claims like or related to those that were raised at the counseling stage, may be the *subject of a formal complaint .and how to amend a complaint after it has been filed.  The right to know how to amend a complaint after it has been filed.*

16. _____ The *time frames* in the complaint process.

17 _____ The *class complaint procedures* and the responsibilities of a class agent where  class allegations are raised.

18. _____ Allegations of sexual harassment; misconduct of a sexual nature or  related reprisal; incidents of verbal, written, graphic or physical harassment ; or other misconduct that creates or may create an intimidating, hostile or offensive work environment  will be reported to the FAA Accountability Board. The Board will review the allegations to determine an appropriate management response.  Reports to the Board will conceal the identity of aggrieved individuals who wish to remain anonymous.

P .4
Revised 07/00

# ATTACHMENT #2

For needed additional information, please contact the Civil Rights office. You may also visit our EEO site on the World Wide Web at http://www.faa.gov/acr/EEO.htm. The site has answers to frequently asked questions on the EEO process, lists of EEO counselors, electronic copies of regulations and policies, and links to other sites of interest such as EEOC's home page.

EEOC's Management Directive (MD-110) is on-line at: http://www.eeoc.gov/federal/md110.html
Title 29 CFR Part 1614 is on-line at: http://www.eeoc.gov/federal/1614-final.html.

**It is recommended that you retain this letter for future reference.**

_____     6/14/06
EEO Counselor (Signature)

I, _____ Nadine Slaughter _____ (Aggrieved
Person's name),

acknowledge receipt of this letter and its attachments.

_____ June 14, 2006 _____     (Signature) _Nadine Slaughter_
(Date).

Attachments

1. EQUAL EMPLOYMENT OPPORTUNITY STATUTES AND REGULATIONS
2. EQUAL EMPLOYMENT OPPORTUNITY BASES
3. EEOC REVISED FINAL RULE ON PART 1614 REGULATION – Time Frames
4. EEO SPECIAL PROCEDURES AND ELECTION RIGHTS
5. PROCEDURES FOR COMPLAINTS OF DISCRIMINATION BASED ON SEXUAL ORIENTATION
6. EQUAL EMPLOYMENT OPPORTUNITY CLASS COMPLAINT PROCEDURES
7. FAA ACCOUNTABILITY BOARD, FAA Order 1110.125A, Appendix 1
8. FAA EEO MEDIATION PROGRAM

Page 3
Revised 07-00



U.S. Department
of Transportation
Federal Aviation
Administration

# Memorandum

| | |
|---|---|
| Subject | **INFORMATION:** Aggrieved Person's Rights and Responsibilities in the EEO Complaint Process |
| From | EEO Counselor |

Date 6/14/06

Reply to
Attn Of

To: Aggrieved Person / *Judith Slaughter AFM*

This notice advises you of your rights and responsibilities as an aggrieved person under 29 Code of Federal Regulation (CFR) 1614, Federal Sector Equal Employment Opportunity; Equal Employment Opportunity Commission (EEOC) Management Directive (MD) 110, Federal Sector Complaint Processing Manual; and the Department of Transportation, Departmental Office of Civil Rights (DOCR) Investigation Procedures Manual. PLEASE READ THIS NOTICE CAREFULLY SO THAT YOU MAY FULLY UNDERSTAND YOUR RIGHTS AND RESPONSIBILITIES. Should you have any questions or difficulty in clearly understanding this information, please contact the Office of Civil Rights for further assistance.

a) You have the right to remain **anonymous** during EEO counseling unless you waive that right. The right to remain anonymous ends when you file a formal EEO complaint.

b) You have the right to representation throughout the EEO complaint process including the counseling stage. EEO Counselors may not act as representatives. EEO counselors are not advocates for either the aggrieved person or the agency but act strictly as a neutral in the EEO process.

c) You have the right to request traditional EEO counseling or an **Alternative Dispute Resolution (ADR)** process. The FAA uses Mediation as our ADR process. More detailed information about the FAA EEO Mediation Program is provided in Attachment 8.

d) If you are a member of a bargaining unit, you may elect between the EEO complaint procedure and a **negotiated grievance procedure (NGP)** if the NGP permits claims of discrimination to be raised. Filing a formal EEO complaint constitutes an election. Participation in the pre-complaint counseling is not considered an election.

e) For permanent status employees who have completed their probationary period and, in general, the claim of discrimination has to do with demotion, removal, suspension for more than 14 days, furlough for more than 30 days, or separation through reduction-in-force, you have the right to elect to proceed through the EEO complaint process with a **mixed case complaint** or to file an appeal to the Merit Systems Protection Board (MSPB). Participation in EEO informal counseling is not considered an election. Filing a formal EEO complaint constitutes an election. Additional information on filing an appeal with MSPB is available at: http://WWW.MSPB.GOV/foia/foia.info.html.

CR 3
Revised 02/05

(f) If your claims are not resolved through EEO counseling or EEO mediation and you wish to pursue the matter, you must file a formal EEO complaint within 15 calendar days of receipt of the counselor's notice of final interview and right to file a formal complaint.

g) You have the right to file a notice of intent to sue when age is alleged as a basis for discrimination and the right to file a lawsuit under the Age Discrimination in Employment Act (ADEA) instead of filing a complaint of age discrimination in the EEO process.

h) You have the right to go directly to a court of competent jurisdiction on claims of sex-based wage discrimination under the **Equal Pay Act (EPA)** even though such claims are also cognizable under Title VII of the Civil Rights Act. Individuals so aggrieved may thus claim violations of both statutes simultaneously. Equal Pay Act complaints may be processed administratively through the EEO complaint process or go directly to a court of competent jurisdiction.

i) You have the right to request **a hearing before an EEOC Administrative Judge** except in a mixed case after 180 calendar days from the filing of a formal complaint or after completion of the investigation, whichever comes first.

j) You have the right to request a **final agency decision** after an investigation by the agency.

k) You have the right to go to **U.S. District Court** 180 calendar days after filing a formal complaint or 180 days after filing an appeal.

l) You have a duty to **mitigate damages**, e.g., interim earnings or amounts that could be earned by the individual with reasonable diligence generally must be deducted from an award of back pay.

m) You have a duty to keep the agency and EEOC informed of your **current mailing address** and to serve copies of appeal papers on the Secretary of Transportation at the following address:

Original:

Secretary of Transportation
U. S. Department of Transportation
Departmental Office of Civil Rights, S-30
400 7th Street SW
Washington, DC 20590

Copy:

Federal Aviation Administration
Office of the Chief Counsel
General Legal Services, AGC 100
800 Independence Ave SW
Washington, DC 20591

It is your duty to pick up certified mail or any other correspondence sent to you by FAA, DOCR, or EEOC. If you fail to notify us of a new mailing address or fail to pick up certified mail, your case may be dismissed for failure to cooperate.

n) When EEO counseling is selected, you have the right to receive, in writing, within 30 calendar days of the first counseling contact (unless you agree in writing to an extension), **a notice terminating counseling** and informing you of:

(1) The right to file a **formal individual or class complaint within 15 calendar days** of receipt of the notice,
(2) The appropriate official with whom to file a formal complaint, and
(3) Your duty to immediately inform the agency if you retain counsel or a representative.

Any extension of the counseling period may not exceed an additional 60 calendar days.

o) If you have not reached an EEO mediation and resolution of all claims is not achieved, the written notice terminating the counseling period will be issued upon completion of the mediation process or within ninety (90) calendar days of the first contact with the EEO counselor, whichever is earlier.

p) Only those claims raised at the counseling stage or claims that are like or related to those that were raised may be the subject of a formal complaint.

q) If your complaint is accepted, DOCR will conduct an EEO investigation into your complaint. At the conclusion of the investigation, a Report of Investigation (ROI) will be forwarded to you with appropriate instructions. PLEASE READ THE ROI THOROUGHLY.

r) The ROI contains personal data and is to be treated in a confidential manner. **You may not show your copy of the ROI, in whole or in part, to a third party except your designated representative.** Violations of privacy safeguards may result in disciplinary action, a fine of up to $5,000, or both (Public Law 93-576).

s) If you have not received a ROI within 180 calendar days of filing your formal EEO complaint, you have the right to request a hearing on your case before an EEOC Administrative Judge. **NOTE:** This right does not apply to complaints of discrimination based on sexual orientation. Claims based on sexual orientation do not have coverage under Title VII of the Civil Rights Act of 1964, as amended. Such claims are limited to the authority of Department of Transportation policy.

t) You will have 30 calendar days to review the ROI. Following your review, you may request a hearing before an EEOC Administrative Judge or an immediate final agency decision (FAD) based on the written record.

u)  A FAD will be issued within 60 calendar days of:

    1.  receiving notice that you requested an immediate decision;
    2.  the end of the 30-day period for requesting a hearing, if the agency has not received a timely request or;
    3.  receiving the findings and conclusions of law of an EEOC Administrative Judge.

v) You may amend an EEO complaint at any time prior to the completion of the EEO investigation. Amendments may provide additional evidence in support of an existing claim or raise a new claim that is like or related to a pending complaint. There is no requirement to seek EEO counseling for amendments. To amend an existing complaint, you must submit a letter to the Departmental Office of Civil Rights (DOCR) that is processing your pending complaint.

w) The Departmental Office of Civil Rights will issue a letter to you accepting or dismissing your complaint. If your formal EEO complaint is dismissed your appeal rights will be provided to you in DOCR's letter of dismissal. The letter will also explain your rights should there be a partial dismissal of your complaint. Appeals are made to:

> Equal Employment Opportunity Commission
> Office of Federal Operations
> Federal Sector Programs
> P.O. Box 19848
> Washington, D.C. 20036

x) Compensatory damages are included in the possible remedies available through the EEO complaint process. Compensatory damages are not available under Age Discrimination in Employment Act, in

CR-3
Revised 07/00

le impact cases, o   compla nts of discrimination based on a   al o    ion.  Punitive
ges are not available in Federal sector EEO complaints

chment 1, *EQUAL EMPLOYMENT OPPORTUNITY STATUTES, REGULATIONS AND POLICIES*, lists the
s and regulations which govern the EEO process.

ttachment 2, *EQUAL EMPLOYMENT OPPORTUNITY BASES*, explains the bases for raising an allegation of discrimination in the EEO process at FAA.

Attachment 3, The time frames applicable to the Equal Employment Opportunity (EEO) process are described in *EEOC REVISED FINAL RULE ON 1614 REGULATIONS - FLOWCHART - (SIMPLIFIED VERSION)*

Attachment 4, Options and election rights for pursuing your complaint are described in *EEO Special Procedures and Election Rights.*  PLEASE READ ABOUT YOUR ELECTION RIGHTS CAREFULLY.  If you have any questions concerning election rights, contact your Civil Rights Office.

Attachment 5, Complaints of discrimination based on sexual orientation is processed in accordance with the DOCR Investigation Procedures Manual as opposed to 29 CFR 1614.  The procedures are described in *PROCEDURES FOR COMPLAINTS OF DISCRIMINATION BASED ON SEXUAL ORIENTATION.*

Attachment 6, *EQUAL EMPLOYMENT OPPORTUNITY CLASS COMPLAINT PROCEDURES*, describes class complaints and the rights & responsibilities of a class agent.

Attachment 7, *FAA ACCOUNTABILITY BOARD*, describes the scope of the Accountability Board responsibility on allegations of sexual harassment and incidents of verbal, written, graphic or physical harassment that creates an intimidating, hostile or offensive work environment.

Attachment 8, *FAA's EEO MEDIATION PROGRAM*, describes the Office of Civil Rights' mediation program to resolve allegations of workplace discrimination and or harassment raised through the EEO complaint process.

CP-3
Revised 07/00

# ATTACHMENT #3

Date. June 12, 2006

Aggrieved:     Judine Slaughter
               6104 Osborn Road
               Cheverly, MD 20785

Management Official:     Tony Fazio
                         800 Independence Ave, Suite 810
                         Washington, DC 2059]

About:  Alleged discrimination against race

Since I was hired in the Office of Rulemaking, I feel Tony Fazio has discriminated against me because of my race. I've listed the areas of alleged discrimination in the following ways:

- I remained a temporary employee for 4 years, while I performed permanent tasks. See #s 3, 4, 5, 7, 8, 9, 12 of Performance Expectation Chart (the Chart)
- I worked side-by-side with my white peers while they received a higher salary for the same tasks.  See #s 1, 2, 3, 4, 8, 9 of the Chart.
- I worked as a team lead with my white peers while they received a higher salary for the same tasks.  See #s 3, 4, 10 of the Chart.
- I have been given the opportunity for promotion, or I have the equivalent or more training, however task was assigned to my white peers.  See #s 4, 5, 7, 12, 13 of the Chart.
- I have performed the tasks as my white peers, and then the job is not available for promotion when I only have the task.   See #s 1, 10 of the Chart.

I feel the alleged discrimination has affected the way my white peers treat me.  Although I may have performed as a backup for a task, they have recommended another white peer to fill in for the task while they were away on leave or a detail.  I receive cash awards, while my peers receive promotions.  I have not been adversely reprimanded because of my performance in my annual evaluations.

How I have been discriminated outside of job performance:

- I've been denied 9 days sick leave to take care of a parent, while my peers were afforded the opportunity to take 3 weeks sick leave to help a parent.



Performance Expectation Chart

| | Judine Slaughter GS-7/9/11 | Nancy Trembley GS-13/14 | Gerri Robinson GS-13 | Joan Allen GS-11/12/13 | Pat Boyd GS-14 | Steven Nichols (contractor)/??? |
|---|---|---|---|---|---|---|
| 1. DOT Automation | RMS[1] & ROCIS 05/03 thru present | RMS 2002 thru 06/03 | n/a | RMS & ROCIS 05/03 thru 06/03 | n/a | n/a |
| 2. Rulemaking[2] | 05/03 thru 05/04 POC 02/05 | n/a | n/a | Always POC never | Always POC never | n/a |
| 3. Web Content[7] | Internet/Intranet 06/01 thru present and Public forum 2003 | Dashboard ??? thru present | 12/00 thru present | n/a | n/a | n/a |
| 4. Web Development | Primary Internet/Intranet 10/03 thru 11/05 - Secondary 11/05 thru present - Sharepoint 2006 | 2002 public online forums | n/a | n/a | n/a | Primary Internet/Intranet 01/03 thur 01/04 Secondary 01/04 thru 11/05 Primary 11/05 thur present[4] |
| 5. Exemptions/ AES[3] | 09/01 thru 05/06 | 05/06 thru present | n/a | n/a | n/a | n/a |
| 6. CyberDocs/DM | 05/04 thru 12/04 | 05/06 thru present | n/a | n/a | n/a | n/a |
| 7. Rulemaking Manual | 03/03 thru 04/04 | 01/02 thru 03/03 04/04 thru present | n/a | n/a | 03/03 thru 04/04 | n/a |
| 8. Federal Register[5] | Certifying Officer 08/02 thru 02/05 | Certifying Officer 02/05 thru present | n/a | FR liaison 05/03 – 06/06 | n/a | n/a |
| 9. ARAC/Steering Committee | 08/01 thru present | ??? thru present | 11/00 thru present | n/a | n/a | n/a |
| 10. Scanning | Team Lead 06/04 thru present COTR 11/04 to 07/05 | n/a | n/a | n/a | n/a | n/a |

| | | | | | | |
|---|---|---|---|---|---|---|
| 11. Plain Language Instructor | 06/04 thru 04/05 | n/a | n/a | n/a | Always | n/a |
| 12. Designation List[6] | Support Staff 02/04 thru 06/06 | n/a | n/a | Team Lead 02/04 thru 06/06 | n/a | n/a |
| 13. IRMIS | Administrator 08/01 – present | Administrator ??? - present | Administrator ??? - present | | | |

[1] NDI contract support -- 2002 thru 05/03; Rhonda Underwood serve as backup -- RMS 06/06
[2] Tim Adams -- POC rulemaking 06/06
[3] Denise Emrick exemption support 10/01 thru 2002
[4] Steve Nichols promoted to full-time government employee -- 06/06
[5] Tim Adams FR -- 02/05 thru present
[6] Caren Waddell Designation List and ROCIS in ARM -- 06/06
[7] All the other AVS Web Content team members are GS-15.

Page 19

## Training

- 2001 – Section 508 Training.
- 2001 – ARM Plain Language Training.
- 2001 – Section 508 Point of Contact Meeting.
- 2001 – Regulatory Course.
- 2001 – Getting Through the Paper Screen
- 2002 – Federal Register liaisons meeting.
- 2002 – Writing for Web training.
- 2002 – Complete Competent Toastmasters Certificate from FAA Speechmasters
- 2003 -- Section 508 Web-Based Internet and Intranet Information and Application Course
- 2003 -- History and Application of Section 508
- 2003 -- Document Management and Automation for the Federal Enterprise Training
- 2003 -- Writing Letters That Work
- 2003 – RMS training.
- 2003 – Complete TWO Mentor program
- 2003 -- Fast Track to Dreamweaver

- 2003 -- Answering Frequently Asked Questions Training for AVS web team.
- 2004 – Web Based Applications training.
- 2004 – RMS training.
- 2004 – Security Awareness Virtual Initiative Training
- 2004 – Team Building Workshop
- 2004 – Systems Thinking Course
- 2004 -- Document Management and Automation Training
- 2004 – Plain Language Workshop for Web Content Mgrs.
- 2004 – Writing for the Web
- 2004 – Facilitator Workshop
- 2005 – Web Services workshop.
- 2005 -- Document Management and Enterprise Content Management Training
- 2005 – Building Better Work Relationships
- 2005 -- Attend EEO counselors training.
- 2006 -- Document Management and Automation for the Government Enterprise Training
- 2006 – Leadership Skills for Non-supervisors
- 2006 – Developing a Strategic Plan for Your Website

 Judine Slaughter/AWA/FAA
ARM-020, Program Analysis
Staff

06/16/2006 09:12 AM

To  Phyllis Seaward/AWA/FAA@FAA

cc

bcc

Subject  More documentation from Judine Slaughter

Hi Phyllis,

Attached is the long version which documents an unofficial timeline of the EEO complaint.

I would also like to amend my remedies.  This is in the interest that if we negotiate, I have been counseled to ask for more than expected, in hopes to received what I really expected.

**Modified remedies:**
- Promotion to GS-15, with 3 years retroactive pay.
- Letter stating I have been working at a GS-15 for the past 3 years.
- Transfer to another agency.
- $300,00 for discrimination damages.


Judine Slaughters unofficial time line.doc

Judine Slaughter, CTM
Phone:  (202) 493-4698
http://intranet.faa.gov/avr/arm

Judine Slaughter's unofficial time line for discriminatory events**

- June 2000: Judine Slaughter accepted position as full-time temporary Transportation Regulations Assistant, FG-0303-7. Position not to exceed two years; expiration June 2002. Under ARM-1, her performance expectations are:
    - Demonstrate effective administrative skills. This includes, preparing exemption response letters as requested by analysts. She is never given this assignment.
    - Office Files/Administrative Support. This includes, maintaining regulatory archives. She performs this permanent assignment.
    - Automation. This includes placing documents on the web, and acting as ARM webpage liasion. She performs this permanent assignment.
- Jan 2001: Denise Emrick hired as secretary for ARM-100.
- Jan/2001 ~ Jul/2001: Serve as ARM representative on FAA web redesign team.
- Aug/2002 ~ present: Attend AVR Web Team meetings with Joel Wilcox, Steven Nichols, Caprice Brown, Roberta Katson and Gerhardt ???.
- April 2001: Ms. Slaughter received cash award for automation support.
- April 2001: Ms Slaughter's performance expectations are*:
    - Demonstrate effective administrative skills. This includes, preparing exemption response letters as requested by analysts. She is never given this assignment.
    - Office Files/Administrative Support. This includes, maintaining regulatory archives. She performs this permanent assignment.
    - Automation. This includes placing documents on the web, and acting as ARM webpage liasion. She performs this permanent assignment.
- July 2001: Announcement for Program Support Specialist, FG-0301-9, full-time temporary. Position not to exceed 13 months. Ms. Slaughter applied, however she did not qualify.
- July 2001: Attend Section 508 Training.
- July 2001: Attend ARM Plain Language Training.
- August 2001 ~ present: Serve as Freedom of Information Act specialist.
- August 2001 ~ present: Ms Slaughter serves as IRMIS Administrator. Ms Trembley and Gerri Robinson also serve in this role.
- August 2001: Attend Section 508 Point of Contact Meeting.
- Aug 2001: Ms. Slaughter received cash award for assisting with Steering Committee meeting.
- Sept ~ Oct 2001: Announcement for permanent Transportation Regulations Assistant, FG-0303-7, for AVS employees only. Ms. Slaughter unable to qualify because she is a temporary employee.
- Aug ~ Sept 2001: Ms Emrick begins to prepare exemption response letters as requested by analysts.
- Sept 2001: Attend Regulatory Course.
- Sept/2001 ~ 10/2004: Serve as Automated Exemption System (AES) Administrator. This includes working with contractor on AES requirements and any updates. May 2006, Nancy Trembley assigned as AES Administrator.

- Oct 2001: Ms. Emrick accepted full-time permanent position as Transportation Regulations Assistant. One of her performance expectations is:
  - Prepare exemption response letters as requested by analysts. She is given this assignment. This prepares her for a Transportation Regulations Analyst position.
- Oct/2001 ~ present: Serve as ARM rep on AVS web team.
- Dec/2001 ~ Feb 2002: Serve as ARMs CFC Cookbook team lead.
- April 2002: Ms. Slaughter position is reassigned to ARM-20.
- April 2002: Ms. Slaughter prepares IDP, which indicates her short-range goal is to obtain a permanent position. Ms. Florence Hamn signs the IDP.
- May 2002: ARM extended Ms. Slaughter's full time temporary position for three more years; expiration June 2005. A few of her performance expectations are*:
  - Demonstrate effective administrative skills. This includes, preparing exemption response letters as requested by analysts. She is never given this assignment.
  - Office Files/Administrative Support. This includes, maintaining regulatory archives. She performs this permanent assignment.
  - Automation. This includes placing documents on the web, and acting as ARM webpage liasion. She performs this permanent assignment.
- Sept ~ Nov 2002: ARM announced full-time permanent Transportation Regulations Analyst position. Ms Slaughter bids on the announcement, and places on the certification list. Ms Emrick chosen for this position.
- Oct 2002: Attend Federal Register liaisons meeting.
- Oct/2002 ~ Jan/2003: Serve as ARMs CFC Cookbook Project manager.
- Nov 2002: Attend Writing for Web training.
- Nov 2002: Attend ARAC meeting with Tony and Gerri.
- Dec 2002: Ms Slaughter receives her Bachelor's of Science in Organizational Management.
- Jan 2003: Begin TWO mentor program as mentee.
- Jan/2003 ~ Oct/2005: Serve as ARM web developer.
- Jan ~ Feb 2003: ARM announced full-time permanent Transportation Regulations Analyst position. Ms Slaughter did not bid on this announcement.
- March 2003: Ms Slaughter competed for the temporary full-time Program Support Specialist position, FG-0301-9; position not to exceed 2 years. This position description is similar to her current functions. She asks Florence Hamn, Manager of the Program Analysis staff, why this position is not permanent. Ms Florence replied the duties are permanent, but Ms Slaughter would remain temporary.
- Apr 2003: ARM hires John Chescavage and Tim Adams as full-time permanent Transportation Regulations Analysts.
- April 2003: Ms Slaughter accepted the temporary full-time Program Support Specialist position, FG-0301-9; position not to exceed 2 years. Her performance expectations are*:
  - Regulatory Administrative Support. This includes
    - Demonstrating the ability to write clearly and to organize material so that it is logical and understandable.

- Serving as the ARM liaison to the Department of Transportation's Rulemaking Management System.
  - o Automation issues and the Web
    - Establishes and monitors the official Office of Rulemaking website, registers, history files, and/or records.
    - Serving as ARM web content liaison.
    - Researching for new technology or innovative methods for improving office automation.
  - o Office files
    - Ensures that the office files and archives are properly maintained.
    - Organizes electronic files as requested.
  - o Research and Reports
    - Researches, gathers, assembles, analyzes and consolidates information and response to public inquires.
    - Conducts research in support of staff and managers, and makes appropriate recommendations.
- April 2003: AHR specialist informed ARM of a problem with a previous personnel action.
- April ~ August 2003: Serve on ARAC Clean-up Meeting and Web Usability Team.
- June 2003: Ms. Slaughter requests a permanent position from Tony Fazio. He asks if she "knows how to write?" She replies that she has written a book "Clear Skinned." He remarks that it is formatted nicely, but does not acknowledge her writing skills, although this is one of her performance expectations.
- June 2003: Ms Slaughter attends RMS training.
- June 2003: Ms. Slaughter requests and is granted a part-time position.
- August 2003: ARM hires Caren Waddell, John Linsenmeyer, and Jim Crotty as full-time permanent Transportation Anaysts.
- August 2003: Ida Klepper asks Ms Slaughter to return as full-time, and requests AHR to convert Ms Slaughter's position as permanent.
- Attend Answering Frequently Asked Questions Training for AVS web team.
- Oct 2003 ~ Dec 2005: Scanning project; Members Carolina, Judine, and Sue
- Nov 2003: Nancy Trembley presents IRMIS 3.0.
- Dec/2003 ~ Feb/2004: Ms Slaughter serves as ARM web support for on-line pubic forum. Ms Trembley served as ARM web support for first 2 on-line public forums in 2002.
- Feb 2004: Ms Slaughter's position is converted to full-time permanent. Appointment is subject to completion of 1-year trial period.
- Feb 2004: Attend RMS and 60-day (designation) list meeting with Carolina and Joan. When Joan goes on a detail in June 2006, she recommends Caren Waddell to take over 60-day (designation) list duties.
- March 2004: AHR specialist informed ARM that the April 2003 issue is resolved.
- March 2004: Attend Web Based Applications training.
- March 2004: Attend "Right Now" training for FAA Frequently Asked Questions.
- April 2004: Attend RMS training.
- May/2004 ~ July/2004: Testing for Hummingbirds DM with NDI contractors.

- May 2004: Mr Boyd reviewed the Electronic Records Management Software Applications (RMA) Requirement. This is a document Ms Slaughter edited using plain language techniques. Mr Boyd left a message on my voice mail saying, "His blood pressure started to rise, and he had to stop reading after the second paragraph. It also increased his stress levels." When Ms Slaughter told him she forwarded his voice message to Florence Hamn, he immediately calmed down to say I (Judine) was the only one who was supposed to hear the message. Then he apologized by admitting maybe he was too harsh in his comments. He then gave good advice to improve the document. (I mention this as an example of how my peers felt it was okay to discriminate against me, because they saw Mr Fazio do the same thing.)
- June 2004: Gave Florence Hamn documents supporting grade increase.
- June/2004 ~ Dec/2004: Attend ARM Automation meetings with Carolina, Doug, Todd Keller, and Nancy Trembley. These include RMS/IRMIS connectivity.
- June 2004: In a web content meeting, Joel Wilcox casually joked "Judine, you slut," When we talked about how the customers reply back with my name in their email from the Frequently Asked Questions. She did not say anything during the meeting, because she really didn't know what to say. Ms Slaughter was hoping noone else heard it. She went to talk to Joel, at his desk, about what he said. He told me that it was "in jest" and he didn't think of me that way. He called me at the office on his cell phone to reference the incidence to Saturday Night Live with Dan Akrod and Jane Curtain where Dan says "Jane, you slut." This reminded him of how Judine and Jane both start with a J. Ms Slaughter knows Roberta Katson heard the remark, because she talked to her about it also. (I mention this as an example of how my peers felt it was okay to discriminate against me, because they saw Mr Fazio do the same thing.)
- July 2004: Ms Slaughter's performance expectations are*:
  - Facilitation/Communication (Core objectives for office)
  - Writing (Core objectives for office)
  - Program Management (Core objectives for office)
  - Individual expectations
    - Revise and issue ARMs Rulemaking Handbook by March 04.
    - Update DOTs Rulemaking Management System (RMS) monthly.
    - Serve as ARMs Web Content manager on a daily basis.
    - Respond to Broad Daylight generated questions within five days.
    - Provide administrative support to the scan to electronic media project by Sept 04.
    - Serve as the AFSCME Representative for the AVR Helpdesk Committee through Dec 03.
- August 2004: Ms Hamn made me aware of a Management and Program Analyst, GS-11 job announcement within the Office of Rulemaking, because this position was similar to my tasks. Ms Slaughter asked why it did not have a ladder. She gave no response. Ms Slaughter applied and was converted in October 2004. The HR specialist said it had been approved one month ago; she didn't know what took them so long to give the documents to her. Ms Hamn then accepted a job outside the agency. My SF50 has the title of Program Analyst. Ms Slaughter asked Ms.

Trembley, my acting manager the in Nov 2004, why the Management part of the title was truncated. This issue was never resolved.

- Oct 2004: Attend ISO Committee Manual meeting.
- Oct 2004: Attend Aerospace Safety Information Management Mtg with Tony Fazio, Patrick Murphy, Janice Duskin, Nancy Trembley, Fred Sapp, and Allen ??? (I represent RMS contact.)
- Oct 2004: Trained 4 secretaries on AES.
- Nov 2004: Ms Slaughter talks to Mr Fazio about AVS Web Lead, Randy Carter, giving her development duties to the contractor. At this time, ARM would be the only office in AVS without a web developer. As a result, Ms Slaughter suggests giving her web duties to Pat Boyd, since he is a GS-14, which will be similar to the other web team member's salary. Mr. Fazio thanks Ms Slaughter for performing the "menial work" in the office, and says the conversation is really about salary. Ms Slaughter told him she did not visit for that purpose, but let's discuss it. He says, he considers the web content mgr position administrative. And he again asks me, "Do you know how to write?" Ms Slaughter explained that she worked with Mr Boyd to revise the Rulemaking Manual. The contractor begins to perform the development work, and he is promoted to a full-time permanent government employee in June 2006.
- Dec 2004: Ms Slaughter nominates herself for an award because of the work she had done with the Electronic Document Requirements. Annetta Cheek cannot give me an award, but suggests she become a Plain Language Instructor.
- Dec 2004: Ms Trembley gives Ms Slaughter a new assignment to write a final rule. Ms Slaughter exclaims, "Write the rule?" This is because the ARM analysts generally edit the content; the Office of Primary Responsibility writes the rules. When Ms Slaughter stops by to say hello to Mr. Fazio, he asks if she got her new writing task. The rule is published in Feb 2005 with Ms Slaughter as the Point of Contact. Ms Slaughter is never given any recognition, as this is the first time an analyst in ARM is listed as the POC. This is also her first rule.
- Feb 2005: Attend Web Services workshop.
- Feb 2005: Attend ARM/AGC/APO meeting for ARM staff analysts.
- April 2005: Attend EEO counselors training.
- May 2005: Performance evaluation with Mr Fazio and Eve Adams. Ms Trembley was unofficially the acting manager from October 2004 thru April 2005.
- Oct 2005: Ms Slaughter's end of year performance evaluation with Ms Adams. Ms Slaughter requests a promotion. Ms Adams tells her she has to wait until next year. Ms Slaughter requests a desk audit. Ms Adams signs Ms Slaughter's evaluation that she is comfortable with the level of work that Ms Slaughter performs is at a GS-11.
- Jan 2006: Agnes Brooks gives the desk audit. The audit returns that Ms Slaughter is a high GS-11.
- Mar 2006: Mr Boyd recommends Ms Slaughter to take his place on the ARM Template team, because she has worked with him on the templates and the rulemaking manual. (Ms Slaughter gives kudos to Mr Boyd for this action.)
- April 2006: Ms Slaughter develops and implements the eAmendments Sharepoint Site. This site is of tremendous value to the AVS community because it has the rule preambles in electronic format, which were only available in hardcopy. This site has

been instrumental for Hop Potter and others, because they can readily access the background of previous rule amendments. I presented the site to AFS-200 and the at an ARM All Hands meeting.

- May 2006: Ms Trembley announces at a staff meeting that she will be taking care of AES, because there were so many mistakes. Then in June 2006 in a staff meeting, she mentions that she is working with AES, and there are so many mistakes in IRMIS.
- May 2006: Noreen Hannigan, who mentored Ms Slaughter on the first rule, gives a good report to Ms Adams a good report on Ms Slaughter's performance.
- May 2006: Joan Allen mentions in a staff meeting that she is going on detail, and Caren Waddell will take over her designation list duties.
- June 2006: Ms Slaughter learns that Tim Adams is the POC on a new rule. Ms Slaughter feels as if management will use this opportunity for Mr Adams so he can get a promotion to a GS-13.
- June 15, 2006: Mr Fazio is aware of the EEO complaint. Ms Slaughter had scheduled a web meeting to discuss ARAC web documents. After Mr Fazio met with Ms Adams about the EEO complaint, he cancelled the web meeting. Ms Slaughter feels Mr Fazio is angry about the EEO compliant. Ms Slaughter wants Mr Fazio to know that the EEO compliant is strictly business – nothing personal.

*Performance Evaluations are available upon request.

**My Daytimer notes are available upon request.

 Judine Slaughter/AWA/FAA
ARM-020, Program Analysis
Staff

06/19/2006 05:19 PM

To    Phyllis Seaward/AWA/FAA@FAA
cc
bcc
Subject   ARM announcement

Hi Phyllis,

In my long and short version, I mentioned the designation list duties were given to Caren Waddell (GS-13).
She has never performed those duties.

I would also like to mention when Bonnie Fritts was the Federal Register liaison, I was her backup.
Then when Joan Allen took over those duties, I became the last on the list, below John Chescavage and Caren Waddell. Then ARM took replaced me with Nancy Trembley.

Caren Waddell is now the Federal Register liaison while Joan Allen is on detail. She is pregnant with her second child, and I feel as if ARM has given her the additional duties to promote her to a GS-14.

There is a job announcement for a Transportation Regulations Analyst, which posted today.
http://jobs.faa.gov/announcement_detail.asp?vac_id=87103.

It's funny this announcement is for GS-13/14, when at the last All Hands meeting, Tony stated ARM was looking to hire a GS-9.

Something else I did not mention before is that Nancy Trembley is half Italian, Caren is Italian and Nick Sabatini is Italian.
I feel as if Tony, who is also Italian, is giving job opportunities and promotions to those who are from his ethnic group.

Judine Slaughter, CTM
Phone:  (202) 493-4698
http://intranet.faa.gov/avr/arm

| DEPARTMENT OF TRANSPORTATION | COMPLAINT OF DISCRIMINATION IN THE FEDERAL GOVERNMENT *(Privacy Act Statement attached)* | (FOR AGENCY USE) |
|---|---|---|

**BECAUSE OF RACE, COLOR, RELIGION, SEX, NATIONAL ORIGIN, AGE, HANDICAP, Reprisal or Sexual Orientation**
*(Please Type or Print)*

| 1.  WHAT IS YOUR (COMPLAINANT'S) FULL NAME<br><br>Judine Eleanor Slaughter | 2.  WHAT IS YOUR TELEPHONE NO.?<br>*(Including Area Code)*<br>301-219-9378 |
|---|---|

| YOUR STREET ADDRESS *(or RD Number of Post Office Box Number)*<br><br>6104 Osborn Road | HOME PHONE<br><br>301-386-4033 |
|---|---|

| YOUR CITY | STATE | ZIP CODE | WORK PHONE |
|---|---|---|---|
| Cheverly | Maryland | 20785 | 202-493-4698 |

| 3.  WHICH FEDERAL OFFICE DO YOU BELIEVE DISCRIMINATED AGAINST YOU? *(Prepare a separate complaint form for each office which you believe discriminated against you)*<br><br>Federal Aviation Administration | 4.  ARE YOU NOW WORKING FOR THE FEDERAL GOVERNMENT?<br><br>___X__ YES *(Answer A, B, and C)*<br><br>_____ NO *(Continue with 5)* |
|---|---|

| a.  NAME OF OFFICE WHICH YOU BELIEVE DISCRIMINATED<br>     AGAINST YOU -- Office of Rulemaking | a.  NAME OF AGENCY WHERE YOU WORK<br><br>Federal Aviation Administration |
|---|---|

| b.  STREET ADDRESS OF OFFICE<br>800 Independence Ave, SW Suite 810 | |
|---|---|

| c.  CITY | STATE | ZIP CODE | c.  CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|
| Washington | DC | 20591 | | | |

| | WHAT IS THE TITLE AND GRADE OF YOUR JOB?<br><br>Program Analyst/ FG-11 |
|---|---|

| 5.  DATE ON WHICH MOST RECENT ALLEGED DISCRIMINATION TOOK PLACE | 6.  CHECK BELOW WHY YOU BELIEVE YOU WERE DISCRIMINATED AGAINST<br>___X__ RACE, IF SO, STATE YOUR RACE -- African American _____<br>_____ COLOR, IF SO STATE YOUR COLOR _____<br>_____ RELIGION, IF SO, STATE YOUR RELIGION _____<br>_____ NATIONAL ORIGIN, IF SO, STATE YOUR NATIONAL ORIGIN_____<br>_____ SEX, IF SO, STATE YOUR SEX _____<br>_____ AGE, IF SO, STATE YOUR AGE _____<br>_____ HANDICAP, IF SO, STATE YOUR HANDICAP _____<br>_____ REPRISAL _____<br>_____ SEXUAL ORIENTATION _____ |
|---|---|
| MONTH     DAY     YEAR<br><br>___05___   __16___   __2006__ | |



7.   EXPLAIN HOW YOU BELIEVE YOU WERE DISCRIMINATED AGAINST (TREATED DIFFERENTLY FROM OTHER EMPLOYEES OR
     APPLICANTS). BECAUSE OF YOUR RACE, COLOR, RELIGION, SEX, NATIONAL ORIGIN, AGE, HANDICAP OR SEXUAL ORIENTATION.
     *(For each allegation, please state to the best of your knowledge, information and belief, what incident occurred
     And when the incident occurred.)  (Continue on reverse of form or add additional sheets.)*

Judine Slaughter (Complainant) alleges Tony Fazio encouraged:

- An assignment or reassignment of tasks to the Complainant's Caucasian peers, when the Complaint had more education and experience.  This denied the Complainant opportunities for promotion, which would match the salary of the Caucasian peers in Office of Rulemaking, Program Analysis Staff (ARM-20), when the Complainant performed the same or similar tasks.

- The Office of Rulemaking (ARM) management team, and the ARM human resources specialist to not acknowledge the Complainant's writing and editing skills/tasks.  This denied the Complainant opportunities for promotion, which would match the salary of the Caucasian peers in ARM-20, who performed the same or similar tasks.

- The ARM-20 manager and other FAA employees to consider the Complainant as subordinate administrative personnel, while the Complainant performed the same or similar tasks as the Caucasian peers.

The Complainant believes she was discriminated against because she is an African American.  The Complainant's current position is a Program Analyst, Federal Grade (FG) 11/Step 2, without a promotional ladder.

## Table of Contents for Incidences

Tab #1 – Rulemaking Management System
Tab #2 – Rulemaking Analyst
Tab #3 – Program Analyst
Tab #4 – Web Content Manager
Tab #5 – Automated Exemption System
Tab #6 – CyberDocs/DM
Tab #7 – Rulemaking Manual
Tab #8 – Plain Language
Tab #9 – Designation List
Tab #10 – Transportation Regulation Analyst
Tab #11 – Federal Register
Tab #12 – Desk Audit
Tab #13 – Other Duties

**Appendices**
A – Education/Training
B – Performance Evaluations
C – Journal Entries
D – ABM Performance Plans

The complainant has not filed a grievance under a negotiated grievance procedure; an appeal to the FAD Tri-Party Panel; or a complaint with the Merit Protection Board on the same claim(s).

| 8. I HAVE DISCUSSED MY COMPLAINT WITH AN EQUAL EMPLOYMENT OPPORTUNITY COUNSELOR<br>_X_ YES ____ NO | a. NAME OF COUNSELOR<br><br>Phyllis Seaward |
|---|---|

**9. WHAT CORRECTIVE ACTION ARE YOU SEEKING?**

- Place the Complainant in the position that she would have occupied absent discrimination or, if justified, a substantially equivalent position. Or pay the full salary for years the Complainant would occupied the position absent the discrimination.

- Commitment that corrective, curative or preventive action will be taken, measures adopted, to ensure that violation of the law similar to Complainant will not recur.

- Payment on a make whole basis for any loss of earnings the Complainant may have suffered as a result of the discrimination.

- Expunction from the agency's records of any adverse material relating to the discriminatory employment practice.

| 10. DATE OF THIS COMPLAINT *(Month, Day, Year)*<br><br>August 28, 2006 | 11. SIGN YOUR (COMPLAINANT'S) NAME HERE<br><br>*Jardine Slaughter* |
|---|---|

(ATTACHMENT TO "COMPLAINT OF DISCRIMINATION IN THE FEDERAL GOVERNMENT" FORM)

## PRIVACY ACT STATEMENT (6 USC 552a)

Authority:  Public Law 92-261

Principle Purpose:  Formal filing of allegation of discrimination because of race, color, religion, sex, handicap, age, national origin, or reprisal.

Routine Uses:  This form and the information on this may be used (a) as a data source for complaint information for production of summary descriptive statistics and analytical studies of complaints processing and resolution efforts and may also be used to respond to requests for information under the Freedom of Information Act, (b) to respond to requests from legitimate outside individuals or agencies (e.g. Members of Congress), the White House, and the Equal Employment Opportunity Commission (EEOC) regarding the status of the complaint or appeal, and (c) to adjudicate complaint or appeal.

Disclosure:  Voluntary, however, failure to complete all appropriate portions of this form may lead to rejection of complaint on the basis of inadequate data on which to determine if complaint is acceptable.



**U.S. Department of
Transportation**

Office of the Secretary
of Transportation

Departmental Office of
Civil Rights

Washington Regional Office
400 Seventh Street., S.W.
Washington, D.C.  20590

**CERTIFIED MAIL/7006 0100 0003 7407 8157
RETURN RECEIPT REQUESTED**

Ms. Judine E. Slaughter
6104 Osborn Road
Cheverly, MD  20785

Ref:  DOT Complaint No. 2006-20595-FAA-02

Dear Ms. Slaughter:

This is in further reference to your complaint filed on August 29, 2006, against the
Department of Transportation, Federal Aviation Administration (FAA).  Complaints
filed against the Department of Transportation are processed in accordance with the
Equal Employment Opportunity Commission (EEOC) regulation, 29 C.F.R. Part
1614, et. seq.

Based on a thorough review of your complaint, the EEO counselor's report, and
related documents, the following claims have been accepted for investigation:

Were you discriminated against based on your **race** (African American) when:

1) you became aware on May 16, 2006 that your duties pertaining to the
   Automation Exemption System were being reassigned to a GS-14
   employee; **and**

2) In April 2006, you received the results of a desk audit which did not
   support an upgrade of your position?

Any request for correction to the claims as stated, must be submitted to this office in
writing within five calendar days of your receipt of this letter.  If you do not respond
within the five-day period, it will be assumed that the claims are correctly stated.
You will be contacted directly by the investigator assigned to investigate your
complaint.



GOVERNMENT
EXHIBIT
3

You also raised the following claim in your complaint:

3) Were you discriminated against based on your **race** (African American) when on June 8, 2006, you became aware that a grade 12 employee served as a point-of-contact for a rule and you performed the duties previously without any recognition?

I contacted you via telephone on November 17, 2006 in an attempt to gain clarity regarding the claims raised in your complaint. During our telephone conversation, you chose to withdraw Claim 3 at this time. Therefore, this matter will not be addressed during the investigation of your complaint.

If you wish to engage in Alternate Dispute Resolution, you may participate in the One DOT Sharing Neutrals Program or FAA's Alternative Dispute Resolution Program by completing the attached form and returning it to this office at the address provided or by fax (202) 493-2064. Participation in this process is voluntary for both parties. Upon receipt of your request to participate in ADR, you will be contacted by a mediation coordinator if management agrees to offer mediation.

If you have additional questions regarding the processing of your complaint, you may contact me at the address provided, by e-mail (tami.wright@dot.gov), by telephone (202) 366-0440, or TTY (202) 366-0663.

Sincerely,

Tami L. Wright
Regional Director

Enclosures:    1) Mediation Request Form
               2) Mediation Pamphlet

cc:    ACR-1
       w/o Enclosures

       AGC-30
       w/o Enclosures





**U.S. Department of Transportation**

Departmental Office of
Civil Rights

Washington Regional Office
400 7th Street, S.W., Room 2104
Washington, DC 20590

Office of the Secretary
Of Transportation

## FINAL AGENCY DECISION REQUEST FORM

Dear Sir/Madam:

I am requesting a final decision by the Department of Transportation in accordance to 29 C.F.R. § 1614.108(g). I hereby certify that either more than 180 days have passed from the date I filed my complaint or I have received a notice from the agency that I have thirty (30) days to elect a hearing or a final agency decision.

My Name: *Judine Slaughter*

Agency: *Federal Aviation Administration*

Name & Address: *800 Independence Ave, Sw, Wash, DC 20591*

Agency No.: **2006-20595-FAA-02**

Signed: *Judine Slaughter*     Date: *April 23, 2007*

GOVERNMENT
EXHIBIT
4





**U.S. Department of**         Departmental Office of       Washington Regional Office
**Transportation**            Civil Rights                 400 7th Street, S.W., Room 2104
                                                           Washington, DC 20590

Office of the Secretary
Of Transportation

<u>**CERTIFIED MAIL/7006 0100 0003 7409 3990**</u>
<u>**RETURN RECEIPT REQUESTED**</u>

March 28, 2007

Ms. Judine E. Slaughter
6104 Osborn Road
Cheverly, MD  20785

Ref:  DOT Complaint No. 2006-20595-FAA-02

Dear Ms. Slaughter:

This is to advise you that the investigation into the above referenced employment
discrimination complaint has been completed. Enclosed is a copy of the report of
investigation (ROI) file for the case. Please read the investigative file thoroughly.

The ROI contains personal data that is to be treated in a confidential manner and the use
is restricted. When not in use, it is to be stored in a locked cabinet or secure area. It must
be disposed of properly. Employees who violate the privacy safeguards may be subject
to disciplinary actions, a fine of up to $5,000.00, or both. {P.L. 93-579, 5 U.S.C.
§ 552(a)(b)}

Pursuant to 29 C.F. R. § 1614, you have the following options at this time:

(1)     Within 30 days of your receipt of this communication, you may request a
        hearing before an Administrative Judge of the Equal Employment
        Opportunity Commission. A 'Request for a Hearing' form is attached. To
        request a hearing, please complete the form and send it to:

                Equal Employment Opportunity Commission
                Washington Field Office
                1801 L Street, N.W., Suite 100
                Washington, D.C.  20507-1002
                Attn:  Hearings Unit

(2)     You may request a final decision by the Department of Transportation.

(3)     You may withdraw your complaint.

You must also send a copy of your request for a hearing to this office at the letterhead address.

Your request for withdrawal or for a final decision by the Department of Transportation must be in writing and submitted within thirty (30) calendar days of your receipt of this communication to:

> Regional Director
> Department of Transportation
> Departmental Office of Civil Rights
> Washington Regional Office
> 400 7th Street, S.W., Room 2104
> Washington, D.C. 20590

You may, of course, engage in settlement efforts at any time during the complaint process.

In the event you fail to act on this communication within the prescribed time limit of thirty (30) calendar days, we will issue a final decision within sixty (60) calendar days from the end of the thirty-day period.

Please contact your Civil Rights Officer or me if you have any questions concerning 29 C.F.R. § 1614.

Sincerely,

Tami L. Wright
Washington Regional Office
Departmental Office of Civil Rights

Enclosures:    1)  Report of Investigation
               2)  Hearing Request Form
               3)  Final Agency Decision Request Form

cc:  ACR-1
     w/Enclosure 1

     AGC-30
     w/o Enclosures

# FINAL AGENCY DECISION
## COMPLAINT DOT 2006-20595-FAA-02

This is the final Departmental decision in the discrimination complaint filed by Ms. Judine E. Slaughter [hereinafter *the Complainant*] against the Federal Aviation Administration (FAA), U.S. Department of Transportation (DOT) [hereinafter *the Agency*].

## I. CLAIMS[1]

Whether the Complainant was discriminated against based on race (African American) when:

    A.    She became aware on May 16, 2006, that her duties pertaining to the Automation Exemption Systems (AES) were being reassigned to a GS-14 employee; and

    B.    In April 2006, she received the results of a desk audit, which did not support an upgrade of her position.

## II. PROCEDURAL BACKGROUND

| | |
|---|---|
| Alleged Discriminatory Action(s) Occurred: | May 16, 2006 and April 2006 |
| Initial Counseling Contact Occurred: | June 13, 2006 |
| Notice of Right to File Issued: | August 15, 2006 |
| Formal Complaint Filed: | August 29, 2006 |
| Formal Complaint Acknowledged: | October 6, 2006 |
| Formal Complaint Accepted: | November 20, 2006 |
| Investigation Conducted: | January 3, 2007 - February 15, 2007 |
| Report of Investigation (ROI)[2] Issued: | March 28, 2007 |
| Complainant Requested Decision: | May 1, 2007 |

---

[1] The Complainant also raised the following claim, which she withdrew prior to the investigation:

Whether she was discriminated against based on race (African-American) when on June 8, 2006, she became aware that a grade 12 employee served as a point-of-contact for a rule, and she had performed the duties previously without any recognition.

(ROI Ex. C1)

[2] ROI = Report of Investigation, Ex(s). = Exhibit(s), p(p). = page(s).



Subject: Slaughter, DOT No. 2005-20595-FAA-02                                2

This decision is being issued pursuant to Title 29, <u>Code of Federal Regulations</u> <u>(C.F.R.)</u>, § 1614.110(b).

## III.    FACTUAL BACKGROUND

At the time the matters at issue arose, the Complainant (African-American) was employed as a Program Analyst, FG-343-11, Program Analysis Staff, Office of Rulemaking, Aviation Safety, FAA, Washington, DC.[3]  (ROI Ex. F-1)

*A.    Reassignment of Duties*

### 1.    *Complainant's Testimony*

The Complainant states that she was previously responsible for inputting information about exemptions into the internal AES.  However, that responsibility was later transferred to the secretaries in the Office of Rulemaking.  The Complainant states that she trained the office secretaries on how to perform the function and remained in the process, addressing problems with entering data.  Also, whenever the customers would have questions or concerns about information posted on the Agency's public website regarding exemption determinations, she would be called on to address those concerns and queries.  (ROI Ex. F-1)

The Complainant states that in November 2004, Florence Hamm, then Manager of the Program Analysis Staff, left the Office of Rulemaking and Nancy Trembley became the Acting Manager.  She contends that once Ms. Trembley became Acting Manager, the secretaries ceased coming to her with problems or concerns, and she no longer received any queries from the general public to address.  The Complainant further contends that Ms. Trembley completely took over the responsibility of assisting the secretaries with their concerns and also addressed all questions or concerns coming from the general public.  She alleges that her race was a factor in Ms. Trembley's ending her involvement with AES and taking over those matters herself because Ms. Trembley did not take over any of the duties of the Caucasian employees, who work on the Program Analysis staff.  (ROI Ex. F-1)

### 2.    *FAA Management's Testimony*

Nancy M. Trembley (Caucasian), Management Analyst, FG-14, Quality Integration and Executive Services, Aviation Safety, testifies that she served as the Acting Manager for the Program Analysis staff from November 2004 to the end of March 2005.  Ms. Trembley denies that she reassigned any of the Complainant's duties while she served as Acting Manager.  She further denies that she assisted the secretaries in inputting data or information about exemptions into the AES system.

---

[3] The Office of Rulemaking handles requests received by members of the general public to be exempted from any of the FAA regulations.

She states that she never received any concerns or queries from the general public regarding FAA exemptions posted on the agency website. (ROI Ex. F-2)

Ms. Trembley explains that in her former position as the Program Analyst for the Office of Rulemaking, she "performed database requirements." The secretaries in the Office of Rulemaking would come to her with issues concerning the actual functioning of the database and how the database could be improved. Ms. Trembley states that she would look into the concerns raised and make recommendations to management on how to improve the functionality of the database. (ROI Ex. F-2)

### 3.    Other Witness Testimony

Francesca P. Stephenson (African-American), Secretary, GS-7, Aircraft and Airport Rules Division, Office of Rulemaking, states that she is one of three secretaries required to input data or information about FAA exemptions into the AES system. Ms. Stephenson states that this function was formerly performed by the Complainant, but it was later transferred to the office secretaries. As the Complainant was already tasked with this function, she was asked to train the secretaries on how to perform the task. Ms. Stephenson states that after their training, the secretaries went to the Complainant with questions or problems they encountered. Ms. Stephenson adds that assisting the secretaries was not part of the Complainant's official duties. (ROI Ex. F-3)

Ms. Stephenson maintains that Ms. Trembley never got involved with the AES system after she became Acting Manager for the Program Analysis staff in November 2004, and she never assisted her [Ms. Stephenson] or the other secretaries in inputting data or information about exemptions into the AES system. She states that the secretaries stopped seeking the Complainant's assistance because they became knowledgeable and proficient in the input function and did not need guidance or assistance. (ROI Ex. F-3)

### B.    Accretion of Duties Promotion

### 1.    Complainant's Testimony

The Complainant states that on October 7, 2005, she requested an accretion of duties promotion to a Grade 13. The Complainant's supervisor made a request to Human Resources to perform a desk audit on the Complainant's position. The Complainant reports that the desk audit was performed and a classification determination was rendered, determining that her position was properly classified at the Grade 11 level, and did not warrant an accretion of duties promotion to a Grade 13. (ROI Ex. F-1)

The Complainant believes that this determination was incorrect and that it was made because of her race. She also believes that the classification determination was

incorrect because she serves on the Aviation Safety Web Committee as the Web
Content Manager for the Office of Rulemaking. She explains that all of her peers on
the Aviation Safety Web Committee are GS-15s because of the duties they perform as
Web Content Managers for their offices. She maintains that the individuals in her
office (both Caucasian), who previously served as the Web Content Managers were of
higher grades, GS-13 and GS-14. (ROI Ex. F-1)

###### 2.    FAA Management's Testimony

Agnes R. Brooks (African-American), Personnel Management Specialist, Personnel
Services Division, Office of Human Resources Management Programs and Policies,
confirms that the Complainant's supervisor requested that a desk audit be performed
on the Complainant's position to determine whether or not the job warranted an
upgrade. (ROI Ex. F-4)

Ms. Brooks states that she conducted the desk audit on December 22, 2005. The
audit centered on evaluating the Complainant's job responsibilities against the
classification standards that pertain to the Complainant's job series. Ms. Brooks
explains that to be a Grade 12, the relevant classification standards require that the
incumbent be an expert and have mastered the application of a full range of methods
for the improvement of complex management processes and systems. Ms. Brooks
states that she interviewed the Complainant and the Complainant's supervisor,
reviewed the Complainant's Official Position Description (OPD) and the relevant
classification standards. She maintains that there was nothing in the Complainant's
OPD or the information the Complainant or her supervisor provided that indicated
that she was an "expert" as required by the classification standards. Rather, the
Complainant's responsibilities fell more under the next highest performance level,
which required that the incumbent have "sufficient knowledge" of website and
database management systems. (ROI Ex. F-4)

Ms. Brooks provides examples of how she graded the Complainant under
classification factors and determined that the Complainant's job position was
properly classified at the Grade 11 level. For example, with respect to Factor 4 of the
classification standards, which deals with complexity of work, the standards require
that the incumbent be responsible for projects and assignments that require analysis
of interrelated issues of effectiveness, efficiency and productivity of substantial
mission oriented programs. In order for the Complainant to meet this highest level,
she would have had to develop detailed plans, goals and objectives for the long-range
implementation and administration of the programs to which she was assigned.
Instead, the Complainant assisted in preparing regulatory documents, ensured that
the timeline regulation information was posted on the Office of Rulemaking's website,
retrieved the historical data on the files, and advised staff members on the status of
the regulatory projects. Ms. Brooks explains that all of these responsibilities were
those of an assistant and not a lead role. Therefore, these duties fell more under the

next highest performance level, which encompasses work that involves the gathering of information, the identification and analysis of issues, and the development of recommendations to resolve substantive problems of effectiveness and efficiencies of work operations in a program setting. Based on the results of the desk audit, it was determined that the Complainant's position was properly classified as a Grade 11 and did not merit a higher grade. (ROI Ex. F-4)

Ms. Brooks unequivocally denies that the Complainant's race was a factor in the desk audit. With respect to the Complainant's claim that she should have been graded higher because she served on the Aviation Safety Web Committee and all of the Web Content Managers on that committee are GS-15s, Ms. Brooks reports that the individuals who served on the committee are not higher-graded because of their involvement with the committee; they are higher-graded employees because of all of their duties. Ms. Brooks notes that she gave the Complainant credit for her service on the Aviation Web Committee where applicable. (ROI Ex. F-4)

### 3. Other Witnesses' Testimony

Caprice A. Brown (African-American), Program Analyst, GS-14, Office of Aerospace Medicine, Aviation Safety, states that she serves on the Aviation Safety Web Committee, and as the Web Content Manager for the Office of Aerospace Medicine. Ms. Brown states that she is a GS-14, not because of her service on the Aviation Safety Web Committee, but because of all of the duties of her position of record. She adds that serving as Web Content Manager is only one of her duties. (ROI Ex. F-5)

Geraldine A. Robinson (Caucasian), Program Analyst, GS-13, states that she served on the Aviation Safety Web Committee during 1999 and 2000. She state states that she was a Grade 13, not because she served as the Web Content Manager, but because of all of the duties of her position of record. (ROI Ex. F-6)

### 4.    Other Evidence

In a December 12, 2005, e-mail to Eve Adams, Ms. Brooks wrote:

> I would like to set up an appointment with you to conduct the desk audit you requested on Thursday, 15 DEC at 10:00 a.m. Please advise if you are available.

(ROI Ex. F-7).

On January 25, 2006, Ms. Brooks issued an Evaluation Statement that summarized the desk audit compiled for the Complainant's Management and Program Analyst position. Ms. Brooks analyzed the position and assigned points to each of nine (9) factors:

Subject: Slaughter, DOT No. 2005-20595-FAA-02                                    6

| | |
|---|---|
| Factor 1, Knowledge Required by the Position | 1250 points |
| Factor 2, Supervisory Controls | 450 points |
| Factor 3, Guidelines | 275 points |
| Factor 4, Complexity | 225 points |
| Factor 5, Scope and Effect | 225 points |
| Factor 6, Personal Contacts, & Factor 7, Purpose of Contacts | 110 points |
| Factor 8, Physical Demands | 5 points |
| Factor 9, Work Environment | 5 points |

Using methodology contained in an Administrative Analysis Grade Evaluation Guide, Ms. Brooks determined that the total points credited amounted to 2555, which is in the FG-11 range of 2355-2750. Therefore, the Complainant's job was properly classified as Management and Program Analyst, FG-343-11. (ROI Exs. F-12 & F-13)

## IV.    DISMISSAL

EEOC regulations, 29 C.F.R. § 1614.107(a)(2), provide that the agency shall dismiss a complaint or portion of a complaint that fails to comply with the applicable time limits contained in 29 C.F.R. § 1614.105; 29 C.F.R. § 1614.105(a)(1) requires that an aggrieved person initiate contact with an EEO Counselor within 45 days of the date of the matter alleged to be discriminatory.

With respect to the Complainant's claim that her duties pertaining to the Automation Exemption System were being reassigned to a GS-14 employee (Nancy M. Trembley), evidence compiled in the investigation reveals that the matters complained of occurred more than 45 days prior to the date the Complainant initiated EEO counseling. A review of the record reflects that Ms. Trembley served as the Acting Manager for the Program Management staff from November 2004 to the end of March 2005. Therefore, any alleged discriminatory acts pertaining to Ms. Trembley, would have been taken prior to March 2005.[4] The record also shows that the Complainant contacted the EEO office regarding the present complaint on June 13, 2006, more than one year after Ms. Trembley's assignment as Acting Manager ended.

With respect to the Complainant's claim that she received a desk audit that did not support an upgrade of her position, in an e-mail to the EEO Counselor, dated June 16, 2006, the Complainant wrote:

> "Attached is the long version which documents an unofficial timeline of the EEO complaint."

(ROI Ex. B-1)

---

[4] *See* ROI Ex. F-2.

Subject: Slaughter, DOT No. 2005-20595-FAA-02                                        7

Attached to the e-mail is a 5-page "unofficial time line for discriminatory events," in which the Complainant lists incidents beginning in June 2000, when she accepted a position as full-time temporary Transportation Regulations Assistant, FG-0303-7. Significantly, the Complainant listed:

> Jan 2006: Agnes Brooks gives the desk audit. The audit returns that Ms. Slaughter is a high GS-11.

(ROI Ex. B-1)

The January 2006 entry in the time-line clearly shows that the Complainant was aware in January 2006 that her position would not be reclassified. The evidence clearly supports a finding that Ms. Brooks completed her report of the desk audit on January 25, 2006.[5] It is reasonable to conclude that the results of the audit would have been communicated to the Complainant soon after that date. Yet, she waited until June 13, 2006, to initiate contact with the EEO office. Moreover, a careful review of the Counselor's report fails to reveal any information as to how the Complainant would not have been made aware of the results of the desk audit until a date that fell within the 45-day time limit for EEO contact.

The Commission has adopted a 'reasonable suspicion' standard (as opposed to a 'supportive facts' standard) to determine when the limitation period is triggered under EEOC Regulations. Ball v. U. S. Postal Service, EEOC Request No. 05880247 (July 6, 1998). Thus, the 45-day limitation period begins to run when a person with reasonably prudent regard for her rights knew or should have known that she was being discriminated against. The limitation period for EEO Counselor contact is triggered by having a "reasonable suspicion" of discrimination; waiting until one has supporting facts or proof of discrimination before initiating a complaint can result in untimely counselor contact.

EEOC regulations also provide for an agency to extend the 45-day time limit when the individual shows that he or she was not otherwise aware of them, that he or she did not know and reasonably should not have known that the discriminatory matter or personnel action occurred, that despite due diligence he or she was prevented by circumstances beyond his or her control from contacting the counselor with the time limit, or for other reasons considered sufficient by the agency. 29 C.F.R. § 1614.105(a)(2). In this case, the Complainant failed to submit any evidence whatsoever that she was unaware of the time limit for EEO contact, and she has offered no evidence that would serve to persuade the agency to extend the time limits for contact with the EEO office.

---

[5] *See* ROI Ex. F-13.

Subject: Slaughter, DOT No. 2005-20595-FAA-02                                                    8

## V.    CONCLUSION[6]

Therefore, It the final decision of the U. S. Department of Transportation to dismiss this complaint in accordance with 29 C.F.R. § 1614.107(a)(2), for untimely EEO counselor contact.

---

[6] Even if this complaint were not time-barred, the Complainant could not establish a *prima facie* case regarding Claim A. Although she is a member of a protected class by virtue of her race, African-American, she failed to show that she was subjected to an adverse employment action. While she alleged that her duties were reassigned to others, the record does not support such a finding; thus, she was not subjected to an adverse action. She also failed to identify similarly situated employees who were treated more favorably under like circumstances. Furthermore, even if she had established a *prima facie* case with respect to this claim, the Agency articulated a legitimate, nondiscriminatory reason for its actions. Ms. Trembley stated, and other witnesses' testimony corroborated, that she did not reassign any of the Complainant's work; she did not assist the secretaries in inputting data or information into the AES system; and she did not receive concerns or queries from the general public. Her involvement with AES was limited to addressing issues concerning the functionality of the database. The secretaries stated that they stopped seeking the Complainant's assistance because they became knowledgeable and proficient in the input function and did not need guidance or assistance. The Complainant did not offer any persuasive evidence to demonstrate that management's decisions were pretextual or otherwise motivated by discriminatory animus.

Similarly, concerning Claim B, the Complainant failed to identify similarly situated employees who were treated more favorably under the same or similar circumstances. The record showed that the higher grade employees, who served on the Aviation Safety Web Committee, were classified at their respective grade levels based on their duties in their positions of record; not because of their service on the Committee. As above, the Agency articulated a legitimate, nondiscriminatory reason for its actions. Based on the results of the desk audit, it was determined that the Complainant's position was properly classified as a Grade 11. Again, the Complainant failed to offer persuasive evidence that this decision was motivated by discriminatory animus. Significantly, we note that the person conducting the desk audit, Ms. Brooks, is of the same race (African-American) as the Complainant. When a responding management official is in the same protected class, any possible inference of discrimination is weakened. McDonald v. Furgeson School District, 711 F.2d 80, at 83 (8th Circuit 1982) *cert. den.* 464 US 961 (1983).

*Fed Ex Tracking*
*8617 7283 4859*

### Complainant Appeal
### DOT Complaint No. 2006-20565-FAA-02

Judine Slaughter
Complainant

Vs.

The Honorable Mary E. Peters
Secretary of Transportation
Defendent

This is an appeal of the final agency decision in the discrimination complaint filed by Ms. Judine E. Slaughter [hereinafter the Complainant] against the Federal Aviation Administration (FAA), U.S. Department of Transportation (DOT) [hereinafter the Agency].

## I.    CLAIMS

Whether the Complainant was discriminated against based on race (African American) when:

    A.  She became aware on May 16, 2006, that her duties pertaining to the Automation Exemption System (AES) were being reassigned to a GS-14 employee; and

    B.  In April 2006, she received the results of a desk audit, which did not support an upgrade of her position.

## II. DISMISSAL

It was the final decision of the Agency to dismiss this complaint in accordance with 29 C.F.R. § 1614.107(a)(2), for untimely EEO counselor contact.

## III. PROCEDURAL BACKGROUND

| | |
|---|---|
| Alleged Discriminatory Action(s) Occurred: | May 16, 2006 and April 2006 |
| Initial Counseling Contact Occurred: | June 13, 2006 |
| Notice of Right to File Issued: | August 15, 2006 |
| Formal Complaint Filed (FCF): | August 29, 2006 |
| Formal Complaint Acknowledged: | October 6, 2006 |
| Formal Complaint Accepted: | November 20, 2006 |
| Investigation Conducted: | January 3, 2007 – February 15, 2007 |
| Report of Investigation (ROI): | March 28, 2007 |
| ROI Received by Complainant: | April 2, 2007 |
| Complainant Requested Decision: | May 1, 2007 |



GOVERNMENT EXHIBIT
6

Subject: Slaughter, DOT No. 2006-20595-FAA-02                                           2

## VI. APPEAL

EEO regulations, 29 C.F.R. § 1614.402(a) provide that a complainant may appeal an agency's final action or dismissal of a complaint, 29 C.F.R. § 1614.401(a), which must be filed within 30 days of receipt of the dismissal, final action or decision.

### A. *Reassignment of Duties*

With respect to the Agency's dismissal for untimely EEO Counselor contact for the reassignment of duties, the Complainant did not learn about the reassignment of the AES duties to Nancy Trembley until May 2005. Ms. Trembley stated in the staff meeting on May 18, 2005, that she needed the AES application installed on her desktop so she correct data entry mistakes. It was at this time the Complainant realized the reassignment of the Phase II IRMIS included the AES duties. Just as the Complainant had assisted one secretary in November 2004 with correcting a mistake in AES to the exemptions for 14 C.F.R. § 121.383(c), it would be reasonable to conclude that the Complainant would also correct any mistakes in AES for the Phase II.

Ms. Trembley is correct when she states she "performed database requirements." This action is evident in the Office of Rulemaking's 2005 Quality Performance Plan, under "Other ARM Initiatives." As the Acting Manager for the Program Analysis Staff, Ms. Trembley assigned herself the performance target -- Implement Phase II IRMIS for exemptions and petitions for rulemaking by Sep 2005. (ROI Ex F-9) The Performance Plan entry did make reference to AES. Ms. Trembley took more than one year before she would be competent enough to write the Phase II requirements, because she had to learn and understand the exemption process with relationship to IRMIS. Ms. Trembley's highest academic level is a high school diploma; she has been employed at the FAA in the administrative field for 75% of her career.

At the time of the reassignment in November 2005, the Complainant was a Program Analyst who had more knowledge, skills and experience with the exemption process in relationship to Phase II. Significantly, the Complainant was a temporary employee for four years prior, before she was converted to a permanent status in February 2005. Although the Complainant performed the same Administrator role for IRMIS, worked with the contractors on the functionality of the AES database, and wrote the AES process for exemptions, the Complainant did not file an EEO complaint, because she feared termination as a reprisal. It is reasonable to conclude the Complainant did not want to hinder the possibility of becoming a permanent employee.

Additionally, the testimonies of Ms. Stephenson and Ms. Trembly are inconsistent with each other. Ms. Stephenson states the secretaries had no reason to come to Ms. Trembley about the actual functioning of the database, because they had stopped seeking assistance when they became knowledgeable and proficient and did not need guidance or assistance. However Ms. Trembley states the secretaries in the Office of Rulemaking would come to

Subject: Slaughter, DOT No. 2006-20595-FAA-02                                    3

her with issues concerning the actual functioning of the database and how the database could be improved.

Significantly, if the secretaries did have concerns with the database, they would have asked the person who trained them on the database, which was the Complainant.    There was no reason for the secretaries to question Ms. Trembley with issues concerning the actual functioning of the database.

Ms. Stephenson maintains in her testimony that Ms. Trembley never assisted her [Ms. Stephenson] or the other secretaries in inputting data or information about exemptions into the AES system. Ms. Stephenson is only qualified to speak for her interactions with Ms. Trembley; Ms. Stephenson does not have the lead secretary task nor was she delegated as the spokesperson for all of the secretaries in the office.    Therefore Ms. Stephenson does not know of all the communications the other secretaries had with Ms. Trembley, which might have included the other secretaries getting assistance from Ms. Trembley on inputting data about exemptions into the AES system.

Ms. Stephenson added in her testimony that assisting the secretaries was not part of the Complainant's official duties.    However if Ms. Stephenson had read the Complainant's personnel description carefully, she would have realized that assisting the secretaries was incorporated in the description of "Other duties as assigned."

Significantly, Ms. Stephenson is the secretary for Ms. Brenda Courtney, Aircraft and Airport Rules Division Manger.  Ms. Courtney and Ms. Trembley have worked together at the FAA as secretaries in the same office more than 30 years ago, have carpooled together for a minimum of 20 years and have maintained a close relationship the entire time. Mr. Anthony Fazio, Office of Rulemaking's Director in November 2004, was aware of Ms. Trembley's relationship with Ms. Courtney when he appointed Ms. Trembley as the Acting Manager of the Program Analysis staff. At the time of Ms. Stephenson's testimony, Ms. Trembley had received a promotion to a GS-15, Office of Quality and Safety, Aviation Safety.  With Ms. Trembley's new position, she continues to work with the Office of Rulemaking management staff.  Ms. Stephenson's testimony may have been bias because of her manager's relationship with Ms. Trembley.

### B. Accretion of Duties

With respect to the Agency's dismissal for untimely EEO Counselor contact for an accretion of duties from the desk audit, the Complainant could not have contacted the EEO contact within 45 days after the January 25, 2006 personnel action, because she was unaware Mr. Fazio had approved the desk audit results.

The evidence clearly supports a finding that Ms. Brooks completed her report of the desk audit on January 25, 2006 (ROI Ex F-13).  It is reasonable to conclude that Ms. Brooks communicated the desk audit results to Ms. Adams, (African-American) GS-15, Manager, Program Analysis Staff, Office of Rulemaking, Aviation Safety, because Ms. Adams requested the audit.  (ROI Ex. F-7) It is also

reasonable to conclude that Ms. Adams communicated the results of the audit to Mr. Fazio, (Caucasian) SES, Director of Office of Rulemaking, Aviation Safety, soon after that date, because Mr. Fazio was the FAA Management Official who would concur with Ms. Brooks if the audit was correct. Upon Mr. Fazio's acceptance of the audit, it would be reasonable to conclude that Ms. Adams communicated the results of the audit to the Complainant.

Additionally, in Ms. Brooks' testimony, she states that she interviewed both the Complainant and the Complainant's supervisor. The Report of Investigation includes Ms. Brooks' documentation from the Complainant's interview (ROI Ex. F-10), and the Complainant's supporting documentation for an accretion of duties (ROI Ex. F-11), which includes a summary from Ms. Adams when she initially had a one-on-one meeting with the Complainant in April 2006. However the Report of Investigation does not include documentation or an affidavit from Mr. Tony Fazio. Ms. Brooks was erroneously interviewed as the FAA Management Official.

It was at the Complainant's mid-year review with Ms. Adams on April 12, 2006, that she [the Complainant] had to ask Ms. Adams about the audit results. Ms. Adams replied that she did not have the completed results. By the end of April 2006, Ms. Adams then communicated the audit results to the Complainant. Mr. Fazio had approximately three months to concur on the accuracy of the audit evaluation, before Ms. Adams communicated the desk audit to the Complainant. Ms. Adams did not have any one-on-one meetings with the Complainant about the desk audit or any other personnel actions from January 25, 2006 until April 12, 2006.

This would not be the first time Mr. Fazio delayed a personnel action for the Complainant. Mr. Fazio signed the Complainant's Official Position Description for a Management and Program Analyst, FG-0343-11, on July 8, 2004. However the Notification of Personnel Action is dated October 17, 2004. Ms. Trembley gave the Complainant the Personnel Action at the end of October 2006. At this time the Complainant was a condition employee. Alfeida Brooks (African-American) member of the National Black Coalition of Federal Aviation Employees, advised the complainant to work like she was "walking on eggshells." The Complainant did not file an EEO complaint, because she feared termination as a reprisal. It is reasonable to conclude the Complainant did not want to hinder the possibility of becoming a permanent employee.

The Web Management Order 1370.93(4) states "The FAA website for the public is our 'face to the world.'" The Complainant attended 14 training courses from 2001 thru 2006 for her role as the Web Content Manager (ROI Ex B-11, Attachment #3) for the Office of Rulemaking, and her duties increased with her knowledge and experience. Thus the Complainant was subjected to adverse employment action, because the desk audit shows she was ineligible for an accretion of duties promotion. The Complainant has articulated evidence that the results of the desk audit was motivated by discriminatory animus. (ROI Ex. B-1, Attachment #3)

In November 2004 the Complainant concluded that her tasks, to include the web content management, were of no value to Mr. Fazio, after he thanked the Complainant for performing the menial work in the office. (ROI Ex B-1)  The Merriam Webster definition of menial is slave or domestic labor.  Although Mr. Fazio considered the Complainant's tasks as menial, he asked Ms. Trembley to assign the Complainant to write a rule.  The Complainant wrote and served as the Point of Contact, which was signed by the FAA's Administrator in the final rule titled "Definition of Commuter Aircraft at Ronald Reagan Washington National Airport" (70 FR 29061)

Comparatively, Joan Allen (Caucasian), Program Analyst, GS-13, Program Analysis Staff, Office of Rulemaking, received a promotion in February 2005 from a GS-12, Transportation Regulations Analyst to a GS-13 for her duty as the Alternate Federal Register Liaison.  (List of duties in ROI Ex. F-11)  Ms. Allen had performed the Alternate Federal Register Liaison task for less than one year when she received her promotion.  Ms. Allen had approximately 1 day of formal training from the Federal Register's staff.  Additionally, out of the 35 rules published by the FAA in FY 2003, Ms. Allen coordinated the publication of one rule.  In FY 2004, out of 43 rules published by the FAA, Ms. Allen coordinated the publication of one rule.  The FAA's Flight Plan does not reference the significance of sending regulatory documents to the Federal Register in a timely fashion, neither were the two rules on the flight plan, which Ms. Allen acted as a regulatory analyst.

Significantly, Ms. Allen is the wife of John Allen, (Caucasian) SES, Deputy Director, Flight Standards Service, Aviation Safety.  The Office of Rulemaking works closely with the Flight Standards Service for exemptions and rulemakings.  As the Alternate Federal Register Liaison, Ms. Allen was in the position to certify original regulatory documents, which might have her husband's signature.

Additionally, the unofficial timeline states:

> June 15, 2006: Mr. Fazio is aware of the EEO complaint.  Ms. Slaughter had scheduled a web meeting to discuss ARAC web documents.  After Mr. Fazio met with Ms. Adams about the EEO complaint, he cancelled the web meeting.

Mr. Fazio would not approve a promotion for Ms. Slaughter's accretion of duties, although her web functions had increased while she performed them from 2001 until the present, and her salary did not come close to matching the salaries of the other web content managers in Aviation Safety.

Additionally, the Complainant shows evidence that she spent 50% of her time on her web duties. (ROI Ex F-10).  The Aviation Safety Web Content Team has been scheduled to met every week for the last 3 ½ year.  This was because the Office of Rulemaking had more than 2000 web pages, which the Complainant needed to review and certify.  Ms.

Subject:  Slaughter, DOT No. 2006-20595-FAA-02                                6

Caprice A. Brown (African-American) Program Analyst, GS-15, Aerospace Medicine, Aviation Safety, Joel Wilcox (Caucasian) Aviation Safety Inspector, Flight Standards Service, Aviation Safety, and Roberta Katson, (Caucasian) Internet Web Content Manager, GS-15, Aircraft Certification Service, Aviation Safety, also had to review and certify more than 2500 web pages. Therefore, it is reasonable to conclude that Ms. Brown, Mr. Wilcox and Ms. Katson also spent at least 50% of their time, if not more, as the Web Content Managers for their offices. Ms. Brown and Mr. Wilcox were initially a GS-14 because of all their other duties on their position of record. Ms. Katson was hired in 2003 with the web duties as her primary position of record.

Additionally, Geraldine A. Robinson (Caucasian) Program Analyst, GS-13, Office of Rulemaking, Aviation Safety, states that she served on the Aviation Safety Web Committee during 1999 and 2000. However the Complainant's web duties were reassigned to Ms. Robinson during Ms. Trembley's tenure as Acting Manager of the Office of Rulemaking's Program Analyst staff. This is evident in the 2005 Quality Performance Plan, under "Other ARM Initiatives." (ROI Ex. F-11) Ms. Robinson was assigned the performance target of "Move from a paper to web-based document management system for the advisory committees." This target is very similar to the performance target tasked to the Complainant on the Office of Rulemaking's Business Plan – FY 2004. (ROI Ex. F-11) The Complainant's performance target was "Update ARM website to reflect ARAC events as they occur." It is reasonable to conclude that the ARAC documents were already being moved from paper to web-based in 2004. However Ms. Robinson's description of the target was more favorable.

## IV.  CONCLUSION

Therefore, the Complainant appeals the Agency's decision to dismiss the complaint in accordance with 29 C.F.R. § 1614.107(a), which states that "prior to a request for a hearing in a case, the agency shall dismiss an entire complaint…" The Complainant should have received the dismissal for both claims before the Report of Investigation was complete, not after the 30 days required to request for a hearing. However, the evidence shows the Complainant did not know and reasonably should not have known that the discriminatory matter or personnel action occurred, and despite due diligence she was prevented by circumstances beyond her control from contacting the counselor with the time limit.

Additionally, 29 C.F.R. §1614.110(b) states that a copy of EEOC form 573 shall be attached to the final action. This form was not attached to the Agency's final action.

Sincerely,

Judine Slaughter
6104 Osborn Road
Cheverly, MD 20785
301-386-4033

# NOTICE OF APPEAL/PETITION
## TO THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
### Office of Federal Operations

1. Appellant's name (Last, First, Middle): [Please Print or Type]

Slaughter, Judine Eleanor

2. Home/mailing address:    Social Security No.: 578 88 1200

6104 Osborn Road, Cheverly, MD 20785

3. Name and address of attorney or other representative, if any:  N/A

4. Appellant's daytime telephone number (incl. area code):

36 202-493-4698

5. Representative's telephone number (if applicable):

N/A

6. Has the appellant filed a formal complaint with his/her agency?

_____ No    ✓ Yes, indicate the Agency's complaint number:  2006-20565-FAA-02

7. Name of the agency being charged with discrimination:

Department of Transportation

8. Location of the duty station or local facility in which the complaint arose:

Federal Aviation Administration, Aviation Safety, Office of Rulemaking

9. Has a FINAL DECISION been issued by the agency, an Arbitrator, FLRA, or MSPB on this complaint?

✓ Yes (Indicate the date the appellant RECEIVED it May 29, 2007, and ATTACH A COPY.)

_____ No

_____ This appeal alleges a breach of a settlement agreement.

10. Has a complaint been filed on this same matter with this Commission, another agency, or through any other administrative or collective bargaining procedure?

✓ No    _____ Yes (Indicate the agency or procedure, complaint/docket number, and attach a copy, if appropriate).

11. Has a civil action (lawsuit) been filed in connection with this complaint?

✓ No    _____ Yes (ATTACH A COPY OF THE CIVIL ACTION FILED)

12. Signature of appellant or appellant's representative

Judine Slaughter

13. Date:

June 22, 2007

**NOTICE:** Before mailing this appeal, be sure to attach a copy of the final decision from which you are appealing, if one has been issued. Any comments or brief in support of the appeal MUST be filed with the Commission AND with the agency within 30 days of the date this appeal filed. Making a knowingly false statement on this form is punishable by law. See 18 USC § 1001. **PRIVACY ACT STATEMENT ON REVERSE SIDE.**

FOR EEOC USE ONLY:    OFO DOCKET NUM

GOVERNMENT EXHIBIT

69

EEOC FORM 573 REV 4-92

# PRIVACY ACT STATEMENT

(This form is covered by the Privacy Act of 1974. Public Law 93-597. Authority for requesting the personal data and the use thereof are given below.)

1.  **FORM NUMBER/TITLE/DATE:** EEOC Form 573, Notice of Appeal/Petition, April 1992.

2.  **AUTHORITY:** 42 U.S.C. §2000e-16.

3.  **PRINCIPAL PURPOSE:** The purpose of this questionnaire is to solicit information to enable the Commission to properly and efficiently adjudicate appeals filed by Federal employees, former Federal employees, and applicants for Federal employment.

4.  **ROUTINE USES:** Information provided on this form will be used by Commission employees to determine: (a) the appropriate agency from which to request relevant files: (b) whether the appeal is timely; (c) whether the Commission has jurisdiction over the issue(s) raised in the appeal, and (d) generally, to assist the Commission in properly processing and deciding appeals. Decisions of the Commission are final administrative decisions, and, as such, are available to the public under the provisions of the Freedom of Information Act. Some information may also be used in depersonalized form as a data base for statistical purposes.

5.  **WHETHER DISCLOSURE IS MANDATORY OR VOLUNTARY AND EFFECT ON INDIVIDUAL FOR NOT PROVIDING INFORMATION:** Since your appeal is a voluntary action, you are not required to provide any personal information in connection with it. However, failure to supply the Commission with the requested information could hinder timely processing of your case, or even result in the rejection or dismissal of your appeal.

Send your appeal to:

The Equal Employment Opportunity Commission
Office of Federal Operations
P.O. Box 19848
Washington, D.C.  20036

*Jennifer*



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Office of Federal Operations**
P. O. Box 19848
Washington, D.C. 20036

2007 SEP 12  PM 12: 46

Judine E. Slaughter,
Complainant,

v.

Mary E. Peters,
Secretary,
Department of Transportation,
Agency.

Appeal No. 0120073050

Agency No. DOT 2006-20595-FAA-02

## DECISION

Complainant filed an appeal with this Commission from the May 25, 2007 agency decision dismissing her complaint pursuant to 29 C.F.R. § 1614.107(a)(2), for failure to contact an EEO Counselor in a timely manner.

In her complaint, complainant alleged that the agency discriminated against her on the basis of race (African-American) when: (1) on May 16, 2006, she became aware that her duties pertaining to the Automation Exemption Systems (AES) were being reassigned to a GS-14 employee; and (2) in April 2006, complainant received the results of a desk audit which did not support an upgrade of her position.[1]

Complainant alleged that in November 2004, Person A became the Acting Manager of the Program Analysis Staff and when she did so, she assumed complainant's responsibilities of assisting secretaries with their concerns, addressing questions from the public, and performing AES duties. The record reveals that Person A served as the Acting Manager until the end of March 2005. The record also reveals that the desk audit was completed in January 2006. The record reveals that complainant initiated contact with an EEO Counselor on June 13, 2006. The record reveals that complainant should have known by the end of March 2005, about the alleged reassignment of her AES duties and that she was aware in January 2006, of the results

---

[1] Complainant withdrew the claim that she was discriminated against when on June 8, 2006, she became aware that a grade level 12 employee served as a point-of-contact for a rule, and she had performed the duties previously without any recognition.

GOVERNMENT EXHIBIT
7

2                                                       0120073050

of the audit.   The Commission finds that complainant's contact of an EEO Counselor was untimely because it occurred beyond the 45-day limitation period.    Complainant has not provided justification sufficient to extend the time limitation period.

Accordingly, the agency's decision dismissing complainant's complaint is AFFIRMED.

## STATEMENT OF RIGHTS - ON APPEAL

### RECONSIDERATION (M0701)

The Commission may, in its discretion, reconsider the decision in this case if the complainant or the agency submits a written request containing arguments or evidence which tend to establish that:

1.    The appellate decision involved a clearly erroneous interpretation of material fact or law; or

2.    The appellate decision will have a substantial impact on the policies, practices, or operations of the agency.

Requests to reconsider, with supporting statement or brief, must be filed with the Office of Federal Operations (OFO) within thirty (30) calendar days of receipt of this decision or within twenty (20) calendar days of receipt of another party's timely request for reconsideration. *See* 29 C.F.R. § 1614.405; Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO MD-110), 9-18 (November 9, 1999).  All requests and arguments must be submitted to the Director, Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box 19848, Washington, D.C. 20036.   In the absence of a legible postmark, the request to reconsider shall be deemed timely filed if it is received by mail within five days of the expiration of the applicable filing period.  *See* 29 C.F.R. § 1614.604.  The request or opposition must also include proof of service on the other party.

Failure to file within the time period will result in dismissal of your request for reconsideration as untimely, unless extenuating circumstances prevented the timely filing of the request.  Any supporting documentation must be submitted with your request for reconsideration.   The Commission will consider requests for reconsideration filed after the deadline only in very limited circumstances. *See* 29 C.F.R. § 1614.604(c).

## COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION (S0900)

You have the right to file a civil action in an appropriate United States District Court **within ninety (90) calendar days** from the date that you receive this decision.    If you file a civil action, you must name as the defendant in the complaint the person who is the official agency head or department head, identifying that person by his or her full name and official title.

3                                          0120073050

Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you work. If you file a request to reconsider and also file a civil action, **filing a civil action will terminate the administrative processing of your complaint.**

## RIGHT TO REQUEST COUNSEL (Z1199)

If you decide to file a civil action, and if you do not have or cannot afford the services of an attorney, you may request that the Court appoint an attorney to represent you and that the Court permit you to file the action without payment of fees, costs, or other security. *See* Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791, 794(c). **The grant or denial of the request is within the sole discretion of the Court.** Filing a request for an attorney does not extend your time in which to file a civil action. Both the request and the civil action must be filed within the time limits as stated in the paragraph above ("Right to File A Civil Action").

FOR THE COMMISSION:


Carlton M. Hadden, Director
Office of Federal Operations


SEP   7 2007
Date

## CERTIFICATE OF MAILING

**For timeliness purposes, the Commission will presume that this decision was received within five (5) calendar days after it was mailed.** I certify that this decision was mailed to the following recipients on the date below:

Judine E. Slaughter
6104 Osborn Rd
Cheverly, MD 20785

Mary Jones, Deputy Director, Civil Rights
Department of Transportation
400 7th St., SW #10215
Washington, DC 20590

SEP  7 2007
_____
Date

_____
Equal Opportunity Assistant



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Office of Federal Operations
P. O. Box 19848
Washington, D.C. 20036

Judine E. Slaughter,
Complainant,

v.

Mary E. Peters,
Secretary,
Department of Transportation,
Agency.

Request No. 0520080029

Appeal No. 0120073050

Agency No. 2006-20595-FAA-02

## DENIAL

Complainant timely requested reconsideration of the decision in *Judine E. Slaughter v. Department of Transportation*, EEOC Appeal No. 0120073050 (September 7, 2007). EEOC Regulations provide that the Commission may, in its discretion, grant a request to reconsider any previous Commission decision where the requesting party demonstrates that: (1) the appellate decision involved a clearly erroneous interpretation of material fact or law; or (2) the appellate decision will have a substantial impact on the policies, practices, or operations of the agency. *See* 29 C.F.R. § 1614.405(b).

After reconsidering the previous decision and the entire record, the Commission finds that the request fails to meet the criteria of 29 C.F.R. § 1614.405(b), and it is the decision of the Commission to deny the request. The decision in EEOC Appeal No. 0120073050 remains the Commission's final decision. There is no further right of administrative appeal on the decision of the Commission on this request.

## COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION (P0900)

This decision of the Commission is final, and there is no further right of administrative appeal from the Commission's decision. You have the right to file a civil action in an appropriate United States District Court **within ninety (90) calendar days** from the date that you receive this decision. If you file a civil action, you must name as the defendant in the complaint the



GOVERNMENT
EXHIBIT

2·                                    0520080029

person who is the official agency head or department head, identifying that person by his or her full name and official title. Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you work.

## RIGHT TO REQUEST COUNSEL (Z1199)

If you decide to file a civil action, and if you do not have or cannot afford the services of an attorney, you may request that the Court appoint an attorney to represent you and that the Court permit you to file the action without payment of fees, costs, or other security. *See* Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791, 794(c). **The grant or denial of the request is within the sole discretion of the Court.** Filing a request for an attorney does not extend your time in which to file a civil action. Both the request and the civil action must be filed within the time limits as stated in the paragraph above ("Right to File a Civil Action").

FOR THE COMMISSION:

*Carlton M. Hadden*

Carlton M. Hadden, Director
Office of Federal Operations

NOV 2  2007

Date

3 ·

0520080029

## CERTIFICATE OF MAILING

**For timeliness purposes, the Commission will presume that this decision was received within five (5) calendar days after it was mailed.** I certify that this decision was mailed to the following recipients on the date below:

Judine E. Slaughter
6104 Osborn Rd
Cheverly, MD  20785

Mary Jones, Deputy Director, Civil Rights
Department of Transportation
400 7th St., SW  #10215
Washington, DC  20590

_____
Date

_____
Equal Opportunity Assistant

## MEMORANDUM OF UNDERSTANDING

## COLLATERAL DUTY EEO COUNSELOR

**PURPOSE:** This Memorandum of Understanding (MOU) describes the responsibilities for the named parties. Its intent is to serve as an agreement for all parties regarding the collateral duty EEO counselor.

**BACKGROUND:** According to FAA's Order 1400.8, 29CFR Part 1614 the Federal Aviation Administration (FAA) is responsible for designating Equal Employment Opportunity (EEO) counselors. Within the FAA, the responsibility has been delegated to the Office of Civil Rights.

The EEO counselor is an essential part of the FAA's internal Equal Employment Opportunity process. The pre-complaint process is separated from the formal complaint process. The counselor's responsibility rests with the pre-complaint process, addressing individual claims and attempting resolution early and at the lowest possible level. In cases involving allegations of personal discrimination because of race, color, religion, sex, age, national origin, physical or mental handicap, reprisal, and sexual orientation for supporting or participating in EEO activity, the aggrieved person may contact the National Intake Unit. The aggrieved will be offered Traditional Counseling or Alternative Dispute Resolution/Mediation Process (ADR). Traditional counseling is conducted by an EEO counselor, which is assigned by the Region/Center Civil Rights Office. The counselor consults with the aggrieved person, and management in an attempt to resolve the complaint. Mediators will conduct ADR.

**OFFICE OF CIVIL RIGHTS RESPONSIBILITIES:** The Office of Civil Rights is designated authority for selecting EEO counselors. Within the FAA, the position is performed along with the employee's regularly assigned duties. The Civil Rights Officer is responsible for providing the collateral duty EEO counselor with supervision and training. Direct supervision is only provided when the counselor performs the duties related to this position. The Civil Rights Officer will ensure that the counselor will receive initial and continuous training. If requested an assessment of the employee's performance as a counselor will be provided to the first line level supervisor and may be factored in during the yearly performance appraisal-rating period.

**COLLATERAL DUTY EEO COUNSELOR RESPONSIBILITIES:** EEO counselors will perform the duties as outlined in the attached position description. Generally, the duties will require an average of 20% of the employees work time to carry out EEO counselor functions. It is essential that counselors are readily available and accessible to an aggrieved.

Training will require 32 hours for initial counselor training and 8 hours of annual refresher training per Title 29 C.F.R. Part 1614 and Equal Employment Opportunity Management Directive (EEO-MD-110). If the training is off site it may require traveling to another location. During the appointment, there will also be periodic training. All travel expenses will be paid by the agency.

The collateral duty EEO counselor shall make necessary arrangements with their first-level supervisor before leaving their normal work assignments when performing their counseling duties. When possible, the counselor should provide their supervisor with time schedules of regular scheduled EEO activities.



**FIRST-LEVEL AND SECOND-LEVEL SUPERVISORS:** The supervisors of collateral duty EEO counselors are expected to provide support and time for their collateral duty EEO counselor to perform his/her assigned counseling duties. The employee will have a performance standard that covers his/her counseling responsibilities. At the end of the rating period, the supervisors may factor in the Civil Rights Officer's input regarding the employee's performance as a counselor.

Counselors should be afforded an opportunity to establish cooperative relationships with local FAA managers through familiarization and introductory on-site visits. This should be accomplished upon initial assignment and thereafter when new managers are assigned to the local area. Counselors are expected to provide counseling services for all employees and managers within the assigned geographic area regardless of service or facility.

Where available, EEO counselors should be provided a discreet designated area to conduct counseling sessions and prepare required documentation and reports. If at all possible, access to the use of a PC with Microsoft Word capabilities, and a fax machine are suggested to aid the counselor in expediting counseling functions.

The supervisor will notify and discuss with the Civil Rights Officer any concerns regarding the activities of the collateral duty counselor.

**REVIEW:** On a yearly basis a new MOU agreement will be reviewed and validated with all signatures by all principal parties. It is the responsibility of parties to document instances where new items or clarifications are required. Those items that are of immediate need or concern should be raised to the Civil Rights Officer. Otherwise, feedback will be given to counselors on an ongoing basis based on review of counselor reports, as well as feedback from the aggrieved and managers involved in the pre-complaint process.

_____
Manager, Civil Rights Staff

_____
Collateral Duty EEO Counselor's Signature

_____
PRINT EEO COUNSELOR'S NAME

_____
First-Level Supervisor's Signature
Title, Division

_____
Second-Level Supervisor's Signature
Title, Division

6/7/05
Date

05/03/05
Date

April 3, 2005
Date

5/4/05
Date

Eve Adams/AWA/FAA                         To   Judine Slaughter/AWA/FAA@FAA
05/25/2006 11:02 AM                       cc

                                          bcc

                                    Subject   Fw: Desk Audit FG-0343-11

*This is the last e-mail exchange I see related to the subject action.  You may wish to follow up
with Agnes by phone at this time on your additional question, Judine.  Her phone number is
X77006.*

Agnes Brooks/AWA/FAA

        Agnes Brooks/AWA/FAA
        02/14/2006 09:44 AM               To   Judine Slaughter/AWA/FAA@FAA
                                          cc   Eve Adams/AWA/FAA@FAA
                                    Subject   Re: Desk Audit FG-0343-11


Ms. Slaughter,

I must apologize for taking so long in replying to your message.  While doing my analysis of your desk
audit I took into consideration all the information that you provided me, which included your rulemaking
and other duties.  However, based on the audit you indicated to me that your primary responsibilities were
IT type duties.  Please call or e-mail me if you have any additional questions.

Vr,
Agnes

Judine Slaughter/AWA/FAA

        Judine Slaughter/AWA/FAA
        ARM-020, Program Analysis
        Staff                            To   Agnes Brooks/AWA/FAA@FAA
        01/26/2006 04:19 PM              cc   Eve Adams/AWA/FAA@FAA
                                    Subject   Desk Audit FG-0343-11


Hi Agnes,

Thank you for you review of my desk audit.  I have read both documents.
Will you do the same kind of review for my rulemaking, plain language and RMS activities?

Moving America safely.  It's what we do.

Judine Slaughter with the Office of Rulemaking
(202) 493-4898


GOVERNMENT
EXHIBIT
10

# EVALUATION STATEMENT

**Current Position:**   Management and Program Analyst, FG-0343-11

**Proposed Position:**

**Incumbent:**   Judine Slaughter

**Location:**   Department of Transportation
Federal Aviation Administration
Associate Administrator for Aviation Safety
Office of Rulemaking
Program Analysis Staff, ARM-20



**Background:** Management has requested a review of this position to determine if an upgrade is warranted. Ms. Slaughter spends the majority of her time establishing and monitoring the official Office of Rulemaking website, registers, history files and records. This includes tracking program activities and advising management on progress of the website. Placing Notice of Proposed Rulemaking, Final Rules, Advisory Committees information, and other documents on the web. Developing and monitoring the Office of Rulemaking's website to ensure that it is in compliance with agency rules, policies, and practices. In a desk audit, conducted December 21, 2005, the incumbent indicated that her current position description needed updating to reflect her more current duties and that the workload has increased significantly in the recent year due to the growing Internet activity. The audit information was verified through discussion with Ms. Slaughter's supervisor, Ms. Eve Adams.

**Title and Series Determination:** This position requires that the incumbent have a comprehensive technical knowledge of web design and programming, as well as knowledge of and skill in records, archival and information management principles, concepts, practices and methods. Knowledge of and skill in records analysis, appraisal and disposition practices. The ability to plan, initiate, and coordinate, and execute records management studies or special projects. The incumbent must keep abreast of the management of electronic records created in an office environment and the application of computer technology to records management. The Administrative Analysis guide provides grade level criteria for non-supervisory staff administrative analytical, planning, and evaluative work, at GS-9 and above. The work covered by the guide is administrative in nature and does not require specialized subject matter knowledge and skills. While such work does not require specialized educational preparation, it does require a high degree of qualitative and/or quantitative analytical skills, the ability to research problems and issues, written and oral communication skills, and the application of mature judgment in problem solving. This position, therefore, is properly allocated to the 343 series, with the authorized title of Management and Program Analyst.

**Grade Determination:**

**Factor 1, Knowledge Required by the Position.**      **FL 1-7**      **1250 points**

Included under Factor Level 1-7 knowledge and skill in applying analytical and evaluative methods and techniques to issues or studies concerning the efficiency and effectiveness of program operations carried out by administrative or professional personnel, or substantive

administrative support functions (i.e., internal activities or functions such as supply, budget, procurement, or personnel which serve to facilitate line or program operations). This level includes knowledge of pertinent laws, regulations, policies and precedents that affect the use of program and related support resources (people, money, or equipment) in the area studied. Projects and studies typically require knowledge of the major issues; program goals and objectives work processes, and administrative operations of the organization. Knowledge required for this position includes ability to lead change and effectively communicate status of a variety of management levels. Ability to work independently, prioritize projects and manage resources. Knowledge of and skill in records, archival and information management principles, concepts, practices and methods (sufficient to advise agencies on their records management programs and management of records in all media throughout their lifecycle). Knowledge and skill in records analysis, appraisal and disposition practices. (Find common file names of both eAmendments and historical project folders.) Knowledge of and skill in the management of electronic records created in an office environment and the application of computer technology to records management. Ability to plan, initiate, coordinate, and execute records management studies or special projects of broad scope and complexity.

This position does not meet Factor Level 1-8, which describes expert analyst work has mastered the application of a wide range of qualitative and/or quantitative methods for the assessment and improvement of program effectiveness or the improvement of complex management processes and systems. In addition to knowledge of the next lower level, this level requires comprehensive knowledge of the range of administrative laws, policies, regulations, and precedents applicable to the administration of one or more important public programs. Typically, this includes knowledge of agency program goals and objectives, the sequences and timing of key program events and milestones, and methods of evaluating the worth of program accomplishments. Work requires knowledge of relationships with other programs and key administrative support functions within the employing agency or in other agencies.

Factor Level 1-7, therefore, is credited. The incumbent must have sufficient knowledge of web site and database management system. Monitors the accuracy and currency, periodically purges, updates, and validates website. Knowledge of posting proposed Rulemaking, Final Rules, Advisory Committee information, and other documents on the web. Knowledge of the theory and principles of management and organization, including the ability to conduct studies and give briefings. Ability to research and analyze based planning, controlling and analysis programs.

**Factor 2, Supervisory Controls.**                    **FL 2-4**        **450 points**

Level 2-4 describes situations where the supervisor outlines overall objectives and available resources. The employee and supervisor develop mutually acceptable project plan, which typically includes identification of the work to be done, the scope of the project, and deadlines for its completion. Within the parameters of the approved project plan, the employee is responsible for planning and organizing the study, estimating costs, coordinating with staff and line management personnel, and conducting all phases of the project. In performing the work, the employee is responsible for the overall monitoring and maintenance of the Office of Rulemaking website, dockets, registers, history files and/or records. Completed projects, evaluations, reports, or recommendations are reviewed by the supervisor for compatibility with organizational goals, guidelines, and effectiveness in achieving intended objectives.

For Level 2-5, the employee is recognized as an authority in the analysis and evaluation of programs and issues, the employee is subject only to administrative and policy direction concerning overall project priorities and objectives. At this level, the employee is typically delegated complete responsibility and authority to plan, schedule, and carry out major projects concerned with the analysis and evaluation of programs or organizational effectiveness. Management officials only for potential influence on broad agency policy objectives and program goals normally review analyses, evaluations, and recommendations developed by the employee. Findings and recommendations are normally accepted without significant change.

As discussed during the audit, and confirmed by her supervisor, Level 2-4 is warranted. The supervisor provides board outlines and the employee is responsible for carrying out the work effort and interpreting policy and procedures on own initiative. Employee is considered to be authoritative and successfully accomplishes work with little or no supervisor intervention day-to-day.

**Factor 3, Guidelines.**                         **FL 3-3**        **275 points**

Factor Level 3-3 describes situations where the employee uses guidelines consist of standard reference material, texts, and manuals covering the application of analytical methods and techniques (statistical, descriptive or evaluative) and instructions and manuals covering the subjects involved (e.g., organizations, equipment, procedures, policies, and regulations). Analytical methods contained in the guidelines are not always directly applicable to specific work assignments. However, precedent studies of similar subjects are available for reference. The employee uses judgment in choosing, interpreting, or adapting available guidelines to specific issues or subjects studies.

Level 3-4 requires the use guidelines consist of general administrative policies and management and organizational theories, which require considerable adaptation and/or interpretation for application to issues and problems studies. At this level, administrative policies and precedents studies provide a basic outline of the results desired, but do not go into detail as to the methods used to accomplish the project.

Level 3-3 is credited for 275 points. Guidelines consist of FAA guidelines for web management, FAA guidelines for certification and the National Archive Record Administration guidelines for requirements in sending hard or soft copy of documents.

**Factor 4, Complexity.**                         **FL 4-4**        **225 points**

Level 4-4 depicts work that involves gathering information, identifying and analyzing issues, and developing recommendations to resolve substantive problems of effectiveness and efficiency of work operations in a program or program support setting. This is in addition to improving conditions of a procedural nature, which relate to the efficiency of organizations. Work at this level requires the application of qualitative and quantitative analytical techniques that frequently require modification to fit a wider range of variables. Subjects and projects assigned at this level usually consist of issues, problems, or concepts that are not always susceptible to direct observation and analysis.

In contrast, Level 4-5 assignments consists of projects and studies which require analysis of interrelated issues of effectiveness, efficiency, and productivity of substantive mission-oriented

programs. Typical assignments require developing detailed plans, goals, and objectives for the long-range implementation and administration of the program, and/or developing criteria for evaluating the effectiveness of the program. Decisions about how to proceed in planning, organizing and conducting studies are complicated by conflicting program goals and objectives, which may derive from changes in legislative or regulatory guidelines, productivity, and/or variations in the demand for program services.

Factor Level 4-4 is credited. The work involved includes assisting analysis in preparing regulatory documents. Incumbent ensures that timely regulation information is available on website. Work typically requires in-depth analysis of systems and websites. Incumbent retrieves historical data from files and advises staff members on the status of regulatory projects.

**Factor 5, Scope and Effect.**                              **FL 5-4**         **225 points**

At Level 5-4, the work is to assess the productivity, effectiveness, and efficiency of program operations or to analyze and resolve problems in the staffing, effectiveness and efficiency of administrative support and staff activities. Work involves establishing criteria to measure and/or predict the attainment of program or organizational goals and objectives. Work at this level may also include developing related administrative regulations, such as those governing the allocation and distribution of personnel, supplies, equipment and other resources, or promulgating program guidance for application across organizational lines or in varied geographical locations. The work contributes to the improvement of productivity, effectiveness, and efficiency in program operations and/or administrative support activities at different echelons and/or geographical locations within the organization.

The purpose of the work described for Level 5-5 is to analyze and evaluate major administrative aspects of substantive, mission-oriented programs. The work involves identifying and developing ways to resolve problems or cope with issues, which directly affect the accomplishment of principal program goals and objectives. Study reports typically contain findings and recommendations of major significance to top management of the agency, and often serve as the basis for new administrative systems, legislation, regulations, or programs.

Level 5-4 best characterizes the work of the incumbent. The work involves solving a variety of problems; formulating studies and establishing complex analyses, contract criteria, cost analysis, and assuring contractor compliance with contract specifications. The work is not characterized as that of a consultant or project coordinator in carrying out one-of-a-kind effort. Accomplishment of the work affects the operations within the Office of Rulemaking.

**Factor 6, Personal Contacts, and**                         **FL 3b**          **110 points**
**Factor 7, Purpose of Contacts.**

Under Level 3b, contacts are with persons outside the agency, which may include consultants, contractors, or business executives in a moderately unstructured setting. The purpose of contacts is to provide advice to managers on non-controversial organization or program related issues and concerns. Contacts typically involve such matters as: identification of decision-making alternatives; appraisals of success in meeting goals; or recommendations for resolving administrative problems.

This level is appropriate for this position. Internal contacts are with the Office of Rulemaking Policy and Planning Office, Legal Office, other organizations within FAA and Office of Secretary of Transportation. External contacts include three contract companies responsible for performing scanning and web tasks.

**Factor 8, Physical Demands.**                    **FL 8-1**          **5 points**

The work is sedentary. Some work may require walking and standing in conjunction with travel and to attendance at meetings and conferences away from the work site. Some light carrying of items such as papers, books, or binders. The work does not require any special physical effort.

**Factor 9, Work Environment.**                    **FL 9-1**          **5 points**

The work area is adequately lighted, heated, and ventilated. The work environment involves everyday risks or discomforts that require normal safety precautions. Special safety precautions are not required.

**Conclusion:** Total points credited amount to 2555, which is in the FG-11 range of 2355-2750. The position is properly classified as **Management and Program Analyst, FG-343-11.**

JOB FAMILY POSITION CLASSIFICATION STANDARD FOR ADMINISTRATIVE ANALYSIS GRADE EVALUATION GUIDE AND MANAGEMENT AND PROGRAM ANALYSIS SERIES, GS-0343, TS-98 AUGUST 1990 was used to evaluate this position.


AGNES R. BROOKS
PERSONNEL MANAGEMENT SPECIALIST
01-25-06

Judine Slaughter's unofficial time line for discriminatory events**

- June 2000: Judine Slaughter accepted position as full-time temporary Transportation Regulations Assistant, FG-0303-7. Position not to exceed two years; expiration June 2002. Under ARM-1, her performance expectations are:
    - o Demonstrate effective administrative skills. This includes, preparing exemption response letters as requested by analysts. She is never given this assignment.
    - o Office Files/Administrative Support. This includes, maintaining regulatory archives. She performs this permanent assignment.
    - o Automation. This includes placing documents on the web, and acting as ARM webpage liasion. She performs this permanent assignment.
- Jan 2001: Denise Emrick hired as secretary for ARM-100.
- Jan/2001 ~ Jul/2001: Serve as ARM representative on FAA web redesign team.
- Aug/2002 ~ present: Attend AVR Web Team meetings with Joel Wilcox, Steven Nichols, Caprice Brown, Roberta Katson and Gerhardt ???.
- April 2001: Ms. Slaughter received cash award for automation support.
- April 2001: Ms Slaughter's performance expectations are*:
    - o Demonstrate effective administrative skills. This includes, preparing exemption response letters as requested by analysts. She is never given this assignment.
    - o Office Files/Administrative Support. This includes, maintaining regulatory archives. She performs this permanent assignment.
    - o Automation. This includes placing documents on the web, and acting as ARM webpage liasion. She performs this permanent assignment.
- July 2001: Announcement for Program Support Specialist, FG-0301-9, full-time temporary. Position not to exceed 13 months. Ms. Slaughter applied, however she did not qualify.
- July 2001: Attend Section 508 Training.
- July 2001: Attend ARM Plain Language Training.
- August 2001 ~ present: Serve as Freedom of Information Act specialist.
- August 2001 ~ present: Ms Slaughter serves as IRMIS Administrator. Ms Trembley and Gerri Robinson also serve in this role.
- August 2001: Attend Section 508 Point of Contact Meeting.
- Aug 2001: Ms. Slaughter received cash award for assisting with Steering Committee meeting.
- Sept ~ Oct 2001: Announcement for permanent Transportation Regulations Assistant, FG-0303-7, for AVS employees only. Ms. Slaughter unable to qualify because she is a temporary employee.
- Aug ~ Sept 2001: Ms Emrick begins to prepare exemption response letters as requested by analysts.
- Sept 2001: Attend Regulatory Course.
- Sept/2001 ~ 10/2004: Serve as Automated Exemption System (AES) Administrator. This includes working with contractor on AES requirements and any updates. May 2006, Nancy Trembley assigned as AES Administrator.



- Oct 2001: Ms. Emrick accepted full-time permanent position as Transportation Regulations Assistant. One of her performance expectations is:
  - Prepare exemption response letters as requested by analysts. She is given this assignment. This prepares her for a Transportation Regulations Analyst position.
- Oct/2001 ~ present: Serve as ARM rep on AVS web team.
- Dec/2001 ~ Feb 2002: Serve as ARMs CFC Cookbook team lead.
- April 2002: Ms. Slaughter position is reassigned to ARM-20.
- April 2002: Ms. Slaughter prepares IDP, which indicates her short-range goal is to obtain a permanent position. Ms. Florence Hamn signs the IDP.
- May 2002: ARM extended Ms. Slaughter's full time temporary position for three more years; expiration June 2005. A few of her performance expectations are*:
  - Demonstrate effective administrative skills. This includes, preparing exemption response letters as requested by analysts. She is never given this assignment.
  - Office Files/Administrative Support. This includes, maintaining regulatory archives. She performs this permanent assignment.
  - Automation. This includes placing documents on the web, and acting as ARM webpage liaison. She performs this permanent assignment.
- Sept ~ Nov 2002: ARM announced full-time permanent Transportation Regulations Analyst position. Ms Slaughter bids on the announcement, and places on the certification list. Ms Emrick chosen for this position.
- Oct 2002: Attend Federal Register liaisons meeting.
- Oct/2002 ~ Jan/2003: Serve as ARMs CFC Cookbook Project manager.
- Nov 2002: Attend Writing for Web training.
- Nov 2002: Attend ARAC meeting with Tony and Gerri.
- Dec 2002: Ms Slaughter receives her Bachelor's of Science in Organizational Management.
- Jan 2003: Begin TWO mentor program as mentee.
- Jan/2003 ~ Oct/2005: Serve as ARM web developer.
- Jan ~ Feb 2003: ARM announced full-time permanent Transportation Regulations Analyst position. Ms Slaughter did not bid on this announcement.
- March 2003: Ms Slaughter competed for the temporary full-time Program Support Specialist position, FG-0301-9; position not to exceed 2 years. This position description is similar to her current functions. She asks Florence Hamn, Manager of the Program Analysis staff, why this position is not permanent. Ms Florence replied the duties are permanent, but Ms Slaughter would remain temporary.
- Apr 2003: ARM hires John Chescavage and Tim Adams as full-time permanent Transportation Regulations Analysts.
- April 2003: Ms Slaughter accepted the temporary full-time Program Support Specialist position, FG-0301-9; position not to exceed 2 years. Her performance expectations are*:
  - Regulatory Administrative Support. This includes
    - Demonstrating the ability to write clearly and to organize material so that it is logical and understandable.

- Serving as the ARM liaison to the Department of Transportation's Rulemaking Management System.
  - o Automation issues and the Web
    - Establishes and monitors the official Office of Rulemaking website, registers, history files, and/or records.
    - Serving as ARM web content liaison.
    - Researching for new technology or innovative methods for improving office automation.
  - o Office files
    - Ensures that the office files and archives are properly maintained.
    - Organizes electronic files as requested.
  - o Research and Reports
    - Researches, gathers, assembles, analyzes and consolidates information and response to public inquires.
    - Conducts research in support of staff and managers, and makes appropriate recommendations.
- April 2003: AHR specialist informed ARM of a problem with a previous personnel action.
- April ~ August 2003: Serve on ARAC Clean-up Meeting and Web Usability Team.
- June 2003: Ms. Slaughter requests a permanent position from Tony Fazio. He asks if she "knows how to write?" She replies that she has written a book "Clear Skinned." He remarks that it is formatted nicely, but does not acknowledge her writing skills, although this is one of her performance expectations.
- June 2003: Ms Slaughter attends RMS training.
- June 2003: Ms. Slaughter requests and is granted a part-time position.
- August 2003: ARM hires Caren Waddell, John Linsenmeyer, and Jim Crotty as full-time permanent Transportation Anaysts.
- August 2003: Ida Klepper asks Ms Slaughter to return as full-time, and requests AHR to convert Ms Slaughter's position as permanent.
- Attend Answering Frequently Asked Questions Training for AVS web team.
- Oct 2003 ~ Dec 2005: Scanning project; Members Carolina, Judine, and Sue
- Nov 2003: Nancy Trembley presents IRMIS 3.0.
- Dec/2003 ~ Feb/2004: Ms Slaughter serves as ARM web support for on-line pubic forum. Ms Trembley served as ARM web support for first 2 on-line public forums in 2002.
- Feb 2004: Ms Slaughter's position is converted to full-time permanent. Appointment is subject to completion of 1-year trial period.
- Feb 2004: Attend RMS and 60-day (designation) list meeting with Carolina and Joan. When Joan goes on a detail in June 2006, she recommends Caren Waddell to take over 60-day (designation) list duties.
- March 2004: AHR specialist informed ARM that the April 2003 issue is resolved.
- March 2004: Attend Web Based Applications training.
- March 2004: Attend "Right Now" training for FAA Frequently Asked Questions.
- April 2004: Attend RMS training.
- May/2004 ~ July/2004: Testing for Hummingbirds DM with NDI contractors.

- May 2004: Mr Boyd reviewed the Electronic Records Management Software Applications (RMA) Requirement. This is a document Ms Slaughter edited using plain language techniques. Mr Boyd left a message on my voice mail saying, "His blood pressure started to rise, and he had to stop reading after the second paragraph. It also increased his stress levels." When Ms Slaughter told him she forwarded his voice message to Florence Hamn, he immediately calmed down to say I (Judine) was the only one who was supposed to hear the message. Then he apologized by admitting maybe he was too harsh in his comments. He then gave good advice to improve the document. (I mention this as an example of how my peers felt it was okay to discriminate against me, because they saw Mr Fazio do the same thing.)
- June 2004: Gave Florence Hamn documents supporting grade increase.
- June/2004 ~ Dec/2004: Attend ARM Automation meetings with Carolina, Doug, Todd Keller, and Nancy Trembley. These include RMS/IRMIS connectivity.
- June 2004: In a web content meeting, Joel Wilcox casually joked "Judine, you slut," When we talked about how the customers reply back with my name in their email from the Frequently Asked Questions. She did not say anything during the meeting, because she really didn't know what to say. Ms Slaughter was hoping noone else heard it. She went to talk to Joel, at his desk, about what he said. He told me that it was "in jest" and he didn't think of me that way. He called me at the office on his cell phone to reference the incidence to Saturday Night Live with Dan Akrod and Jane Curtain where Dan says "Jane, you slut." This reminded him of how Judine and Jane both start with a J. Ms Slaughter knows Roberta Katson heard the remark, because she talked to her about it also. (I mention this as an example of how my peers felt it was okay to discriminate against me, because they saw Mr Fazio do the same thing.)
- July 2004: Ms Slaughter's performance expectations are*:
  - Facilitation/Communication (Core objectives for office)
  - Writing (Core objectives for office)
  - Program Management (Core objectives for office)
  - Individual expectations
    - Revise and issue ARMs Rulemaking Handbook by March 04.
    - Update DOTs Rulemaking Management System (RMS) monthly.
    - Serve as ARMs Web Content manager on a daily basis.
    - Respond to Broad Daylight generated questions within five days.
    - Provide administrative support to the scan to electronic media project by Sept 04.
    - Serve as the AFSCME Representative for the AVR Helpdesk Committee through Dec 03.
- August 2004: Ms Hamn made me aware of a Management and Program Analyst, GS-11 job announcement within the Office of Rulemaking, because this position was similar to my tasks. Ms Slaughter asked why it did not have a ladder. She gave no response. Ms Slaughter applied and was converted in October 2004. The HR specialist said it had been approved one month ago; she didn't know what took them so long to give the documents to her. Ms Hamn then accepted a job outside the agency. My SF50 has the title of Program Analyst. Ms Slaughter asked Ms.

Trembley, my acting manager the in Nov 2004, why the Management part of the title was truncated. This issue was never resolved.

- Oct 2004:  Attend ISO Committee Manual meeting.
- Oct 2004:  Attend Aerospace Safety Information Management Mtg with Tony Fazio, Patrick Murphy, Janice Duskin, Nancy Trembley, Fred Sapp, and Allen ??? (I represent RMS contact.)
- Oct 2004:  Trained 4 secretaries on AES.
- Nov 2004:  Ms Slaughter talks to Mr. Fazio about AVS Web Lead, Randy Carter, giving her development duties to the contractor. At this time, ARM would be the only office in AVS without a web developer.  As a result, Ms Slaughter suggests giving her web duties to Pat Boyd, since he is a GS-14, which will be similar to the other web team member's salary.  Mr. Fazio thanks Ms Slaughter for performing the "menial work" in the office, and says the conversation is really about salary. Ms Slaughter told him she did not visit for that purpose, but let's discuss it.  He says, he considers the web content mgr position administrative.  And he again asks me, "Do you know how to write?"  Ms Slaughter explained that she worked with Mr Boyd to revise the Rulemaking Manual.  The contractor begins to perform the development work, and he is promoted to a full-time permanent government employee in June 2006.
- Dec 2004:  Ms Slaughter nominates herself for an award because of the work she had done with the Electronic Document Requirements.  Annetta Cheek cannot give me an award, but suggests she become a Plain Language Instructor.
- Dec 2004:  Ms Trembley gives Ms Slaughter a new assignment to write a final rule.  Ms Slaughter exclaims, "Write the rule?"  This is because the ARM analysts generally edit the content; the Office of Primary Responsibility writes the rules.  When Ms Slaughter stops by to say hello to Mr. Fazio, he asks if she got her new writing task.  The rule is published in Feb 2005 with Ms Slaughter as the Point of Contact.  Ms Slaughter is never given any recognition, as this is the first time an analyst in ARM is listed as the POC.  This is also her first rule.
- Feb 2005: Attend Web Services workshop.
- Feb 2005: Attend ARM/AGC/APO meeting for ARM staff analysts.
- April 2005: Attend EEO counselors training.
- May 2005:  Performance evaluation with Mr Fazio and Eve Adams.  Ms Trembley was unofficially the acting manager from October 2004 thru April 2005.
- Oct 2005:  Ms Slaughter's end of year performance evaluation with Ms Adams.  Ms Slaughter requests a promotion.  Ms Adams tells her she has to wait until next year.  Ms Slaughter requests a desk audit.  Ms Adams signs Ms Slaughter's evaluation that she is comfortable with the level of work that Ms Slaughter performs is at a GS-11.
- Jan 2006:  Agnes Brooks gives the desk audit.  The audit returns that Ms Slaughter is a high GS-11.
- Mar 2006:  Mr Boyd recommends Ms Slaughter to take his place on the ARM Template team, because she has worked with him on the templates and the rulemaking manual.  (Ms Slaughter gives kudos to Mr Boyd for this action.)
- April 2006:  Ms Slaughter develops and implements the eAmendments Sharepoint Site.  This site is of tremendous value to the AVS community because it has the rule preambles in electronic format, which were only available in hardcopy.  This site has

been instrumental for Hop Potter and others, because they can readily access the background of previous rule amendments. I presented the site to AFS-200 and the at an ARM All Hands meeting.

- May 2006: Ms Trembley announces at a staff meeting that she will be taking care of AES, because there were so many mistakes. Then in June 2006 in a staff meeting, she mentions that she is working with AES, and there are so many mistakes in IRMIS.
- May 2006: Noreen Hannigan, who mentored Ms Slaughter on the first rule, gives a good report to Ms Adams a good report on Ms Slaughter's performance.
- May 2006: Joan Allen mentions in a staff meeting that she is going on detail, and Caren Waddell will take over her designation list duties.
- June 2006: Ms Slaughter learns that Tim Adams is the POC on a new rule. Ms Slaughter feels as if management will use this opportunity for Mr Adams so he can get a promotion to a GS-13.
- June 15, 2006: Mr Fazio is aware of the EEO complaint. Ms Slaughter had scheduled a web meeting to discuss ARAC web documents. After Mr Fazio met with Ms Adams about the EEO complaint, he cancelled the web meeting. Ms Slaughter feels Mr Fazio is angry about the EEO compliant. Ms Slaughter wants Mr Fazio to know that the EEO compliant is strictly business – nothing personal.

*Performance Evaluations are available upon request.

**My Daytimer notes are available upon request.

 **Judine Slaughter/AWA/FAA**
ARM-020, Program Analysis
Staff

06/19/2006 05:19 PM

To   Phyllis Seaward/AWA/FAA@FAA

cc

bcc

Subject   ARM announcement

Hi Phyllis,

In my long and short version, I mentioned the designation list duties were given to Caren Waddell (GS-13).
She has never performed those duties.

I would also like to mention when Bonnie Fritts was the Federal Register liaison, I was her backup. Then when Joan Allen took over those duties, I became the last on the list, below John Chescavage and Caren Waddell. Then ARM took replaced me with Nancy Trembley.

Caren Waddell is now the Federal Register liaison while Joan Allen is on detail. She is pregnant with her second child, and I feel as if ARM has given her the additional duties to promote her to a GS-14.

There is a job announcement for a Transportation Regulations Analyst, which posted today.
http://jobs.faa.gov/announcement_detail.asp?vac_id=87103.

It's funny this announcement is for GS-13/14, when at the last All Hands meeting, Tony stated ARM was looking to hire a GS-9.

Something else I did not mention before is that Nancy Trembley is half Italian, Caren is Italian and Nick Sabatini is Italian.
I feel as if Tony, who is also Italian, is giving job opportunities and promotions to those who are from his ethnic group.

Judine Slaughter, CTM
Phone: (202) 493-4698
http://intranet.faa.gov/avr/arm

EXHIBIT
12

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JUDINE E. SLAUGHTER,  )
       Plaintiff  )

        )      No. 1:07-CV-02201

        )      (Judge Ellen S. Huvelle)

       v.  )

MARY E. PETERS, Secretary,  )
Department of Transportation
       Defendant  )

## DECLARATION OF NANCY TREMBLEY

I, Nancy Trembley, voluntarily and knowingly, make the following statement.

1.    I worked with Judine Slaughter, Plaintiff, from April 2004 through May 2006, in the Program Analyst Office (ARM-20) of the Office of Rulemaking (ARM) in the Federal Aviation Administration (FAA), Washington DC. Between November 2004 and April 2005, I was the Acting Manager of ARM-20.

2.    When I assumed the role of Acting Manager of ARM-20 in November 2004, Plaintiff was a Management and Program Analyst, FG-343-11. Plaintiff had been hired into a position that had no established career progression. The journey level for her position was FG-11.

3.   Plaintiff's day to day functions were largely administrative.  The purpose of her

work was to "ensure regulatory material [was/] is processed accurately, in a timely

manner, and appropriate office (sic) are apprised of new and proposed regulations."

Section 5 of the FG-343-11 Position Description.  Plaintiff's primary day to day

duties between November 2004 and April 2005  included the following:  1)

Monitoring the official Office of Rulemaking web site, dockets, registers, history files

and/or records for accuracy and currency, periodically purging and

updating/uploading files and/or records; 2) Reviewing the Department of

Transportation's Rulemaking Management System (RMS) for accuracy and currency

to ensure that recent FAA Rulemaking Activity is uploaded into the system; and 3)

Servings as the ARM representative at the Office of Aviation Safety (AVS) meetings

keeping management informed about agency-wide initiatives to streamline and better

manage web pages.  In addition, she was assigned to finalize the issuance of a non-

significant rule that involved minor modifications and that did not require any

evaluation of the technical content.

4.   During my tenure as Acting Manager, Plaintiff was never responsible for mapping

the system architecture of the Automated Exemption System (AES) software.  She

also was never assigned the duties of a Contracting Officer Technical Representative

(COTR).

5.   By May 2006, I had worked in Federal Service for almost 35 years.  In 1981, I had

participated in a 3 year Upward Mobility Program training program at the conclusion

2

of which I was promoted to a Technical Information Specialist. In addition, I had spent almost 24 years of my Federal career as a Management Analyst, GS/FG-343, with a background in database and system requirements.

6.    I was hired in April 2000 in ARM based, in large part, on my database and system requirements experience. A major project in ARM between October 2003 and December 2006 was to redesign the functionality of IRMIS (Integrated Rulemaking Management Information System). The original plan was a complete overhaul of IRMIS as a single project; however, budget constraints forced ARM to break up the project into three phases—database administrator functionality, exemption/petition for rulemaking tracking functionality, and rulemaking tracking functionality. I was the systems architect who mapped and documented every step of the Federal Aviation Administration's rulemaking process. Based on this mapping, the computer programmers were able to modify and to improve the functionality of IRMIS. The database administrator's module was completed in January 2005.

7.    Once I finished the database administrator's module for IRMIS, I was assigned to undertake similar type of mapping task with respect to the exemption/petition for rulemaking module of IRMIS. See Attachment 1: IRMS III Requirement Phase II, Exemptions Only More precisely, under previous version of IRMIS, each exemption, including extensions of the original exemption, resulted in the creation of separate records. As a result, there was no clear way to track the history of an exemption requested, granted, and extended since they would be separate and non-related

3

records in IRMIS. My task was to improve the functionality of the exemption tracking, so that in one single location a user would be able to obtain the full history of any exemption. In other words, the exemption and each subsequent extensions of said exemptions would be interrelated. See Attachment 2: Modified Initial Migration of Exemption Record

8.   It is important to note that the AES (Automated Exemption System) is not a database. It is a web-based site that petitioners can access to view or print copies of agency decisions on all exemptions. Once an exemption is completed, the administrative staff would use the AES to complete an exemption (or petition for rulemaking) profile, attach a copy of the decision document to the profile, and "send" it to the AES site. AES is separate from IRMIS. I did not alter the functionality of the AES in any way.

9.   In order for the new exemption module in IRMIS to be effective, I had to build the historical records of each exemption that would be migrated to the new module. I would begin each new exemption history by locating what was available in IRMIS. Some of the history for a given exemption was in IRMIS, some was in AES. Since the AES software was not on my desktop, I asked to have it installed on my desktop in order to locate the historical records for the exemption histories. While building these historical records for the new module, I would occasionally find discrepancies in the IRMIS records. Likewise, when I started using the AES, I occasionally found there were discrepancies in those records. Where applicable, I would correct IRMIS

4

records and/or AES profiles. In order to make corrections to the profiles, however, I had to ask for administrator rights to the AES software.

10.    I created a spreadsheet containing the exemption history records that would be migrated to the new exemption module in IRMIS. The new exemption module was implemented in the summer of 2006. All the active exemption/petition for rulemaking records and their histories were migrated at the time of implementation. Between summer and December 2006, exemption records that were completed in Fiscal Year 2004 were the next set of exemption records that were prepared to be migrated to the new exemption module. The same process for building the historical records for these exemptions was applied.

11.    I never performed the same duties as Plaintiff. I also never reassigned Plaintiff's duties to myself during my tenure as Acting Manager of ARM-20. During the period from November 2004 through April 2005, Plaintiff never had the responsibility of mapping the Automated Exemption System (AES).

5

12.  Plaintiff never advised me that she believed that she was being harassed based on her race.  Based on what I observed in the office, I had no knowledge or awareness that Plaintiff was being or felt that she was being harassed.  I did not discriminate against Plaintiff on the basis of race (African American).

Pursuant to 28 USC §1746, I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief.

Executed in the District of Columbia, Washington on the 2nd day of April in 2008.

Nancy Trembley
Nancy Trembley
Program and Management Analyst
Office of Quality, Integration, &
Executive Services
Federal Aviation Administration
800 Independence Ave., SW
Room 835
Washington, DC 20591

# AFFIDAVIT

## STATE OF:  WASHINGTON, DC

## COUNTY OF:

I, Judine E. Slaughter (African American), Program Analyst,
GS-343-11, Program Analysis Staff, Office of Rulemaking,
Aviation Safety, Federal Aviation Administration,
Department of Transportation, make the following statement
freely and voluntarily to Charlester Williams, who has
identified himself to me as a Contract EEO Investigator for
the following federal agency: FAA, investigating a
complaint of discrimination filed by Judine Slaughter,
knowing that this statement may be used in evidence. I
understand that this statement is not confidential and may
be shown to the interested parties (those with a legal
right to know). I solemnly swear or affirm:

Reassignment of Duties

1.   Any person in the general public can request that the
     FAA bend a rule or exempt them from one of the FAA
     regulations. They do this by way of sending an
     exemption request to the FAA Administrator. The Office
     of Rulemaking handles these requests from the general
     public by reviewing the requests and responding back
     to the petitioner by letting them know whether their
     request is accepted or declined. Our determination
     letter on the exemption request completes the matter.
     Once the exemption request is so completed, we then
     input information from the determination into our
     internal Automated Exemption System (AES). The
     information we input is uploaded into the AES website
     for the public to view any and all exemption
     determinations. I was responsible for inputting the
     information about exemptions into our internal AES.
     Inputting the data into AES was later transferred to
     the secretaries of the Office of Rulemaking. However,
     this is not the subject of my complaint. Even though
     the data input duties were transferred to the
     secretaries I remained involved in the process because
     when the secretaries would have a problem with

GOVERNMENT
EXHIBIT
13

Initials

entering data or they entered the data incorrectly, I would go in and correct the data or address their problems or concerns. Also, whenever the public customers would have difficulty or concerns about information posted on the public website regarding exemptions determinations, I would address those concerns and queries. Assisting the secretaries and addressing the public queries were a part of my official duties as can be seen by my performance evaluation stating that I was required to train the secretaries on the AES by October 2004. In the section of my evaluation for the 2005 annual evaluation, "Expectation", my supervisor at the time, Florence Hamn, stated that I am expected to train the secretaries on the AES by 2004.

2.  In November 2004, Florence Hamn left the Office of Rulemaking and Nancy Trembley became the Acting Manager of the Program Analysis Staff. Once Ms. Trembley became acting, the secretaries no longer came to me with any problems or concerns and neither did I receive any public concerns or questions to troubleshoot or address. I was no longer involved at all with the AES. Ms. Trembley as the acting manager had taken over the responsibility of assisting the secretaries with their concerns and problems with the AES and was also addressing all public queries regarding the system.

3.  I am led to believe my race was a factor in Ms. Trembley ending my involvement with AES and taking over those matters to herself because she did not reassign any of my white peers in the Program Analysis Staff to herself.

Accretion of Duties Promotion

4.  On October 7, 2005, I requested an accretion of duties promotion to a Grade 13 to my new supervisor, Eve Adams. Based on my request, Ms. Adams requested a desk audit of my position to Human Resources. A desk audit was performed by Ms. Agnus Brooks, a Classification Specialist. Her desk audit determined that my position was properly classified as a GS-11 and did not warrant a promotion to a Grade 13 based on an accretion of duties. I feel that this determination was incorrect and based on my race.

**Initials** 



5.    I feel the determination was incorrect because I am on the Aviation Safety Web team as the Web Content Manager for the Office of Rulemaking. There is one person from each office in Aviation Safety who represents their office Web Content Managers. I am the person who represents the Office of Rulemaking in this capacity. I have represented the Office of Rulemaking on this team since 2001. All of my peers on the Aviation Safety Web Team are GS-15s because of the Web Content Managers' duties they perform for their offices as part of this team. Also, in my office, the job of Web Content Manager had been previously held by a GS-14 (Gene Casiano) and a GS-13 (Gerri Robinson), both of whom were Caucasian. But when I took over the responsibility, I remained a GS-11. It is for these reasons that I believe my race was a factor in the desk audit determination.

**Initials**

I have read this statement, consisting of _____ pages, and it is true, complete, and correct to the best of my knowledge and belief.

X  *Judine Slaughter*
**Signature of Affiant**

*February 12, 2007*
**Date**

Signed and sworn to before me

on this *12* day of *2*, *07*,

at _____

_____
Neutral witness, notary, or Investigator

Initials_____

## PRIVACY ACT NOTICE
### FOR DISCRIMINATION COMPLAINT INVESTIGATION INTERVIEW

### GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

### AUTHORITY

The authority to collect the information requested by this interview is derived from one or more of the following: Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1613/1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

### PURPOSES AND USES

The information you supply will be used to resolve an equal employment opportunity discrimination complaint. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve an equal employment opportunity discrimination complaint. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to Equal Employment Opportunity Commission activities, or to others for uses as published in the Federal Register.

### EFFECTS OF NON-DISCLOSURE

Disclosure of the information sought is voluntary. However, failure to furnish the information will result in disciplinary action, up to and including removal from Federal service.

_____          X _____
Signature of Interviewer              Signature of Affiant

_____          _____
DATE  2/12/07                         DATE  February 12, 2007

Initials_____



**AFFIDAVIT**

**STATE OF:  WASHINGTON, DC**

**COUNTY OF:**

I, Judine E. Slaughter (African American), Program Analyst,
GS-343-11, Program Analysis Staff, Office of Rulemaking,
Aviation Safety, Federal Aviation Administration,
Department of Transportation, make the following statement
freely and voluntarily to Charlester Williams, who has
identified himself to me as a Contract EEO Investigator for
the following federal agency: FAA, investigating a
complaint of discrimination filed by Judine Slaughter,
knowing that this statement may be used in evidence.  I
understand that this statement is not confidential and may
be shown to the interested parties (those with a legal
right to know).  I  solemnly swear or affirm:

This statement shall serve as my rebuttal to management's
asserted defense.

<u>Reassignment of Duties</u>

Q.  Nancy Trembley makes the following assertions. Please
respond:

    "I never reassigned any of the Complainant's duties,
and most especially not her duties related to the AES
system. I also never performed any AES duties as the
Complainant alleges, most specifically I never
assisted the secretaries on inputting data or
information about exemptions into the AES system. I
also never received any concerns or queries from
public customers to address. I simply had no
involvement in these matters before, during, or after
I became the acting manager. . . ."

    "I want to clarify that as the Program Analyst for the
Office of Rulemaking I was required to perform
database requirements. This meant that the secretaries
would come to me with issues concerning the actual
functioning of the database, where there could be
improvements made to the functioning of the database.

Initials_____

My providing factfinding and making recommendations to management on how to improve the functionality of the database had nothing to do with the secretaries actually inputting the data into the system. The Complainant is claiming that I got involved in assisting the secretaries on how to input data into the AES system, which I never did."

A. Nancy Trembley's factfinding and making recommendations to improve the functionality of the database was very similar to the duties I provided when the exemption data was migrated from the previous database to AES in 2001. Then in May 2005, Nancy Trembley announced at an Office of Rulemaking, Program Analysis staff meeting that she was going to have the AES software put on her desktop so that she could correct data that was in the AES application system. Ms. Trembley is correct that she was working with the AES database requirement, meaning to improve the system, however, in doing so she also got involved in inputting corrective data into AES for the migration of the data into the Integrated Rulemaking Information System. This meant that she was performing data entry into AES, whether she was inputting new or old information.

## Accretion of Duties Promotion

Q. Agnes Brooks, the Specialist who performed the desk audit of your position, states that in order for your position to have been graded out higher, the incumbent must have been performing higher level duties in order to receive higher points in the various classification factors. For instance, to be a Grade 12, the classification standards require the incumbent be an expert and have mastered the application of a full range of methods for the assessment and improvement of program effectiveness or the improvement of complex management processes and systems. Ms. Agnes states that there was nothing in your job description or information that you or your supervisor provided that indicated that you are an expert as the standards call for. Your duties were more of an assistant as opposed to that of a lead person. Please respond.

A. I was not assisting anyone in my duties. I was the person who made the decisions. As the Web Content Manager I was the person who determined whether information to be placed on the website was correct and fit the FAA web content standards. In order to make such determinations I

Initials_____

had to be an expert in this area and served as the lead person for the Office of Rulemaking on the Aviation Safety Web Team.

Initials_____

I have read this statement, consisting of _____ pages, and it is true, complete, and correct to the best of my knowledge and belief.

x _____

**Signature of Affiant**

_____

**Date**

Signed and sworn to before me

on this _____ day of _____ , _____ ,

at _____ .

_____

Neutral witness, notary, or Investigator

Initials _____

### PRIVACY ACT NOTICE
### FOR DISCRIMINATION COMPLAINT INVESTIGATION INTERVIEW

#### GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

#### AUTHORITY

The authority to collect the information requested by this interview is derived from one or more of the following: Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1613/1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

#### PURPOSES AND USES

The information you supply will be used to resolve an equal employment opportunity discrimination complaint. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve an equal employment opportunity discrimination complaint. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to Equal Employment Opportunity Commission activities, or to others for uses as published in the Federal Register.

#### EFFECTS OF NON-DISCLOSURE

Disclosure of the information sought is voluntary. However, failure to furnish the information will result in disciplinary action, up to and including removal from Federal service.

_____
Signature of Interviewer

x _____
Signature of Affiant

2/12/07
**DATE**

February 12, 2007
**DATE**

## AFFIDAVIT

**STATE OF:  WASHINGTON, DC**

**COUNTY OF:**

I, Nancy M. Trembley (Caucasian), Management Analyst,
FG-343-14, Quality Integration and Executive Services,
Aviation Safety, Federal Aviation Administration,
Department of Transportation, make the following statement
freely and voluntarily to Charlester Williams, who has
identified himself to me as a Contract EEO Investigator for
the following federal agency: FAA, investigating a
complaint of discrimination filed by Judine Slaughter,
knowing that this statement may be used in evidence.  I
understand that this statement is not confidential and may
be shown to the interested parties (those with a legal
right to know).  I solemnly swear or affirm:

Reassignment of Duties

1.    After Ms. Florence Hamn left the Office of Rulemaking
      in November 2004, I became the Acting Staff Manager
      where   I   supervised   the   staff,   including   the
      Complainant. I acted from November 2004 to the end of
      March 2005. While serving in this capacity, I never
      reassigned any of the Complainant's duties, and most
      especially not her duties related to the AES system. I
      also never performed any AES duties as the Complainant
      alleges,   most   specifically   I   never   assisted   the
      secretaries   on   inputting   data   or   information   about
      exemptions into the AES system. I also never received
      any   concerns   or   queries   from   public   customers   to
      address. I simply had no involvement in these matters
      before, during, or after I became the acting manager.
      I cannot speak to whether the secretaries took their
      concerns   to   the   Complainant   because   I   did   not   even
      know they had concerns about the data input work they
      were performing on the AES system. I did not know one
      way or the other if they were to go to the Complainant
      for troubleshooting.

2.    I want to clarify that as the Program Analyst for the
      Office   of   Rulemaking   I   was   required   to   perform
      database requirements. This meant that the secretaries
      would   come   to   me   with   issues   concerning   the   actual

Initials _____

GOVERNMENT
EXHIBIT
14

functioning of the database, where there could be improvements made to the functioning of the database. My providing fact-finding and making recommendations to management on how to improve the functionality of the database had nothing to do with the secretaries actually inputting the data into the system. The Complainant is claiming that I got involved in assisting the secretaries on how to input data into the AES system, which I never did.

I have read this statement, consisting of _2_ pages, and it is true, complete, and correct to the best of my knowledge and belief.

X _Nancy M Trembley_____
**Signature of Affiant**

_2/12/07_____
**Date**

Signed and sworn to before me

on this _12_ day of _2___ , _07_ ,

at _____ .

**Page 2 of 4**

**Initials** _NMT___

_____

Neutral witness, notary, or Investigator

Initials _____



2007 OCT -9  AM 10: 26

Judine Slaughter
6104 Osborn Road
Cheverly, MD  20785

Judine Slaughter,
Complainant,

V.

Mary E. Peters
Secretary,
Department of Transportation
Agency.

DECISION

Appeal No. 0120073050

DOT Complaint No. 2006-20565-FAA-02

On September 7, 2007, the U.S. Equal Employment Opportunity Commission affirmed the agency's decision to dismiss the complainant's complaint for failure to contact an EEO Counselor in a timely manner.

In her complaint, complainant alleged that the agency discriminated against her on the basis of race (African-American) when: (1) on May 16, 2006, she became aware that her duties pertaining to the Automation Exemption Systems (AES) were being reassigned to a GS-14 employee; and (2) in April 2006, complainant received the results of a desk audit which did not support an upgrade of her position.[1]

Complainant alleged that in November 2004, Person A became the Acting Manager of the Program Analysis Staff and when she did so, she assumed complainant's responsibilities of assisting secretaries with their concerns, addressing questions from the public, and performing AES duties. The record reveals that Person A served as the Acting Manager until the end of March 2005. The record also reveals that the desk audit was completed in January 2006. The record reveals that complainant initiated contact with an EEO Counselor on June 13, 2006. The record reveals that complainant should have known by the end of March 2005, about the alleged reassignment of her AES duties and that she was aware in January 2006, of the results of the audit. The Commission found that complainant's contact of an EEO Counselor was untimely because it occurred beyond the 45-day limitation period. The Commission did not believe the complainant provided justification sufficient to extend the time limitation period.

---

[1] Complainant withdrew the claim that she was discriminated against when on June 8, 2006, she became aware that a grade level 12 employee served as a point-of-contact for a rule, and she had performed the duties previously without any recognition.



GOVERNMENT
EXHIBIT
15 part 1

RECONSIDERATION

This written request contains arguments and evidence which tend to establish the appellate decision involved a clearly erroneous interpretation of material fact or law, and the appellate decision will have a substantial impact on the policies, practices, or operations of the agency.

*Erroneous interpretation of material fact.*

The complainant should have been aware of the reassignment of the AES duties, before March 2005. The FAA's Permanent Internal Assignment EMP-1.14 states "When an administrative reassignment or relocation is contemplated, the employee shall be fully informed of the reasons why the action must be taken. The personal interests and desires of the employee shall be carefully considered, but the final decision on any such proposed action shall be decided according to the needs of FAA." There are no statements from the responsible management official that the complainant had actual or constructive knowledge of the reassignment of duties before March 2005. See *Webb v. United States Postal Service*, EEOC Appeal No. 01A54870 (December 21, 2005). Therefore, it is an erroneous interpretation of FAA policies to conclude the complaint was untimely.

The complainant was a stronger candidate to research, analyze, or evaluate the database based upon her Bachelor's degree in Organizational Management with a background in computer science, and her three years work experience with AES.[2] In 2001, the complainant tested the integration of Integrated Rulemaking Management Information System (IRMIS) with CyberDocs, and coordinated the IRMIS training for the Rulemaking staff (Attachment A). From 2001 until May 23, 2006, the complainant's IRMIS Access level was Administrator (Attachment B). On the other hand, Person A's previous work experience was primarily secretarial and she possessed limited formal education. Thus, the reasons provided by Person A to perform database requirements, to communicate with the secretaries about issues concerning the database, or to provide factfinding and make recommendations on how to improve the functionality of the database are a pretext for discrimination race-based animus. *Harley v. Department of Labor*, EEOC Appeal No. 7A30077 (September 30, 2003) and *Jr. v. Environmental Protection Agency*, EEOC Appeal No. 07A30128 (August 11, 2005)

Similarly in November 2004, the complainant listed herself as the Team Leader and Person A as the Project Coordinator in the "ARM Scanning Project Plan."[3] In August 2005, the complainant learned she was listed as the Contracting Officer Technical Representative (COTR) for the project. The record clearly states the complainant was not aware of the assignment as the COTR in November 2004. It is reasonable to conclude that the management official would have informed the complainant of assignment. With the notification in August 2005, the complainant listed herself as the COTR for the

---

[2] This information is a part of the "Complaint of Discrimination in the Federal Government" - Tab 5.
[3] This ARM Scanning Project Plan is located in the Report of Investigation, Exhibit F9.

project from November 2004 until July 2005 in the Performance Expectation Chart.[4] For the record, the complainant never signed an invoice.

Additionally, the management official should have communicated the results of the desk audit in a timely fashion after January 25, 2007. In 29 C.F.R part 1614(a)(1), it states "An aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of a personnel action, within 45 days of the effective date of the action." The agency failed to show that the complainant was informed of the desk audit within 45-days after the January 25, 2005 date, or that EEO posters were on display notifying the complainant of the 45-day limitation period from the date of personnel action. The complainant found that nothing occurred from January 2006 until April 2006 that would otherwise have created a reasonable suspicion the delay was discriminatory (Attachment C). See *Bingham v. United States Postal Service*, EEOC Appeal No. 01A50221 (February 25, 2005); *Paszko v. USPS*, EEOC Appeal No. 01A40802 (February 27, 2004); and *Sangiovanni v. Department of the Navy*, EEOC Appeal No. 01A31466 (March 31, 2004). It is an erroneous interpretation of the law that the management official communicated the results of the audit in a timely manner.

### *Substantial impact on the policies, practices, or operations of the agency.*

Title VII of the Civil Rights Act of 1964 Sec. 2000e-2(a)(2) states it shall be an unlawful employment practice for an employer to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin. In the Federal Wage System Operating Manual, Subchapter S1-3(b)(2) states, "There will be equal pay for substantially equal work for all prevailing rate employees who are working under similar conditions of employment in all agencies within the same local wage area."

The record clearly shows the complainant has established a prima facie case of race discrimination with regard to her nonpromotion. The complainant shared fungible duties with her Caucasian co-workers as part of the Program Analysis Staff in the Office of Rulemaking.[5] Complainant was not considered a subject matter expert for substantially equal work as a similarly situated Caucasian co-worker, who was promoted to an expert level.[6] Additionally, the record shows Caucasian co-workers, who were hired as permanent employees while the complainant remained a temporary employee[7] and whose

---

[4] This Performance Expectation Chart is located in the EEO Counselor's Report, Attachment 3.
[5] This information is a part of the "Complaint of Discrimination in the Federal Government"- Tab 3.
[6] This information is located in the complainant's appeal dated June 22, 2007. Additionally, it is reasonable to conclude that the management official rewarded the co-worker with familial favoritism because her husband is an SES. (This information is a part of the "Complainant of Discrimination in the Federal Government"- Tab 13.) This encouraged the co-worker to dismiss her ethical responsibility by certifying two rulemaking documents with her husband's signature (Attachments D and E).
[7] The complainant was hired as a temporary employee and remained in this employment status for four years. As a temporary employee, she received such permanent benefits such as retirement, and life

duties were similar to the complainant, were given the opportunity to advance to an expert level.[8]  The agency is using the results of the desk audit[9] as a pretext for discriminatory race-based animus.

The record also contains sufficient evidence to show that the complainant's performance was in fact above and beyond her job criteria.  A description of the Aviation Safety web team duties (Attachment F) compared with the description of Program/Management Analyst (Web Project Coordinator), GS-0343-11/14 duties from the Economic Research Service (Attachment G), clearly shows the complainant was working at a grade 14 level or higher.  Additionally, it is reasonable to conclude that the complainant's supervisor was aware that she was performing at a higher level work, as the complainant had attended web content meetings for the past three years.[10]  The agency failed to offer a credible, nondiscriminatory reason for the disparity.  *Wimbley-Osborne v. Department of Defense*, EEOC Appeal No. 07A20098 (June 12, 2003).

Furthermore, the FAA's Standards of Conduct ER-4.1, it states that supervisors, are to "Treat their employees with dignity, respect and in a fair and equitable manner in conformance with FAA Model EEO Program. In addition, supervisors and managers will communicate to their staff that they will not tolerate or condone discrimination, or the appearance of discrimination, on the part of any employee." The record clearly shows the management official questioned the complainant's writing skills several times, although she completed a writing exercise as a qualification for employment.  In addition, when the complainant requested to be replaced on the web content team, the management official stated the complainant's duties were administrative and menial.[11]

---

insurance, government contribution toward health insurance, time served is credible service toward federal retirement, while participating in the thrift savings plan. The benefits not granted were within grade increases and promotion potential to a higher grade.

[8] This information is located in the Counselor's report, as Attachment 3, job announcement. This information is also a part of the "Complaint of Discrimination in the Federal Government" form, Tabs 9 and 11.

[9] This desk audit is located in the Report of Investigation, Exhibit F13.

[10] This information is in the "Complaint of Discrimination in the Federal Government" form, Tab 4.

[11] This information is located in the November 2004 entry in the "unofficial timeline for discriminatory events." Additionally, it is not an isolated event for the management official to consider the complainant's duties as administrative based on race animus. From the data of 18 new hires in the Office of Rulemaking from 2000 thru 2005, the statistics show that 80% of the African Americans hired were classified as administrative staff, while only 7% of the Caucasians hired were classified as administrative. See graph.

| | New Hires | Administrative Classification | Professional Classification | Temporary |
|---|---|---|---|---|
| Caucasian | 13 | 1 | 12 | 0 |
| African American | 5 (includes 2 summer hires) | 4 | 1 | 5 |

The agency is liable for the harassment, since it had failed to prove that the complainant unreasonably failed to avail herself of preventative or corrective learning opportunities.[12] Never did the agency provide proof that the Caucasian co-workers with similar duties were treated in the same manner. Additionally, the complainant consistently received and completed assignments which required the ability to write clearly and concisely.[13] The rule on vicarious liability set forth by the Supreme Court in sexual harassment cases applies to harassment based on various protected classes. *Whidbee v. Department of the Navy*, EEOC Appeal No. 01A40193 (March 31, 2005), *Diggs v. Department of the Army*, EEOC Appeal No. 01A12480 (January 9, 2003), and *Brown v. USPS*, EEOC Appeal No. 01A61098 (May 26, 2006).

The record clearly articulates that the complainant was limited, and segregated based on race over a sustained period of time, which tainted and motivated the actions taken by agency officials towards complainant because she was an African-American. The complainant suffered humiliation from her peers,[14] and stress that caused her to resign from her position before securing another job (Attachment H). Therefore, the decision to dismiss this case will have a substantial impact on the practices of the agency, because the agency will be condoning employment discrimination and harassment, which are a violation of Title VII. *Stansbury v. Department of Veterans Affairs*, EEOC Appeal No. 01A33842 (January 26, 2005).

CONCLUSION

Therefore, the complainant requests the Commission to reconsider the agency's dismissal in accordance with 29 C.F.R. § 1614.405; Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO MD-110), 9-18 (November 9, 1999).

Prepared by

*Judine Slaughter*
Judine Slaughter

*October 4, 2007*
Date

Proof of delivery
to EEOC
Fed Ex 8612 6379 9899
(copy of bill attached)

---

[12] This complainant's list of training is located the Counselor's report, Attachment 3.
[13] This information is in the "Complaint of Discrimination in the Federal Government" form, Tabs 2, 3, 4, 7, 8, and 13.
[14] This information is located in the May and June 2004 entries in the "unofficial timeline for discriminatory events."

Page 6 of 36   fedex.com 1.800.GoFedEx 1.800.463.3339

**FedEx.** US Airbill
Express

Fedex
Tracking
Number  8612 6379 9899

Sender's Copy

1 From
Date 10/04/07
Sender's FedEx
Account Number
Sender's
Name Judine Slaughter   Phone 301.219.93.78
Company  #: N/A
Address 6104 Osborn Road
City Cheverly   State MD ZIP 20785

2 Your Internal Billing Reference

3 To
Recipient's
Name Director
Company Office of Federal Operations
Recipient's
Address Equal Employment Opportunity Commission
Address P.O. Box 19848
City Washington   State DC ZIP 20036

4a Express Package Service
4b Express Freight Service

5 Packaging   ☒ FedEx Envelope

6 Special Handling

7 Payment   Bill to
☒ Sender   ☐ Recipient   ☐ Third Party   ☐ Credit Card   ☐ Cash/Check

8 Residential Delivery Signature Options

520

RETAIN THIS COPY FOR YOUR RECORDS.

Attachment A

## IRMIS BRIEFING SCHEDULE

| Tuesday, April 17, 2001 at 1 – 5pm | |
|---|---|
| Judine Slaughter | |
| Teri Bazaral-PAI | |
| Lisa DeFrancesco-PAI | |
| Kristi Foster-PAI | |
| Christa Brolley-PAI | |
| Dan Silverman-PAI | |
| Catrina Archie | |
| Andrea Phaneuf | |

| Wednesday, April 18, 2001 at 1 – 5pm | |
|---|---|
| Marisa Mullen-ARM | |
| Linda Williams-ARM | |
| Forest Rawls- ARM | |
| Effie Upshaw- ARM | |

| Monday, April 30, 2001 at 9 – 12noon | |
|---|---|
| Alberta Brown- | |
| Ida Klepper- ARM | |
| Vanessa Wilkins- ARM | |
| David Teitlebaum- APO | |
| Cindy Nordlie- ARM | |
| Noreen Hannigan- ARM | |
| George Thurston | |

| Monday, April 30, 2001 at 1 – 4pm | |
|---|---|
| Don Bryne - AGC | |
| Charlene Brown - ARM | |
| Bonnie Fritts- ARM | |
| Gerri Robinson- ARM | |
| Angela Anderson- ARM | |
| Shirley Stroman- ARM | |
| George Euling | |

| Thursday, May 3, 2001 at 8 – 12noon | |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |

| Thursday, May 3, 2001 at 1 – 4pm | |
|---|---|
| Pamela Curtis- ARM | |
| Mark Lawyer- ARM | |
| Judy Courbois- ARM | |
| Laurie Fisher- AEE | |
| Anthony Apostolides | |
| Ed O'Connor | |
| Gary Becker (maybe) | |
| Frank Emerson | |

| Friday, May 4, 2001 at 9 – 12am | |
|---|---|
| R. Underwood-ARM | |
| Denise Emrick- ARM | |
| Pat Boyd- ARM | |
| Carolina Forrester | |
| Sandy Buchanan-Sumter- ARM | |
| | |
| | |
| | |

| Friday, May 4, 2001 at 1 – 4pm | |
|---|---|
| Nancy Tremley- ARM | |
| Fran Stephenson- ARM | |
| Brenda Courtney- ARM | |
| Mohan Samtini- APO | |
| Thomas Smith | |
| | |
| Fred Sapp | |
| Beth Gill | |

**IRMIS BRIEFING**
**(Alternate Selections)**

| Tuesday, April 17, 2001 at 1 – 5pm | |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

| Wednesday, April 18, 2001 at 1 – 5pm | |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

| Monday, April 30, 2001 at 8 – 12noon | |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

| Monday, April 30, 2001 at 1 – 5pm | |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

| Thursday, May 3, 2001 at 8 – 12noon | |
|---|---|
| Ida Klepper- ARM | |
| Vanessa Wilkins- ARM | |
| Cindy Nordlie- ARM | |
| C. Brown (2)- ARM | |
| Noreen Hannigan- ARM | |
| Forest Rawls- ARM | |
| | |
| | |
| | |

| Thursday, May 3, 2001 at 1 – 5pm | |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

| Friday, May 4, 2001 at 8 – 12am | |
|---|---|
| Carolina Forrester-ARM | |
| Beth Gill- ARM | |
| | |
| | |
| | |
| | |
| | |
| | |

| Friday, May 4, 2001 at 1 – 5pm | |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

Attachment B



Attachment C

List of Complainant's meeting from Lotus Notes

| | Meeting Time | Subject |
|---|---|---|
| | 01/25/2006 11:00 AM | Queen Carolina's Going-Away Lunch at the District Chop House [Chair: Judine Slaughter] |
| | 01/30/2006 09:00 AM | Re: Fw: Section 508 Awareness Sessions [Chair: Judine Slaughter] |
| | 02/01/2006 08:00 AM | TWO Mentor Program – Presentation Skills -- 5ABC Owner: Judine Slaughter |
| | 02/02/2006 01:00 PM | Fw: Federal Register publication - RIN 2120-AI72 Owner: Judine Slaughter |
| | 02/06/2006 11:30 AM | Accepted: Jundine Lunch [Chair: Patricia Swenor] |
| | 02/07/2006 10:30 AM | Membership Meeting [Chair: Judine Slaughter] |
| | 02/07/2006 01:00 PM | Notice of a reception for Carolina Forrester [Chair: Judine Slaughter] |
| | 02/07/2006 02:00 PM | Fw: Federal Register publication information Owner: Judine Slaughter |
| | 02/09/2006 02:00 PM | Delegation of duties [Chair: Judine Slaughter] |
| | 02/10/2006 04:59 PM | Out Of Office Owner: |
| | 02/13/2006 09:00 AM | Leadership Skills for Non-Supervisors – USDA Owner: Judine Slaughter |
| | 02/13/2006 11:30 AM | TWO Workshop 8ABC – Lunch and Learn with EAP [Chair: Judine Slaughter] |
| | 02/15/2006 09:00 AM | NARA Training Owner: Judine Slaughter |
| | 02/15/2006 02:00 PM | Confirmation of Live Event Registration [Chair: Judine Slaughter] |
| | 02/27/2006 02:00 PM | TWO Meeting with Rita E-C – IDP [Chair: Judine Slaughter] |
| | 02/28/2006 08:00 AM | check with Charlene about ISN contract number Owner: Judine Slaughter |
| | 02/28/2006 12:00 PM | Judine Slaughter is out of the office. [Chair: Judine Slaughter] |
| | 03/01/2006 12:00 PM | Stress Reliever – 5 AB [Chair: Judine Slaughter] |
| | 03/03/2006 09:00 AM | What sounds like an excellent (free) training opportunity [Chair: Judine Slaughter] |
| | 03/07/2006 12:00 PM | Membership Meeting -- 8A [Chair: Judine Slaughter] |
| | 03/08/2006 01:45 PM | Introductions Owner: Judine Slaughter |
| | 03/09/2006 02:00 PM | FYI ... Staff Meeting Change for Next Week! [Chair: Judine Slaughter] |
| | 03/10/2006 10:00 AM | Fw: PAR-05-007 - DMS process – Team room B [Chair: Judine Slaughter] |
| | 03/13/2006 11:00 AM | Accepted: [Chair: Patricia Swenor] |
| | 03/13/2006 01:00 PM | Lunch Owner: Judine Slaughter |
| | 03/13/2006 04:30 PM | Conversation with Tony [Chair: Judine Slaughter] |
| | 03/14/2006 12:00 PM | Jr. Achievement Tuesday March 14 @ 11am in FAA MacCracken Room 1010 [Chair: Judine Slaughter] |
| | 03/14/2006 12:00 PM | TODAY, MARCH 14, JUNIOR ACHIEVEMENT FUNCTION - PLEASE READ BELOW [Chair: Judine Slaughter] |
| | 03/15/2006 09:30 AM | Web Content Mtg Owner: Judine Slaughter |
| | 03/15/2006 10:00 AM | Our Field Trip to the Command March 15, 2006 [Chair: Judine Slaughter] |
| | 03/16/2006 11:30 AM | ALL HANDS MEETING [Chair: Judine Slaughter] |
| | 03/16/2006 01:30 PM | Operating Limitations at Chicago O'Hare International Airport Owner: Judine Slaughter |
| | 03/21/2006 12:15 PM | AFS meeting in room 833 to explain 14 CFR Sharepoint Site [Chair: Judine Slaughter] |
| | 03/21/2006 01:00 PM | my Aunt Patsy tribute speech... [Chair: Judine Slaughter] |
| | 03/21/2006 02:00 PM | Fw: Extension of comment periods documents to the Federal Register. Owner: Judine Slaughter |
| | 03/21/2006 02:00 PM | Fw: Notice "Aviation Rulemaking Advisory Committee; Transport Airplane and Engine Issue Area - New Task" Owner: Judine Slaughter |
| | 03/22/2006 09:00 AM | TWO Mentor Program -- Myers Briggs Type – 2AB [Chair: Judine Slaughter] |
| | 03/30/2006 09:00 AM | Junior Achievement (JA) in a Day at Clermont Elementary School [Chair: Judine Slaughter] |
| | 03/31/2006 11:00 AM | Fw: NPRM "Experimental Permits for Reusable Suborbital Rockets" RIN 2120-AI56 Owner: Judine Slaughter |

| | Meeting Time | Subject |
|---|---|---|
| | 03/31/2006 01:00 PM | Fw: NPRM "Experimental Permits for Reusable Suborbital Rockets" RIN 2120-AI56 Owner: Judine Slaughter |
| | 03/31/2006 01:15 PM | Fw: Notice of Order "Operating Limitations at Chicago O'Hare Intl Airport" and final rule, extension of expiration date "Reservation System for Unscheduled Arrivals at Chicago's |
| | 04/03/2006 09:00 AM | Fw: Notice "Reduction of Fuel Tank Flammability in TCA's" RIN 2120-AI23 Owner: Judine Slaughter |
| | 04/03/2006 09:00 AM | Fw: Notice " Membership in the National Parks Overflight Advisory Group Aviation Rulemaking Committee" Owner: Judine Slaughter |
| | 04/03/2006 10:00 AM | Fw: NPRM, "Fire Penetration Resistance of Thermal Acoustic Insulation Installed on TCA's" RIN 2120-AI75 Owner: Judine Slaughter |
| | 04/04/2006 10:00 AM | EEO COUNSELOR'S MEETING [Chair: Judine Slaughter] |
| | 04/04/2006 10:30 AM | ALL HANDS MEETING [Chair: Judine Slaughter] |
| | 04/04/2006 12:00 PM | ARM-20 Staff Meeting at Jaleo [Chair: Judine Slaughter] |
| | 04/05/2006 08:00 AM | Fw: final rule, delay of compliance date "Antidrug and Alcohol Misuse Prevision Programs for Personnel Engaged in Specified Aviation Activities" Owner: Judine Slaughter |
| | 04/06/2006 08:00 AM | AVS Journey to Excellence Registration Notification [Chair: Judine Slaughter] |
| | 04/11/2006 08:00 AM | Final rule "Safety Standards for Flight Guidance Systems" RIN 2120-AI41 Owner: Judine Slaughter |
| | 04/11/2006 10:00 AM | Belinda Bender - Honoree for 29th EEO Award Ceremony Owner: Judine Slaughter |
| | 04/11/2006 10:00 AM | Fw: 29th Annual Administrator's Awards for Excellence in EEO Owner: Judine Slaughter |
| | 04/12/2006 10:30 AM | Accepted: Mid-year Discussion [Chair: Eve Adams] |
| | 04/13/2006 09:00 AM | Accepted: Mentor program Telcon to discuss May Derby [Chair: Patricia Swenor] |
| | 04/13/2006 12:00 PM | FACF Communion Service – 3rd floor auditorium [Chair: Judine Slaughter] |
| | 04/18/2006 12:00 PM | Lunch and Learn – 8B – Smart Women Finish Rich Owner: Judine Slaughter |
| | 04/18/2006 01:30 PM | Accepted: Designation List/RMS Discussion [Chair: Eve Adams] |
| | 04/19/2006 12:00 PM | Lunch and Learn – Nassif 4438 – Eight Steps to Auto buying Owner: Judine Slaughter |
| | 04/19/2006 12:00 PM | KM Conference at Ronald Reagan Center Owner: Judine Slaughter |
| | 04/21/2006 12:00 PM | Fw: NPRM "Damage Tolerance Data for Repairs and Alterations" and Proposed AC, RIN 2120-AI32 Owner: Judine Slaughter |
| | 04/25/2006 12:00 PM | TWO Workshop – Goals & Dreams – Room 5A [Chair: Judine Slaughter] |
| | 04/25/2006 02:00 PM | RightNow user group meeting change [Chair: Judine Slaughter] |
| | 04/26/2006 02:00 PM | ARM Staff Meeting Change for this week... [Chair: Judine Slaughter] |
| | 04/27/2006 10:30 AM | Re: Fw: Internet Report Updates Owner: Judine Slaughter |
| | 04/27/2006 10:30 AM | Re: Internet Report Updates Owner: Judine Slaughter |
| | 04/27/2006 12:45 PM | Meet Sarah in the lobby Owner: Judine Slaughter |
| | 04/27/2006 01:00 PM | March and April Birthday Celebration [Chair: Judine Slaughter] |

*Attachment D*

*Will publish in part*
*6 of the Federal*
*Register on Oct. 5, 2004*

[4910-13]

## DEPARTMENT OF TRANSPORTATION

**Federal Aviation Administration**

**14 CFR Parts 71 and 97**

**[Docket No. FAA-2004-19247; Notice No. 04-12]**

**RIN 2120-AI39**

**Revision of Incorporation by Reference Provisions**

**AGENCY:**    Federal Aviation Administration (FAA), DOT.

**ACTION:**    Notice of proposed rulemaking (NPRM).

**SUMMARY:** The FAA is proposing to remove the incorporation by reference of certain FAA Orders and terminal aeronautical charts from the provisions of 14 CFR part 97 and incorporate by reference instead instrument procedures that are documented on FAA forms. The FAA also proposes a conforming amendment in 14 CFR part 71. This change would ensure that the appropriate material is incorporated in the FAA's regulations.

**DATE:** Send your comments on or before [~~Insert date 30 days after date of publication in the Federal Register~~] *November 4 2004*

**ADDRESSES:** You may send comments identified by docket number FAA-200X-XXXXX using any of the following methods:

- DOT Docket web site: Go to http://dms.dot.gov and follow the instructions for sending your comments electronically.

- Government-wide rulemaking web site: Go to http://www.regulations.gov and follow the instructions for sending your comments electronically.

- Mail: Docket Management Facility; U.S. Department of Transportation, 400 Seventh Street, SW, Nassif Building, Room PL-401, Washington, DC 20590-001.

- Fax: 1-202-493-2251.

- Hand Delivery: Room PL-401 on the plaza level of the Nassif Building, 400 Seventh Street, S.W., Washington, DC, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays.

For more information on the rulemaking process, see the "SUPPLEMENTARY INFORMATION" section of this document.

Privacy: We will post all comments we receive, without change, to http://dms.dot.gov, including any personal information you provide. For more information, see the Privacy Act discussion in the SUPPLEMENTARY INFORMATION section of this document.

Docket: To read background documents or comments received, go to http://dms.dot.gov at any time or to Room PL-401 on the plaza level of the Nassif Building, 400 Seventh Street, SW, Washington, DC, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays.

FOR FURTHER INFORMATION CONTACT: Thomas E. Schneider, AFS-420, Federal Aviation Administration, P.O. Box 25082, Oklahoma City, OK 73125; telephone (405) 954-5852; facsimile (405) 954-2528; e-mail Thomas.Schneider@faa.gov.

SUPPLEMENTARY INFORMATION:

Comments Invited

The FAA invites interested persons to participate in this rulemaking by submitting written comments, data, or views. The FAA also invites comments relating to the

2

economic, environmental, energy, or federalism impacts that might result from adopting the proposals in this document. The most helpful comments reference a specific portion of the proposal, explain the reason for any recommended change, and include supporting data. The FAA asks that you send two copies of written comments.

The FAA will file in the docket all comments we receive, as well as a report summarizing each substantive public contact with FAA personnel concerning this proposed rulemaking. The docket is available for public inspection before and after the comment closing date. If you wish to review the docket in person, go to the address in the "ADDRESSES" section of this preamble between 9:00 a.m. and 5:00 p.m., Monday through Friday, except Federal holidays. You may also review the docket using the Internet at the web address in the "ADDRESSES" section.

Privacy Act: Using the search function of our docket web site, anyone can find and read the comments received into any of our dockets, including the name of the individual sending the comment (or signing the comment on behalf of an association, business, labor union, etc.). You may review DOT's complete Privacy Act Statement in the Federal Register published on April 11, 2000 (65 FR 19477-78) or you may visit http://dms.dot.gov.

Before acting on this proposal, the FAA will consider all comments it receives on or before the closing date for comments. The FAA will consider comments filed late if it is possible to do so without incurring expense or delay. The FAA may change this proposal in light of the comments it receives.

If you want the FAA to acknowledge receipt of your comments on this proposal, include with your comments a pre-addressed, stamped postcard on which the docket number appears. The FAA will stamp the date on the postcard and mail it to you.

**Availability of Rulemaking Documents**

You can get an electronic copy using the Internet by:

(1)    Searching the Department of Transportation's electronic Docket Management System (DMS) web page (http://dms.dot.gov/search);

(2)    Visiting the Office of Rulemaking's web page at

http://www.faa.gov/avr/arm/index.cfm; or

(3)    Accessing the Government Printing Office's web page at

http://www.access.gpo.gov/su_docs/aces/aces140.html.

You can also get a copy by submitting a request to the Federal Aviation Administration, Office of Rulemaking, ARM-1, 800 Independence Avenue SW, Washington, DC 20591, or by calling (202) 267-9680. Be sure to identify the docket number, notice number, or amendment number of this rulemaking.

**Background**

On December 17, 2002, the FAA published a Notice of Proposed Rulemaking (NPRM) titled "Area Navigation (RNAV) and Miscellaneous Amendments" (67 FR 77326; Dec. 17, 2002). In that NPRM, the FAA proposed to revise § 97.20 to remove the incorporation by reference (IBR) of standard instrument approach procedures as described on FAA Forms 8260-3, 8260-4 and 8260-5. The FAA instead proposed to incorporate by reference into § 97.20 FAA Orders 8260.3B, United States Standard for Terminal Instrument Procedures (TERPS) and 8260.19C, Flight Procedures and

4

Airspace, and terminal aeronautical charts. Incorporating a publication by reference into the Code of Federal Regulations means that the information contained in that publication in fact becomes regulatory. Any subsequent modification is a rule change and is accomplished by rulemaking under the Administrative Procedures Act.

On April 8, 2003, the FAA adopted the final rule titled "Designation of Class A, B, C, D, and E Airspace Areas; Air Traffic Service Routes; and Reporting Points" (68 FR 16943; April 8, 2003), which adopted the proposed amendments to 14 CFR § 97.20. Upon staff review, the FAA concluded that the incorporation by reference of FAA Orders 8260.3B and 8260.19C and the terminal aeronautical charts was in error and resulted in the inappropriate designation of certain material as regulatory.

**Section 97.20**

Specifically, FAA Order 8260.3 provides agency policy and standardized methods for designing instrument flight procedures. The FAA follows this policy for the preparation, approval, and promulgation of terminal instrument procedures. FAA Order 8260.19, provides guidance for administering the Flight Procedure and Airspace Program. It also defines responsibilities, establishes criteria and provides standards to assure effective and orderly processing of all types of procedure actions.

Section 91.175(a) requires a pilot to use an instrument procedure prescribed in part 97, unless otherwise authorized by the FAA, when it is necessary to conduct an instrument letdown to a civil airport. Consistent with this requirement, the FAA, via rulemaking, adopts instrument procedures by amending § 97.20. While the adopted instrument procedures become part of § 97.20, the agency policy and criteria for designing, preparing and approving the procedure should not become part of § 97.20, as

5

they are not regulatory actions and should not be incorporated by reference into part 97. Similarly, it is not appropriate to incorporate by reference terminal aeronautical charts, as those charts merely depict the instrument procedures for use by the pilot.

The FAA is proposing to revise §97.20 by removing the IBR of FAA Orders 8260.3 and 8260.19. Additionally, the IBR of terminal aeronautical charts would be removed. The FAA instead would incorporate by reference the instrument procedures detailed on FAA Forms 8260-3, 8260-4, 8260-5 and 8260-15A into § 97.20.

The proposed text for § 97.20 would set forth the FAA Forms that contain the instrument procedures that would be IBR, and provide information to the public as to where the procedures may be examined. It also provides information on the availability of aeronautical charts depicting standard instrument procedures.

The FAA currently coordinates all new and revised TERPS criteria and procedures in Orders 8260.3 and 8260.19 with those organizations affected, both public and private, in accordance with the coordination process contained in FAA Order 1320.1, *FAA Directives Systems*. In addition, the agency coordination process for these two orders includes any person requesting the opportunity to comment.

Section 71.11

The FAA proposes to delete paragraph (b), and the existing paragraph (c) would be redesignated as paragraph (b). This section would conform to § 97.20, which would remove the IBR of FAA Orders 8260.3 and 8260.19.

The Director of the Federal Register must approve all rules that incorporate by reference material into the Code of Federal Regulations. If this rule is adopted as proposed, the FAA will submit a final rule to the Director of the Federal Register seeking

approval to incorporate by reference into § 97.20 the instrument procedures on FAA forms.

## Paperwork Reduction Act

The Paperwork Reduction Act of 1995 (44 U.S.C.§ 3507(d)) requires that the FAA consider the impact of paperwork and other information collection burdens imposed on the public. The FAA has determined that there is no new information collection requirement associated with this proposed rule.

## International Compatibility

In keeping with U.S. obligations under the Convention on International Civil Aviation, it is FAA policy to comply with International Civil Aviation Organization (ICAO) Standards and Recommended Practices to the maximum extent practicable. The FAA has determined that there are no ICAO Standards and Recommended Practices that correspond to these proposed regulations.

## Economic Assessment, Regulatory Flexibility Determination, Trade Impact Assessment, and Unfunded Mandates Assessment

Executive Order 12866 directs each Federal agency to propose or adopt a regulation only upon a reasoned determination the benefits of the intended regulation justify its costs. Second, the Regulatory Flexibility Act of 1980 requires agencies to analyze the economic impact of regulatory changes on small entities. Third, the Trade Agreements Act (19 U.S.C. §§ 2531-2533) prohibits agencies from setting standards that create unnecessary obstacles to the foreign commerce of the United States. In developing U.S. standards, this Trade Act also requires agencies to consider international standards and, where appropriate, use them as the basis of U.S. standards. Fourth, the Unfunded

Mandates Reform Act of 1995 (Public Law 104-4) requires agencies to prepare a written assessment of the costs, benefits, and other effects of proposed or final rules that include a Federal mandate likely to result in the expenditure by State, local, or tribal governments, in the aggregate, or by private sector, of $100 million or more annually (adjusted for inflation).

We determined this proposed rule (1) has benefits that justify its costs, is not a "significant regulatory action" as defined in section 3(f) of Executive Order 12866, and is not "significant" as defined in DOT's Regulatory Policies and Procedures; (2) will not have a significant economic impact on a substantial number of small entities; (3) will not have any effect on barriers to international trade; and (4) does not impose an unfunded mandate on state, local, or tribal governments, or on the private sector.

However, for regulations with an expected minimal impact the above-specified analyses are not required.  The Department of Transportation Order DOT 2100.5 prescribes policies and procedures for simplification, analysis, and review of regulations. If it is determined that the expected impact is so minimal that the proposal does not warrant a full evaluation, a statement to that effect and the basis for it is included in proposed regulation.  Since this NPRM is administrative in nature removing inappropriate interpretation by reference material from FAA regulations and adding appropriate incorporation by reference material, these changes will not impact the integrity of existing rules. As a result, this proposed rule will have a minimal economic impact. The FAA requests comments with supporting justification regarding the FAA determination of minimal impact.

**Regulatory Flexibility Determination**

The Regulatory Flexibility Act of 1980 (RFA) establishes "as a principle of regulatory issuance that agencies shall endeavor, consistent with the objective of the rule and of applicable statutes, to fit regulatory and informational requirements to the scale of the business, organizations, and governmental jurisdictions subject to regulation." To achieve that principle, the RFA requires agencies to solicit and consider flexible regulatory proposals and explain the rationale for their actions. The RFA covers a wide-range of small entities, including small businesses, not-for-profit organizations and small governmental jurisdictions.

Agencies must perform a review to determine whether a proposed or final rule will have a significant economic impact on a substantial number of small entities. If the agency determines that it will, the agency must prepare a regulatory flexibility analysis as described in the RFA.

However, if an agency determines that a proposed or final rule is not expected to have a significant economic impact on a substantial number of small entities, section 605(b) of the RFA provides that the head of the agency may so certify and a regulatory flexibility analysis is not required. The certification must include a statement providing the factual basis for this determination, and the reasoning should be clear.

This proposed rule is administrative in nature correcting an earlier action that resulted in an inappropriate designation of certain material as regulatory. Consequently, the FAA certifies the proposed rule will not have a significant economic impact on a substantial number of small entities.

**Trade Impact Assessment**

The Trade Agreement Act of 1979 prohibits Federal agencies from establishing any standards or engaging in related activities that create unnecessary obstacles to the foreign commerce of the United States. Legitimate domestic objectives, such as safety, are not considered unnecessary obstacles. The statute also requires consideration of international standards and, where appropriate, that they be the basis for U.S. standards. The FAA has assessed the potential effect of this rulemaking and has determined that it will impose the same costs on domestic and international entities and thus have a neutral trade impact.

**Unfunded Mandates Assessment**

The Unfunded Mandates Reform Act of 1995 (the Act) is intended, among other things to curb the practice of imposing unfunded Federal mandates on State, local, and tribal governments. Title II of the Act requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed or final agency rule that may result in an expenditure of $100 million or more (adjusted annually for inflation) in any one year by State, local, and tribal governments, in the aggregate, or by the private sector; such a mandate is deemed to be a "significant regulatory action." The FAA currently uses an inflation adjusted value of $120.7 million in lieu of $100 million.

This NPRM does not contain such a mandate. The requirements of Title II of the Act do not apply.

**Executive Order 13132, Federalism**

The FAA has analyzed this proposed rule under the principles and criteria of Executive Order 13132, Federalism. The FAA has determined that this action would not have a substantial direct effect on the States, on the relationship between the national

10

Government and the States, or on the distribution of power and responsibilities among the various levels of government, and therefore would not have federalism implications.

**Environmental Analysis**

FAA Order 1050.1D defines FAA actions that may be categorically excluded from preparation of a National Environmental Policy Act (NEPA) environmental impact statement. In accordance with FAA Order 1050.1D, appendix 4, paragraph 4(j), this proposed rulemaking action qualifies for a categorical exclusion.

**Regulations that Significantly Affect Energy Supply, Distribution, or Use**

The FAA has analyzed this NPRM under Executive Order 13211, Actions Concerning Regulations that Significantly Affect Energy Supply, Distribution, or Use (May 18, 2001). The FAA has determined that it is not a significant energy action under the executive order because it is not a significant regulatory action under Executive Order 12866, and it is not likely to have a significant adverse effect on the supply, distribution, or use of energy.

**List of Subjects**

14 CFR Part 71

Airspace, Navigation (air).

14 CFR Part 97

Air traffic control, Airports, Navigation (air), Weather.

**The Proposed Amendments**

In consideration of the foregoing, the Federal Aviation Administration proposes to amend chapter I of title 14, Code of Federal Regulations, as follows:

**PART 71—DESIGNATION OF CLASS A, B, C, D, AND E AIRSPACE AREAS; AIR TRAFFIC SERVICE ROUTES; AND REPORTING POINTS**

11

1. The authority citation for part 71 continues to read as follows:

Authority: 49 U.S.C. 106(g), 40103, 40113, 40120; E.O. 10854, 24 FR 9565, 3 CFR 1959-1963 Comp., p 389.

§71.11 [Amended]

2. Amend §71.11 by removing paragraph (b) and redesignating paragraph (c) as paragraph (b).

## PART 97—STANDARD INSTRUMENT APPROACH PROCEDURES

3. The authority citation for part 97 continues to read as follows:

Authority: 49 U.S.C. 106(g), 40103, 40106, 40113, 40114, 40120, 44502, 44514, 44701, 44719, and 44721-44722.

4. Revise §97.20 to read as follows:

§97.20 General.

(a) This subpart prescribes standard instrument procedures based on the criteria contained in FAA Order 8260.3, U.S. Standard for Terminal Instrument Procedures (TERPs), and other related Orders in the 8260 series that also address instrument procedure design criteria.

(b) Standard instrument procedures and associated supporting data adopted by the FAA are documented on FAA Forms 8260-3, 8260-4, 8260-5, and 8260-15A, and were approved for incorporation by reference by the Director of the Federal Register pursuant to 5 U.S.C. 552(a) and 1 CFR Part 51. The standard instrument procedures are available for examination at the Rules Docket (AGC-200) and at the National Flight Data

12

Center, 800 Independence Avenue, SW., Washington, DC 20590, and at the Office of the

Federal Register, 800 North Capitol Street, NW, suite 700, Washington, DC.

(c) Standard instrument procedures are depicted on aeronautical charts published

by the FAA National Aeronautical Charting Office and these charts are available for

purchase from the FAA's National Aeronautical Charting Office, Distribution Division,

6303 Ivy Lane, Suite 400, Greenbelt, MD 20770.

Issued in Washington, DC, on SEP **2 9** 2004

John M. Allen
Acting Director, Flight Standards Service

Certified to be a True Copy

13

*Will publish it the Federal Register November 16, 2004 in Part 4.*

[4910-13]

## DEPARTMENT OF TRANSPORTATION

Federal Aviation Administration (FAA)

14 CFR Part 61

[Docket No. FAA-2004-*19630*  ; Notice No. 04-14]

RIN 2120-AI38

**Second-in-Command Pilot Type Rating**

**ACTION:** Notice of proposed rulemaking (NPRM).

**SUMMARY:** The FAA proposes to establish a second-in-command (SIC) pilot type rating for those persons who complete the required SIC training. The purpose of this proposal is to conform the FAA pilot type rating requirements to the International Civil Aviation Organization (ICAO) pilot type rating standards and alleviate the difference that the FAA currently has on file with ICAO. The intended effect of this proposal is to allow U.S. flight crews to continue to operate in international airspace without the threat of being grounded for not holding the appropriate pilot type rating.

*December 16, 2004*

**DATES:** Send your comments to reach us by [INSERT DATE 30 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER].

**ADDRESSES:**   You may send comments identified by Docket Number FAA-2004- using any of the following methods:

- DOT Docket web site:  Go to http://dms.dot.gov and follow the instructions for sending your comments electronically.

- Government-wide rulemaking web site: Go to http://www.regulations.gov and follow the instructions for sending your comments electronically.

- Mail: Docket Management Facility; US Department of Transportation, 400 Seventh Street, S.W., Nassif Building, Room PL-401, Washington, DC 20590-001.
- Fax: 1-202-493-2251.
- Hand Delivery: Room PL-401 on the plaza level of the Nassif Building, 400 Seventh Street, S.W., Washington, DC, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays.

For more information on the rulemaking process, see the SUPPLEMENTARY INFORMATION section of this document.

*Privacy:* We will post all comments we receive, without change, to http://dms.dot.gov, including any personal information you provide. For more information, see the Privacy Act discussion in the SUPPLEMENTARY INFORMATION section of this document.

*Docket:* To read background documents or comments received, go to http://dms.dot.gov at any time or to Room PL-401 on the plaza level of the Nassif Building, 400 Seventh Street, S.W., Washington, DC, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays.

**FOR FURTHER INFORMATION CONTACT:** John Lynch, Certification Branch, AFS-840, General Aviation and Commercial Division, Flight Standards Service, Federal Aviation Administration, 800 Independence Avenue, S.W., Washington, DC 20591; telephone (202) 267-3844.

**Comments Invited**

The FAA invites interested persons to participate in this rulemaking by submitting written comments, data, or views. We also invite comments relating to the economic, environmental, energy or federalism impacts that might result from adopting the proposals in

2

this document. The most helpful comments reference a specific portion of the proposal, explain the reason for any recommended change, and include supporting data. We ask that you send us two copies of written comments.

All comments received will be filed in the docket. The FAA will develop a report that summarizes each substantive public contact with FAA personnel concerning this proposed rulemaking. The docket is available for public inspection before and after the comment closing date. If you wish to review the docket in person, go to the address in the ADDRESSES section of this preamble between 9:00 a.m. and 5:00 p.m., Monday through Friday, except Federal holidays. You may also review the docket using the Internet at the web address in the ADDRESSES section.

Before acting on this proposal, we will consider all comments we receive on or before the closing date for comments. We will consider comments filed late if it is possible to do so without incurring expense or delay. We may change this proposal based on the comments we receive.

If you want the FAA to acknowledge receipt of your comments on this proposal, include with your comments a pre-addressed, stamped postcard that identifies the docket number. We will stamp the date on the postcard and mail it to you.

**Availability of Rulemaking Documents**

You can get an electronic copy of these rulemaking documents using the Internet through the Office of Rulemaking's web page at www.faa.gov/avr/armhome.htm or the GPO's web page at www.access.gpo.gov/su_docs/aces/aces140/html.

You can get a printed copy by sending a request to: Federal Aviation Administration, Office of Rulemaking, ARM-1, 800 Independence Avenue, SW, Washington, DC 20591; or

3

by telephoning 202/267-9680. Please identify the docket number of this rulemaking in your request.

**SUPPLEMENTARY INFORMATION:**

**Background**

The Convention on International Civil Aviation (61 Stat. 1180), which was signed at Chicago, Illinois, on December 7, 1944, is an international treaty about aviation that establishes certain principles and arrangements to ensure that international civil aviation develops in a safe and orderly manner and operates soundly and economically. The Member States that have signed the Convention, including the United States, agree to keep their regulations governing civil aviation, to the greatest possible extent, consistent with those established under the Convention (article 12). Concerning pilots and flight crew members, the signatory Member States agree to recognize as valid certificates of competency and licenses issued by other signatories if the requirements for the certificates or licenses are equal to or above the minimum standards established under the Convention (article 33). If a signatory Member State finds it impracticable to comply with an international standard or bring its regulations into full accord with an international standard, or adopts regulations differing from an international standard, it must notify ICAO of the difference (article 38).

Currently, the United States has a difference filed with ICAO concerning our SIC qualification requirements vs. ICAO's type ratings standards for the SIC pilot flight crewmember position (*See* ICAO Annex 1, paragraphs 2.1.3.2 and 2.1.4.1.A). During recent meetings between FAA and ICAO officials, the FAA has explained that our SIC qualifications (14 CFR 61.55) require initial and annual recurrent knowledge and flight training for pilots who serve in the SIC pilot crewmember position, whereas the ICAO type

4

rating standard does not. Although ICAO officials understand our difference, they stated that the § 61.55 SIC pilot familiarization training requirements do not conform to ICAO pilot type ratings standards for the SIC pilot flight crewmember position because the SIC pilot does not actually receive a pilot type rating under the existing § 61.55 provisions. As a result, foreign civil aviation authorities have put the FAA and U.S. flight crews on notice that they intend to enforce the ICAO type rating standards for SIC pilot crewmembers when U.S. flight crews operate in European airspace and in some Caribbean countries

**Discussion of NPRM**

The FAA is proposing to revise 14 CFR § 61.5(b)(5) by adding a new subparagraph (iv) that provides for the SIC type rating. The FAA is proposing to revise 14 CFR § 61.55 by adding new paragraphs (a)(3) and (d) that would provide for the issuance of an aircraft type rating for SIC privileges when a person completes the SIC pilot familiarization training set forth in paragraph (b) of 14 CFR § 61.55. This NPRM proposes to conform our 14 CFR § 61.55 SIC qualification requirements with the ICAO Annex 1, paragraphs 2.1.3.2 and 2.1.4.1.A type rating standards and would eliminate our difference on file with ICAO. By issuing an aircraft type rating for SIC privileges only, the FAA would conform its pilot type rating requirements to the ICAO type rating standards and allow U.S. flight crews to operate internationally unimpeded.

However, the FAA wants it understood that as long as the person operates within the airspace of the United States (as defined in 14 CFR § 91.1), a person needn't hold this proposed SIC pilot type rating. Only when a person operates in international airspace or the airspace of a foreign country where compliance with the pilot type rating standards of ICAO (*i.e.*, ICAO Annex 1, paragraphs 2.1.3.2 and 2.1.4.1.A) or a foreign civil aviation authority's

rule is it mandatory that U.S. pilot flightcrews hold the appropriate pilot type rating. As long as a person operates within the airspace of the United States (as defined in 14 CFR § 91.1), that person only needs to comply the SIC qualifications and training of 14 CFR § 61.55.

In addition, the FAA is proposing to revise 14 CFR § 61.55 by adding new paragraph (e). This proposal would provide for the issuance of a pilot type rating for SIC privileges when a person satisfactorily completes an approved second-in-command training program under parts 121, 125, or 135 in an aircraft that is certificated for operations with a minimum crew of at least two pilots and the aircraft's type certificate requires a pilot type rating. The FAA believes that the pilot community and aircraft operators will support this NPRM because it would impose only minor additional costs on some pilots and operators.

The FAA intends to issue the SIC pilot type rating according to the following process:

1. The SIC applicant must receive the familiarization training of § 61.55(b) from a qualified pilot in command [*See* § 61.31(a)] or an authorized flight instructor who holds the aircraft type rating on his/her pilot certificate [*See* § 61.31(a) and § 61.195(b)]. The ground training of § 61.55(b)(1) may be given by an authorized advanced ground instructor [*See* § 61.215(b)], authorized flight instructor, or qualified pilot in command.

2. The person who provides the SIC familiarization training must sign the applicant's logbook or training record to verify that the training was given. The verification of the training must be in accordance with § 61.51(h)(2), and be documented in the SIC applicant's logbook or training record with the kind of ground and flight training and amount of training given [*See* § 61.51(h)(2)]. The person who provided the training must sign the SIC applicant's logbook/training record after completion of each lesson.

3. The SIC applicant must complete and sign an Airman Certificate and/or Rating Application, FAA Form 8710-1, and submit the application to an FAA Flight Standards District Office or to an Examiner. The Examiner must have the authority to conduct practical tests for pilot certification.

4. The person(s) who provides the ground and flight familiarization training to the SIC applicant must sign the area of the FAA Form 8710-1 identified as the "Instructor's Recommendation." This signoff is required in this area of the form even if a pilot in command who does not hold a flight instructor certificate provided the training.

5. The SIC applicant must appear in person at an FAA Flight Standards District Office or to an Examiner with his/her logbook/training records and a completed and signed FAA Form 8710-1.

6. The FAA Flight Standards District Office or Examiner reviews the SIC applicant's logbook/training record to ensure completion of the required training and endorsements. The Aviation Safety Inspector, Aviation Safety Technician, or Examiner would review the applicant's logbook/training record and inform the applicant that the SIC Privileges Only limitation may only be removed if that applicant completes the appropriate type rating practical test for pilot-in-command qualification. There is no practical test required for the issuance of the SIC Privileges Only type rating.

7. The FAA Flight Standards District Office or Examiner completes the application and issues the applicant a temporary pilot certificate for a SIC type rating with the appropriate aircraft type rating with the limitation "SIC Privileges Only." For example, an applicant who accomplishes the § 61.55(b) SIC familiarization training in a Cessna 500 would receive a temporary pilot certificate that reads as follows:

7

COMMERCIAL PILOT CERTIFICATE

Airplane Single Engine Land

Airplane Multiengine Land

Instrument Airplane

CE500 SIC Privileges Only

8. The FAA Flight Standards District Office forwards the application and newly issued temporary pilot certificate to the FAA Airman Certification Branch, AFS-760. If the application is made through an Examiner, the Examiner forwards the application and newly issued temporary pilot certificate to the Examiner's jurisdictional FAA Flight Standards District Office who sends the application and file to the FAA Airman Certification Branch, AFS-760.

9. The FAA Airman Certification Branch processes the SIC applicant's application and temporary pilot certificate and issues the applicant a permanent pilot certificate.

In addition, a person who satisfactorily completes an approved second-in-command training program under parts 121, 125, or 135 in an aircraft that is certificated for operations with a minimum crew of at least two pilots and the aircraft's type certificate requires a pilot type rating is entitled to receive that aircraft type rating for second-in-command privileges. The procedure for issuing a SIC type rating would be as follows:

1. The SIC applicant must complete an approved second-in-command training program under parts 121, 125, or 135 in an aircraft that is certificated for operations with a minimum crew of at least two pilots and the aircraft's type certificate requires a pilot type rating.

8

2. The person who provides the SIC training must sign the applicant's logbook or training record to verify the training was given. The verification of the training must be in accordance with § 61.51(h)(2), and be documented in the SIC applicant's logbook or training record with the kind of ground and flight training and amount of training given [*See* § 61.51(h)(2)]. The person who provided the training must sign the SIC applicant's logbook/training record after completion of each lesson.

3. The SIC applicant must complete and sign an Airman Certificate and/or Rating Application, FAA Form 8710-1, and submit the application to an FAA Flight Standards District Office or to an Examiner. The Examiner must have authority to conduct practical tests for pilot certification. A part 121 or part 135 Check Airman cannot review and approve the application unless that person also has examiner authority to conduct practical tests for pilot certification and holds an FAA Letter of Authority.

4. The person(s) who provided the ground and flight training to the SIC applicant must sign the area of the FAA Form 8710-1 identified as the "Instructor's Recommendation." This signoff is required in this area of FAA Form 8710-1 even if a pilot in command who does not hold a flight instructor certificate provided the training.

5. The SIC applicant must appear in person at an FAA Flight Standards District Office or to an Examiner with his/her logbook/training records and a completed and signed FAA Form 8710-1.

6. The FAA Flight Standards District Office or Examiner reviews the SIC applicant's logbook and/or training record for ensuring completion of the required training and endorsements. An Aviation Safety Inspector, Aviation Safety Technician, or Examiner reviews the applicant's logbook/training record and informs the applicant that the SIC

9



Privileges Only limitation may only be removed if that applicant completes the appropriate type rating practical test for pilot-in-command qualification. There is no practical test required for the issuance of the SIC Privileges Only type rating.

7. The FAA Flight Standards District Office completes the application and issues the applicant a temporary pilot certificate for an SIC type rating with the appropriate aircraft type rating with the limitation "SIC Privileges Only." For example, an applicant who accomplishes SIC training in a Boeing 737 would receive a temporary pilot certificate that reads as follows:

COMMERCIAL PILOT CERTIFICATE

Airplane Single Engine Land

Airplane Multiengine Land

Instrument Airplane

B-737 SIC Privileges Only

8. The FAA Flight Standards District Office forwards the application and newly issued temporary pilot certificate to the FAA Airman Certification Branch, AFS-760. If the application is made through an Examiner, the Examiner forwards the application and newly issued temporary pilot certificate to the Examiner's jurisdictional FAA Flight Standards District Office who sends the application and file to the FAA Airman Certification Branch, AFS-760.

9. The FAA Airman Certification Branch processes the SIC applicant's application and temporary pilot certificate and issues the applicant a permanent pilot certificate.

The FAA anticipates that many pilots have already completed their SIC training, whether it was § 61.55(b) SIC familiarization training or an approved SIC training program

under parts 121, 125, or 135, and would be making application for an SIC pilot type rating

based on past completion of SIC pilot training or a part 125 proficiency check. The

procedures for making application for an SIC pilot type rating would basically be the same as

previously stated in this document. The only difference would be that applicants who have

completed their SIC training prior to the FAA issuing its final rule for SIC pilot type ratings

would be required to show compliance with either the initial or recurrent SIC training within

the preceding 12 calendar months prior to the month of application for an SIC pilot type

rating. The following examples illustrate how the rule would apply to pilots who have

already completed their SIC training:

*Example No. 1*: The date is January 30, 2005, and the final rule for issuing SIC pilot type

ratings is now in effect. An airman completed initial § 61.55(b) SIC pilot familiarization

training in a Cessna 500 on August 6, 1998. The airman last completed recurrent § 61.55(b)

SIC pilot familiarization training in a Cessna 500 on August 6, 2000. This airman could not

apply for a SIC pilot type rating for the CE500 until completing recurrent SIC familiarization

training within the 12 calendar months before the month of application.

*Example No. 2*: The date is January 30, 2005, and the final rule for issuing SIC pilot type

ratings is now in effect. An airman completed initial part 121 SIC pilot training in a

Boeing 737 on August 6, 1998. The airman has completed recurrent part 121 SIC pilot

training in a Boeing 737 every 12 calendar months, including on August 13, 2004. This

airman could apply for a SIC pilot type rating for the B737 because the recurrent training was

completed within the 12 calendar months before January 2005.

*Example No. 3*: The date is January 5, 2005, and the final rule for issuing SIC pilot type

ratings is now in effect. An airman completed a part 125 SIC proficiency check in a

Gulfstream IV on August 6, 1990. The airman next shows completion of a part 125 SIC proficiency check in a Gulfstream IV on January 23, 2004. This airman could apply for an SIC pilot type rating for the Gulfstream IV because part 125 SIC proficiency check was completed within the 12 calendar months before January 2005.

*Example No. 4:* The date is January 5, 2005, and the final rule for issuing SIC pilot type ratings is now in effect. An airman completed initial § 61.55(b) SIC familiarization in a Lear 60 on August 6, 1990. The airman next shows completion of § 61.55(b) SIC familiarization training in a Lear 60 on January 23, 2004. This airman could apply for an SIC pilot type rating for the Lear 60 because the recurrent SIC familiarization training was completed within the 12 calendar months before January 2005.

**Paperwork Reduction Act**

The Paperwork Reduction Act of 1995 (44 U.S.C. 3507(d)) requires that the FAA consider the impact of paperwork and other information collection burdens imposed on the public. This proposal contains the following additional information collection requirement for pilots who apply for an SIC pilot type rating. As previously stated in this document, the primary purpose for this additional information collection requirement is to allow U.S. flight crews to continue to operate in international airspace without the threat of being grounded for not holding the appropriate pilot type rating.

As required by the Paperwork Reduction Act of 1995 (44 U.S.C. 3507(d)), the Department of Transportation has submitted the information requirements associated with this proposal to the Office of Management and Budget for its review.

Title: Second-in-Command Pilot Type Rating.

12

Summary: This proposal would establish an application process using the existing Airman Certificate and/or Rating Application, FAA Form 8710-1, for pilots who apply for an SIC pilot type rating for the reasons previously stated. This proposal would generate a need for the FAA's Civil Aviation Registry and Flight Standards District Offices to support the processing of the FAA Form 8710-1 application and issuing the SIC pilot type rating. Respondents: The likely respondents to this proposal are the pilots who will be required to complete and submit the FAA Form 8710-1 application when applying for an SIC pilot type rating. However, as it was previously stated in this document, the FAA wants it understood that as long as the person operates within the airspace of the United States (as defined in 14 CFR § 91.1), a person won't be required to hold this proposed SIC pilot type rating. Only when a person operates in international airspace or the airspace of a foreign country where compliance with the pilot type rating standards of ICAO (*i.e.*, ICAO Annex 1, paragraphs 2.1.3.2 and 2.1.4.1.A) or a foreign civil aviation authority's rule is it mandatory that U.S. pilot flightcrews hold the appropriate pilot type rating. As long as a person operates within the airspace of the United States (as defined in 14 CFR § 91.1), that person only needs to comply the SIC qualifications and training of 14 CFR § 61.55.

Frequency: Each pilot who needs to obtain the SIC pilot type rating will do so only once.

Annual Burden Estimate: The FAA has no estimate of the annual recordkeeping and reporting burden.

The FAA is requesting information from the public on the following questions:

How many pilots will apply for an SIC pilot type rating on an annual basis?

What are the annual burden hours to the public?

13

What are the annual costs to pilot who will be applying for an SIC pilot type rating?
What will be the total impact of this proposal?

According to the regulations implementing the Paperwork Reduction Act of 1995,
[5 CFR 1320.8(b)(2)(vi)], an agency may not conduct or sponsor, and a person is not
required to respond to a collection of information unless it displays a currently valid control
number issued by the Office of Management and Budget (OMB). If approved by OMB, the
information collection requirement contained in this NPRM will be incorporated into the
current approval of the Airman Certificate and/or Rating Application, FAA Form 8710-1.
The approved OMB control number for the Airman Certificate and/or Rating Application,
FAA Form 8710-1, is 2120-0021.

**Economic Assessment, Regulatory Flexibility Determination, International Trade
Impact Assessment, and Unfunded Mandates Assessment**

Proposed changes to Federal regulations must undergo several economic analyses.
First, Executive Order 12866 directs each Federal agency to propose or adopt a regulation
only upon a reasoned determination that the benefits of the intended regulation justify its
costs. Second, the Regulatory Flexibility Act of 1980 requires agencies to analyze the
economic impact of regulatory changes on small entities. Third, the Trade Agreements Act
(19 U.S.C. §§2531-2533) prohibits agencies from setting standards that create unnecessary
obstacles to the foreign commerce of the United States. In developing U.S. standards, this
Trade Act requires agencies to consider international standards and, where appropriate, that
they be the basis for U.S. standards. Fourth, the Unfunded Mandates Reform Act of 1995
(Pub. L. 104-4) requires agencies to prepare a written assessment of the costs, benefits, and
other effects of proposed or final rules that include a Federal mandate likely to result in the

expenditure by State, local, or tribal governments, in the aggregate, or by the private sector, of $100 million or more annually (adjusted for inflation).

For proposals with an expected minimal cost impact, a formal assessment of costs and benefits is not required. The Department of Transportation Order 2100.5 prescribes policies and procedures for simplification, analysis, and review of regulations. If it is determined that the expected impact is so minimal that the proposal does not warrant a full evaluation, a statement is included in the NPRM stating that the FAA has determined that the expected outcome will have a minimal impact with positive net benefits.

The FAA's assessment of this NPRM indicates that its economic impact will be minimal because it does not propose to significantly change the SIC qualification requirements. The purpose of this NPRM is to conform FAA pilot type rating rules with our international obligations to ICAO, so as to remove an outstanding difference between our 14 CFR § 61.55 SIC qualification requirements with the ICAO Annex 1, paragraphs 2.1.3.2 abd 2.1.4.1.A type rating standards.

Accordingly, the FAA has determined that there may be minor costs to those pilots who will need the SIC pilot type rating for international flight operations. These costs could include the time required to complete the FAA Form 8710-1 and the time and expense of traveling to an examiner or FAA Flight Standards District Office to file the application. The FAA has determined there may be some benefits to U.S. operators and pilots when conducting flight operations in foreign airspace where a foreign country's civilian aviation authority may enforce ICAO Annex 1, paragraphs 2.1.3.2 and 2.1.4.1.A type rating standards. The FAA has thus determined that this NPRM would have minimal impact with positive net benefits. We specifically request comments from the public on this issue.

15

Regulatory Flexibility Determination

The Regulatory Flexibility Act of 1980 (RFA) establishes "as a principle of regulatory issuance that agencies shall endeavor, consistent with the objective of the rule and of applicable statutes, to fit regulatory and informational requirements to the scale of the business, organizations, and governmental jurisdictions subject to regulation." To achieve that principle, the RFA requires agencies to solicit and consider flexible regulatory proposals and to explain the rationale for their actions. The RFA covers a wide range of small entities, including small businesses, not-for-profit organizations and small governmental jurisdictions.

Agencies must perform a review to determine whether a proposed or final rule will have a significant economic impact on a substantial number of small entities. If the agency determines that it will, the agency must prepare a regulatory flexibility analysis as described in the RFA.

However, if an agency determines that a proposed or final rule is not expected to have a significant economic impact on a substantial number of small entities, section 605(b) of the RFA provides that the head of the agency may so certify and a regulatory flexibility analysis is not required. The certification must include a statement providing the factual basis for this determination, and the reasoning should be clear.

This NPRM imposes minor costs on individuals by requiring U.S. pilots who fly overseas to obtain the SIC pilot type rating. Consequently, the FAA certifies that the rule will not have a significant economic impact on a substantial number of small entities. The FAA solicits comments from the public regarding this determination.

**Trade Impact Assessment**

The Trade Agreement Act of 1979 prohibits Federal agencies from establishing any standards or engaging in related activities that create unnecessary obstacles to the foreign commerce of the United States. Legitimate domestic objectives, such as safety, are not considered unnecessary obstacles. The statute also requires consideration of international standards and, where appropriate, that they be the basis for U.S. standards. The FAA has assessed the potential effect of this rulemaking and has determined that it would reduce trade barriers by narrowing the difference between the U.S. and ICAO regulations. The FAA has determined there may be some benefits to U.S. operators and pilots when conducting flight operations in foreign airspace where a foreign country's civilian aviation authority may enforce ICAO Annex 1, paragraphs 2.1.3.2 and 2.1.4.1.A type rating standards.

**Unfunded Mandates Assessment**

The Unfunded Mandates Reform Act of 1995 (the Act) is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and tribal governments. Title II of the Act requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed or final agency rule that may result in an expenditure of $100 million or more (adjusted annually for inflation) in any one year by State, local, and tribal governments, in the aggregate, or by the private sector; such a mandate is deemed to be a "significant regulatory action." The FAA currently uses an inflation-adjusted value of $120.7 million in lieu of $100 million.

This NPRM does not contain such a mandate. The requirements of Title II of the Act, therefore, do not apply.

17

Executive Order 13132, Federalism

The FAA has analyzed this proposed rule under the principles and criteria of Executive Order 13132, "Federalism," dated August 4, 1999 (64 FR 43255). We have determined that this action would not have a substantial direct effect on the States, on the relationship between the national Government and the States, or on the distribution of power and responsibilities among the various levels of government, and therefore would not have federalism implications.

**Environmental Analysis**

FAA Order 1050.1E identifies FAA actions that are categorically excluded from preparation of an environmental assessment or environmental impact statement under the National Environmental Policy Act in the absence of extraordinary circumstances. The FAA has determined this proposed rulemaking action qualifies for the categorical exclusion identified in paragraph 307(k) and involves no extraordinary circumstances. This NPRM proposes to allow for the issuance of pilot type ratings to SIC pilot crewmembers in order to conform the FAA pilot type rating requirements to the ICAO pilot type ratings standards.

**Regulations that Significantly Affect Energy Supply, Distribution, or Use**

The FAA has analyzed this NPRM under Executive Order 13211, "Actions Concerning Regulations that Significantly Affect Energy Supply, Distribution, or Use" (May 18, 2001). We have determined that it is not a "significant energy action" under the executive order because it is not a "significant regulatory action" under Executive Order 12866, and it is not likely to have a significant adverse effect on the supply, distribution, or use of energy.

List of Subjects

14 CFR Part 61

Aircraft, Airmen, Aviation safety, and Reporting and recordkeeping requirements.

**The Amendment**

In consideration of the foregoing, the Federal Aviation Administration proposes to amend Chapter H of Title 14 Code of Federal Regulations as follows:

**PART 61--CERTIFICATION: PILOTS, FLIGHT INSTRUCTORS, AND GROUND INSTRUCTORS**

1. The authority citation for part 61 continues to read as follows:

**Authority:** 49 U.S.C. 106(g), 40113, 44701-44703, 44707, 44709-44711, 45102-45103, 45301-45302.

2. Amend § 61.5 by adding new paragraph (b)(5)(iv) to read as follows:

**§ 61.5 Certificates and ratings issued under this part.**

\*      \*      \*      \*      \*

(b)      \*      \*      \*

(5)      \*      \*      \*

(iv) Second-in-command type rating for aircraft that is certificated for operations with a minimum crew of at least two pilots.

\*      \*      \*      \*      \*

3. Amend § 61.55 by revising the introductory language of paragraph (a), revising paragraph (a)(2), adding new paragraphs (a)(3), (d), and (e); and redesignating existing paragraphs (d) through (h) as paragraphs (f) through (j) to read as follows:

**§ 61.55 Second-in-command qualifications.**

19

(a) Except as provided in paragraph (e) of this section, no person may serve as a second-in-command of an aircraft type certificated for more than one required pilot flight crewmember or in operations requiring a second-in-command unless that person holds:

(1)    *    *    *

(2) An instrument rating that applies to the aircraft being flown if the flight is under IFR; and

(3) An aircraft type rating for aircraft that is certificated for operations with a minimum crew of at least two pilots.

*    *    *    *    *

(d) If a person complies with the second-in-command familiarization training requirements in paragraph (b) of this section in an aircraft that is certificated for operations with a minimum crew of at least two pilots and the aircraft's type certificate requires a pilot type rating, then that person is entitled to receive that aircraft type rating for second-in-command privileges.

(e) A person who has satisfactorily completed an approved second-in-command training program under parts 121, 125, or 135 in an aircraft that is certificated for operations with a minimum crew of at least two pilots and the aircraft's type certificate requires a pilot type rating, then that person is entitled to receive that aircraft type rating for second-in-command privileges.

*    *    *    *    *

Issued in Washington, D.C., on            NOV – 9 2004

John M. Allen
Acting Director, Flight Standards Service

Certified to be a True Copy

20

9:19 2007 1:16:49 PM

*Attachment F(a)*



# Aviation Safety (AVS)

Updated: 12 1: pm ET September 18, 2007

## Web Team

We provide for the development, operations, and update of AVS web content and services that are available to the public and employees. The team consists of one member from each AVS Office and Service and the AVS Web Program Manager. Key functions include:

- Guiding content owners on effective methods for communicating information
- Providing content owners with the process for requesting web postings
- Creating webpage layouts from content provided by the owners
- Evaluating and approving new webpages, websites, and web-based applications

## Team Members

| Name | Representing | Telephone |
|------|--------------|-----------|
| Brown, Caprice | Aerospace Medicine | 202-267-9881 |
| Carter, Randy | Aviation Safety – Team Lead | 202-267-8923 |
| Douglas, Alicia | Aircraft Certification | 817-222-5379 |
| Mooney, Joe | Accident Investigation | 202-267-3279 |
| Slaughter, Judine | Rulemaking | 202-493-4698 |
| Wilcox, Joel | Flight Standards | 202-493-4876 |

- ...
- Policy & Procedures [A]
  - ○ AVS Procedures
  - ○ Agency Web & Section 508 Policy



This page can be viewed online at:
https://intranet.faa.gov/faaemployees/org/linebusiness/avs/it/info_tech/avs/

Updated 9-13-07

### AVS Trained and Approved Web Developers

The following Web Developers are approved to post websites and webpages to the test and production servers as indicated.

### Public Website

| Name | Approved to Develop for the Following *Static* Websites |
|---|---|
| **Aviation Safety (AVS) Developers:** | |
| The Office of Communications - Steven Nichols is the primary contact | Any AVS webpage |
| Stout, Craig | AFS-600 |
| Ingerson, Scott | AFS-600 |
| | |
| **Flight Standards Service (AFS) Developers:** | |
| Singh, Inderbir | All AFS websites. |
| Bartomeo, Anthony | AFS field offices & AFS region pages - AEA Region |
| Copeland, Kelvin | AFS-700, Flight Standards Registry |
| Han, Jun | AFS field offices & AFS region pages - ASO Region |
| Sherryl Hulett and Nancy McDaniel | AFS field offices & AFS region pages - AWP Region |
| Napolitano, Joann | AFS field offices - AEA Region (ANE Area) |
| Nguyen, Tommy V. | AFS field offices & AFS region pages - ASW Region |
| Parsons, Stuart | AFS field offices for ACE Region |
| Pyles, James | FAA Safety Team |
| Slauson, Ken (ARC Employee) | AFS field offices & AFS region pages - AAL Region |
| Wright, Cary | AFS-700, Flight Standards Registry |
| | |
| **Aircraft Certification Service (AIR) Developers** | |
| Manav, Manu | All AIR websites |
| | |
| **Office of Rulemaking (ARM) Developers** | |
| The Office of Communications - Steven Nichols is the primary contact | All ARM websites |
| Slaughter, Judine | ARM websites (for emergency postings ) |
| | |
| **Office of Aviation Medicine (AAM) Developers** | |
| Nelms, David | All AAM websites |
| The Office of Communications - Steven Nichols is the primary contact | All AAM websites |
| | |
| **Office of Accident Investigation (AAI) Developers** | |
| The Office of Communications - Steven Nichols is the primary contact | All AAI websites |
| Mike Keast | The AAI preliminary accident/incident database |
| Roberta Toth | The AAI preliminary accident/incident database |
| | |
| **Office of Air Traffic Oversight (AOV)** | |
| The Office of Communications - Steven | All AOV static websites |

Updated 9-13-07

| Nichols is the primary contact | |
|---|---|

The following developers are approved to post public websites and webpages as indicated, but to the test server only.

| Aircraft Certification Service (AIR) Developers | Approved to Develop for the Following *Static* Websites |
|---|---|
| Barnett, Eric | ASW Directorate websites |
| Desar, Lucien | ANE Directorate websites |
| Young, Glen Devenport, Jill | ANM Directorate websites |
| Douglas, Alicia Howdeshell, Christopher | All AIR websites |
| Carpenter, Michelle | AIR-500 websites |
| Mutchler, Mark | ACE Directorate websites |

## Employee's Website

| Name | Approved to Develop for the Following *Static* Sites |
|---|---|
| **Aviation Safety (AVS) Developers:** | |
| The Office of Communications - Steven Nichols is the primary contact | Any AVS webpage |
| Stout, Craig | AFS-600 websites |
| Ingerson, Scott | AFS-600 websites |
| | |
| **Flight Standards Service (AFS) Developers:** | |
| Singh, Inderbir | All AFS websites. |
| Bartomeo, Anthony | AFS field offices & AFS region pages - AEA Region |
| Copeland, Kelvin | AFS-700, Flight Standards Registry |
| Han, Jun | AFS field offices & AFS region pages - ASO Region |
| Sherry l Hulett and Nancy McDaniel | AFS field offices & AFS region pages - AWP Region |
| Napolitano, Joann | AFS field offices - AEA Region (ANE Area) |
| Nguyen, Tommy V. | AFS field offices & AFS region pages - ASW Region |
| Parsons, Stuart | AFS field offices for ACE Region |
| Pyles, James | FAA Safety Team |
| Slauson, Ken (ARC Employee) | AFS field offices & AFS region pages - AAL Region |
| Wierbersch, Jan | AFS field offices & AFS region pages - ANM Region |
| Wright, Cary | AFS-700, Flight Standards Registry |
| | |
| **Aircraft Certification Service (AIR) Developers** | |
| Manav, Manu | All AIR websites |
| | |
| **Office of Rulemaking (ARM) Developers** | |
| The Office of Communications - Steven Nichols is the primary contact | All ARM websites |

Updated 9-13-07

| Office of Aviation Medicine (AAM) Developers | |
|---|---|
| Nelms, David | All AAM websites |
| The Office of Communications - Steven Nichols is the primary contact | All AAM websites |

| Office of Accident Investigation (AAI) Developers | |
|---|---|
| The Office of Communications - Steven Nichols is the primary contact | All AAI websites |

| Office of Air Traffic Oversight (AOV) | |
|---|---|
| The Office of Communications - Steven Nichols is the primary contact | All AOV websites |

**The following developers are approved to post Employee's websites and webpages as indicated, to the test server only.**

| Aircraft Certification Service (AIR) Developers | Approved to Develop for the Following *Static* Websites |
|---|---|
| Barnett, Eric | ASW Directorate websites |
| Desar, Lucien Tessicini, Carole | ANE Directorate websites |
| Young, Glen Devenport, Jill | ANM Directorate websites |
| Douglas, Alicia Howdeshell, Christopher | All AIR websites |
| Carpenter, Michelle | AIR-500 websites |
| Mutchler, Mark | ACE Directorate websites |
| **Flight Standards Service (AFS) Developers** | |
| Crawford, Kelli | AFS QMS website |

Economic Research Service                                    Position No. _____
Information Services Division
Office of the Director
Program / Management Analyst (Web Project Coordinator), GS-0343-11

I.    INTRODUCTION

The Economic Research Service (ERS) conducts broad programs of economic and other social science research and analysis relating to agriculture, food, natural resources, and rural America for use by public and private decision makers. ERS' clients are the executive and legislative branches; environmental, consumer and public interest groups, including farm and industry groups; and the general public.

The Information Services Division provides technical leadership, guidance, training, coordination, and other assistance in computing, editing, and disseminating information in support of the economic research and analysis mission of ERS.

This position is located in the Office of the Director (OD) which has responsibility for coordinating and managing the functions and services performed by the Division and providing administrative, management, and clerical support for the branches. This position is subject to the provisions of the Fair Labor Standards Act (FLSA).

The incumbent serves as an Agency specialist and project manager for web product development and in this capacity coordinates efforts closely with the Web Manager and Web Editor-in-Chief. The incumbent assists in planning, organizing, and leading projects that involve high-level policy and program impacts, and require highly sophisticated web development and design processes to meet changing customer needs by effectively communicating agency research.

II.   DUTIES AND RESPONSIBILITIES

1.    Assists with web product development and web project management for the Division team that is responsible for development and maintenance of the ERS Web site, extranets and employee intranet. This includes a high degree of coordination with program division managers and staff to facilitate effective utilization of utilization of electronic methodologies, including the ERS Web site, in a manner that meets the Agency's strategic objectives for information and data dissemination.

2.    Serves as a web project manager and in this capacity coordinates the work of interdisciplinary teams assigned to web projects to ensure that objectives are met and a high degree of effectiveness is maintained. Assists in determining assignments, helps set priorities, monitors progress, and reports on progress in meeting established milestones and deadlines.

3.    Independently researches and evaluates new and emerging methods for web product development and web project management. Assesses these methods with respect to their suitability for: (a) communicating the Agency's research outputs; (b) leveraging use of ERS materials; (c) potential costs and benefits; and (d) adaptability to Agency requirements.

4.    Consults with the ERS Web Team to identify ERS priorities for web product development and opportunities to improve the Agency's performance of this function. Uses this information to develop new or improved methods, prepares and presents concept and strategy papers and/or presentations, trains Agency staff as needed, and demonstrates and communicates the effectiveness of selected methods in meeting agency goals.

5       Coordinates web product development plans and schedules, and advises Agency staff on product planning, development, design, and implementation. In this capacity, incumbent works closely with the Web Editor-in-Chief to manage the web product development process and associated activities. Prepares process marketing and outreach efforts, and ensures a smooth, consistent and transparent product development process by providing comprehensive support documentation. Provides technical direction and assistance to program division staff who are assigned to develop products for web and electronic information delivery. Reviews final products submitted by Agency Product Development Teams for adherence to Agency web policies, procedures, and guidelines.

6       Assists in developing annual and long-range plans to realize the web and electronic product development components of the Agency's strategic goals for information technology, communication, and customer service, and provides project management and leadership for activities that are part of these plans. Provides Agency insight into "best practices" for web and electronic information product development based on research and analysis of these practices in and out of government. Supports the ERS Web Team in developing new web product development and web project management policies, procedures, and guidelines as needed. Serves as an advocate for web product development and web project management techniques and best practices.

7       Provides Agency liaison with other Federal agencies, universities, task forces, and other groups and organizations on issues related to the development, operation, and management of web and electronic information dissemination programs.

8.      Researches technical capabilities of contractors, develops estimated costs, drafts technical requests for proposals, assesses capability of contract experts, and provides advice to the Web Manager on final selection.

9       Assists in developing estimates and monitoring budgets for diverse web projects as needed. Controls expenses to stay within budget guidelines. Identifies and provides for development of generalized systems and structures to achieve economic savings across Agency-wide projects.

10.     Incumbent performs other duties as assigned.


III.    EVALUATION FACTORS

        Factor 1. Knowledge Required by the Position              Level 1 - 7      1250 pts

Broad knowledge of Agency direction and program outputs, electronic information and data dissemination, web project management, information architecture, usability, content management, Web systems technologies, and system design, including an in-depth knowledge of a particular web design and development specialty area; to serve as the technical authority on the web and electronic product development process. In-depth knowledge of program analysis and Web systems methodology is used to develop an environment that includes approaches, standards, procedures, and guidelines for the ongoing improvement of ERS web products and their integration into the Agency electronic information dissemination program. Position requires the ability to deal effectively with Agency representatives and users to assist in the development of dissemination methods that meet the needs of ERS customers. Proposals and decisions must be justified, and if necessary defended concerning the overall design environment.

Factor 2.  Supervisory Controls                    Level 2 - 4        450 pts

The incumbent is under the general supervision of the Web Manager, who provides supervisory, administrative, and policy oversight and helps the incumbent devise plans, work methods, and other aspects of the assignment.  The incumbent exercises some latitude in the planning and execution of assignments.  The results are reviewed prior to release, publication or discussion with management officials.

Factor 3.  Guidelines                              Level 3 - 3        275 pts

Guidelines consist of Government, Departmental, and Agency regulations on information dissemination, ADP, and communications as well as specified Agency goals. Available studies and vendor manuals are also used.  Guidelines are general in nature and may be difficult to interpret or apply.  The incumbent must select and interpret the appropriate material and establish guidance that assures conformance to the pertinent areas.  Trends and patterns in areas such as workload, types of information, customer needs and usage, research directions, and technological advances must be prepared to develop plans and solutions to maintain an effective web product development program.

Factor 4.  Complexity                              Level 4 - 4        225 pts

The work involves an unusual depth of analysis in an area where approaches, customer needs, and technology change at a rapid pace and implementation of improvements can cause extensive changes in Agency practices and procedures. In determining implementation and optimization approaches, decisions must be made over lengthy time periods during which assumptions about research directions, customer needs, system usage, major new system implementations, project funding, and advances in technology could change considerably.

Possibilities for change are developed as a result of exploratory studies that generally involve a wide range of Agency outputs that include intermediate and long-term research, reports and indicators, data, and staff analysis, as well as a wide range of technologies and computer software. These studies require extensive coordination with management, research and technical staff, and vendor representatives; and the evaluation of new approaches and methods is clouded by the lack of similar operational systems available to conduct appropriate studies. Extensive testing, evaluation of results, and incorporating customer feedback vary the pace of implementation.

Factor 5.  Scope and Effect                        Level 5 - 2        150 pts

The work involves improvements in existing systems and operations and development of new approaches to match effective electronic dissemination techniques with customer needs.  The incumbent assists in the design and management of complex information dissemination systems, specializing in developing methods and approaches for use of Web information delivery and its integration with related dissemination systems. The work affects the basic design and use of automated systems that provide for the efficient and effective delivery of Agency products and the collection and delivery of information and services at the Department level.  Advice and guidance provided by the incumbent affects the work of professional staff and management officials throughout the Agency and in other Agencies in the Department.

Factor 6.  Personal Contacts and Factor 7.Purpose of Contacts   Level 6 - 3   60 pts

In addition to contacts within the Agency, contacts also take place with computer personnel and officials of the Department, representatives of vendors and contractors, and with Agency customers.

3

Factor 7.  Purpose of Contacts                              Level 7 - 2       120 pts

Contacts are to present requirements, gather and obtain information, and identify and resolve problems.  Considerable tact and diplomacy are required in convincing and securing cooperation of parties that may have different points of view

Factor 8.  Physical Demands                               Level 8 - 1       5 pts

The work is sedentary.  It occasionally requires the carrying of light office equipment and materials.

Factor 9.  Work Environment                               Level 9 - 1       5 pts

The work is primarily conducted in a typical office environment

4

Economic Research Service                          Position No. ___ _____ _____
Information Services Division
Office of the Director
Program / Management Analyst (Web Project Coordinator), GS-0343-12

I.      INTRODUCTION

The Economic Research Service (ERS) conducts broad programs of economic and other social science research and analysis relating to agriculture, food, natural resources, and rural America for use by public and private decision makers. ERS' clients are the executive and legislative branches; environmental, consumer and public interest groups, including farm and industry groups; and the general public.

The Information Services Division provides technical leadership, guidance, training, coordination, and other assistance in computing, editing, and disseminating information in support of the economic research and analysis mission of ERS.

This position is located in the Office of the Director (OD) which has responsibility for coordinating and managing the functions and services performed by the Division and providing administrative, management, and clerical support for the branches. This position is subject to the provisions of the Fair Labor Standards Act (FLSA).

The incumbent serves as an Agency specialist and project manager for web product development and in this capacity coordinates efforts closely with the Web Manager and Web Editor-in-Chief. The incumbent plans, organizes, and leads projects that involve high-level policy and program impacts, and require highly sophisticated web development and design processes to meet changing customer needs by effectively communicating agency research.

II.     DUTIES AND RESPONSIBILITIES

    1       Specialist on web product development and web project management for the Division team that is responsible for development and maintenance of the ERS Web site, extranets and employee intranet. This includes a high degree of coordination with program division managers and staff to facilitate effective utilization of utilization of electronic methodologies, including the ERS Web site, in a manner that meets the Agency's strategic objectives for information and data dissemination.

    2.      Serves as a web project manager, and in this capacity plans, directs, and coordinates work of the interdisciplinary teams assigned to web projects to ensure that objectives are met and a high degree of effectiveness is maintained. Assists in determining appropriate assignments, setting priorities, monitoring progress, and reporting on progress in meeting established milestones and deadlines.

    3.      Independently researches and evaluates new and emerging methods for web product development and web project management. Assesses these methods with respect to their suitability for (a) communicating the Agency's research outputs; (b) leveraging use of ERS materials; (c) potential costs and benefits; and (d) adaptability to Agency requirements.

    4.      Consults with the ERS Web Team and the division management team to identify ERS priorities for web product development and opportunities to improve the Agency's performance of this function. Uses this information to develop new or improved methods, prepares and presents concept and strategy papers and/or presentations, trains Agency staff as needed, and demonstrates and communicates the effectiveness of selected methods in meeting agency goals.

5       Coordinates web product development plans and schedules, and advises Agency staff on product planning, development, design, and implementation. In this capacity, incumbent works closely with the Web Editor-in-Chief to manage the web product development process and associated activities. Prepares process marketing and outreach efforts, and ensures a smooth, consistent and transparent product development process by providing comprehensive support documentation. Provides technical direction and assistance to program division staff who are assigned to develop products for web and electronic information delivery. Reviews final products submitted by Agency Product Development Teams for adherence to Agency web policies, procedures, and guidelines.

6.      Assists in developing, designing, and implementing annual and long-range plans to realize the web and electronic product development components of the Agency's strategic goals for information technology, communication, and customer service, and provides project management and leadership for activities that are part of these plans. Provides Agency insight into "best practices" for web and electronic information product development based on research and analysis of these practices in and out of government. Supports the ERS Web Team in developing new web product development and web project management policies, procedures, and guidelines as needed. Serves as an advocate for web product development and web project management techniques and best practices.

7.      Provides Agency liaison with other Federal agencies, universities, task forces, and other groups and organizations on issues related to the development, operation, and management of web and electronic information dissemination programs.

8.      Researches technical capabilities of contractors, develops estimated costs, drafts technical requests for proposals, assesses capability of contract experts, and provides advice to the Web Manager on final selection.

9.      Develops estimates and monitors budgets for diverse web projects as needed. Controls expenses to stay within budget guidelines. Identifies and provides for development of generalized systems and structures to achieve economic savings across Agency-wide projects.

10      Incumbent performs other duties as assigned.


III.    EVALUATION FACTORS

        Factor 1. Knowledge Required by the Position          Level 1 - 7      1250 pts

        Broad knowledge of Agency direction and program outputs, electronic information and data dissemination, web project management, information architecture, usability, content management, Web systems technologies, and system design, including an in-depth knowledge of a particular web design and development specialty area; to serve as the technical authority on the web and electronic product development process. In-depth knowledge of program analysis and Web systems methodology is used to develop an environment that includes approaches, standards, procedures, and guidelines for the ongoing improvement of ERS web products and their integration into the Agency electronic information dissemination program. Position requires the ability to deal effectively with all levels of management and users to provide leadership in the development of dissemination methods that meet the needs of ERS customers. Proposals and decisions must be justified, and if necessary defended concerning the overall design environment.

2

Factor 2  Supervisory Controls                    Level 2 - 4        450 pts

The incumbent is under the general supervision of the Web Manager, who provides supervisory, administrative, and policy oversight while making assignments. Plans, work methods, and other aspects of the assignment are devised by the incumbent in consultation with supervisor  The incumbent has certain latitude in the planning and execution of assignments. The results are usually accepted as presented and are reviewed as to the fulfillment of objectives.

Factor 3.  Guidelines                            Level 3 - 4        350 pts

Guidelines consist of Government, Departmental, and Agency regulations on information dissemination, ADP, and communications as well as specified Agency goals. Available studies and vendor manuals are also used.  Guidelines are general in nature and may be difficult to interpret or apply.  The incumbent must select and interpret the appropriate material and establish guidance that assures conformance to the pertinent areas   Trends and patterns in areas such as workload, types of information, customer needs and usage, research directions, and technological advances must be prepared to develop plans and solutions to maintain an effective web product development program.

Factor 4.  Complexity                            Level 4 - 5        350 pts

The work involves an unusual depth of analysis in an area where approaches, customer needs, and technology change at a rapid pace and implementation of improvements can cause extensive changes in Agency practices and procedures. In determining implementation and optimization approaches, decisions must be made over lengthy time periods during which assumptions about research directions, customer needs, system usage, major new system implementations, project funding, and advances in technology could change considerably.

Possibilities for change are developed as a result of exploratory studies that generally involve a wide range of Agency outputs that include intermediate and long-term research, reports and indicators, data, and staff analysis, as well as a wide range of technologies and computer software. These studies require extensive coordination with management, research and technical staff, and vendor representatives; and the evaluation of new approaches and methods is clouded by the lack of similar operational systems available to conduct appropriate studies. Extensive testing, evaluation of results, and incorporating customer feedback vary the pace of implementation.

Factor 5  Scope and Effect                       Level 5 - 4        325 pts

The work involves improvements in existing systems and operations and development of new approaches to match effective electronic dissemination techniques with customer needs.  The incumbent serves as an expert and consultant in the design and management of complex information dissemination systems, specializing in developing methods and approaches for use of Web information delivery and its integration with related dissemination systems. The work affects the basic design and use of automated systems that provide for the efficient and effective delivery of Agency products and the collection and delivery of information and services at the Department level.  Advice and guidance provided by the incumbent affects the work of professional staff and management officials throughout the Agency and in other Agencies in the Department.

Factor 6.  Personal Contacts and Factor 7.Purpose of Contacts  Level 6 - 3    60 pts

In addition to contacts within the Agency, contacts also take place with computer personnel and officials of the Department, the Government, representatives of vendors and contractors, and with Agency customers.

3

Factor 7.  Purpose of Contacts                    Level 7 - 3        120 pts

Contacts are to present requirements, gather and obtain information, and identify and resolve
problems.  Considerable tact and diplomacy are required in convincing and securing cooperation
of parties that may have different points of view

Factor 8.  Physical Demands                       Level 8 - 1        5 pts

The work is sedentary.  It occasionally requires the carrying of light office equipment and
materials

Factor 9.  Work Environment                       Level 9 - 1        5 pts

The work is primarily conducted in a typical office environment.

Economic Research Service
Information Services Division
Office of the Director
Program / Management Analyst (Web Project Coordinator), GS-0343-13

Position No. ___ _____ _____

I.    INTRODUCTION

The Economic Research Service (ERS) conducts broad programs of economic and other social science research and analysis relating to agriculture, food, natural resources, and rural America for use by public and private decision makers. ERS' clients are the executive and legislative branches; environmental, consumer and public interest groups, including farm and industry groups; and the general public.

The Information Services Division provides technical leadership, guidance, training, coordination, and other assistance in computing, editing, and disseminating information in support of the economic research and analysis mission of ERS.

This position is located in the Office of the Director (OD) which has responsibility for coordinating and managing the functions and services performed by the Division and providing administrative, management, and clerical support for the branches.  This position is subject to the provisions of the Fair Labor Standards Act (FLSA).

The incumbent serves as an Agency specialist and project manager for web product development and in this capacity coordinates efforts closely with the Web Manager and Web Editor-in-Chief.  The incumbent plans, organizes, and leads projects that involve high-level policy and program impacts, and require highly sophisticated web development and design processes to meet changing customer needs by effectively communicating agency research.

II    DUTIES AND RESPONSIBILITIES

1.    Serves as a specialist on web product development and web project management for the Division team that is responsible for development and maintenance of the ERS Web site, extranets and employee intranet.  This includes a high degree of coordination with program division managers and staff to facilitate effective utilization of utilization of electronic methodologies, including the ERS Web site, in a manner that meets the Agency's strategic objectives for information and data dissemination.

2    Serves as a web project manager, and in this capacity plans, directs, and coordinates work of the interdisciplinary teams assigned to web projects to ensure that objectives are met and a high degree of effectiveness is maintained. Makes appropriate assignments, sets priorities, monitors progress, and reports on progress in meeting established milestones and deadlines

3.    Independently researches and evaluates new and emerging methods for web product development and web project management  Assesses these methods with respect to their suitability for: (a) communicating the Agency's research outputs; (b) leveraging use of ERS materials; (c) potential costs and benefits; and (d) adaptability to Agency requirements.

4    Consults with Agency senior management, the ERS Web Team, and the division management team to identify ERS priorities for web product development and opportunities to improve the Agency's performance of this function. Uses this information to develop new or improved methods, prepares and presents concept and strategy papers and/or presentations, trains Agency staff as needed, and demonstrates and communicates the effectiveness of selected methods in meeting agency goals.

5       Coordinates web product development plans and schedules, and advises Agency staff on product planning, development, design, and implementation. In this capacity, incumbent works closely with the Web Editor-in-Chief to manage the web product development process and associated activities. Prepares process marketing and outreach efforts, and ensures a smooth, consistent and transparent product development process by providing comprehensive support documentation. Provides technical direction and assistance to program division staff who are assigned to develop products for web and electronic information delivery. Reviews final products submitted by Agency Product Development Teams for adherence to Agency web policies, procedures, and guidelines.

6.      Develops, designs, and implements annual and long-range plans to realize the web and electronic product development components of the Agency's strategic goals for information technology, communication, and customer service, and provides project management and leadership for activities that are part of these plans. Provides Agency insight into "best practices" for web and electronic information product development based on research and analysis of these practices in and out of government. Supports the ERS Web Team in developing new web product development and web project management policies, procedures, and guidelines as needed. Serves as a key champion and advocate for web product development and web project management techniques and best practices

7       Provides Agency liaison with other Federal agencies, universities, task forces, and other groups and organizations on issues related to the development, operation, and management of web and electronic information dissemination programs.

8.      Researches technical capabilities of contractors, develops estimated costs, drafts technical requests for proposals, assesses capability of contract experts, and provides advice to the Web Manager on final selection.

9.      Develops estimates and monitors budgets for diverse web projects as needed. Controls expenses to stay within budget guidelines. Identifies and provides for development of generalized systems and structures to achieve economic savings across Agency-wide projects.

10.     Incumbent performs other duties as assigned.


III     EVALUATION FACTORS

Factor 1   Knowledge Required by the Position            Level 1 - 8       1450 pts

Broad knowledge of Agency direction and program outputs, electronic information and data dissemination, web project management, information architecture, usability, content management, Web systems technologies, and system design, including an in-depth knowledge of a particular web design and development specialty area; to serve as the technical authority on the web and electronic product development process. In-depth knowledge of program analysis and Web systems methodology is used to develop an environment that includes approaches, standards, procedures, and guidelines for the ongoing improvement of ERS web products and their integration into the Agency electronic information dissemination program. Position requires the ability to deal effectively with all levels of management and users to provide leadership in the development of dissemination methods that meet the needs of ERS customers. Proposals and decisions must be justified, and if necessary defended concerning the overall design environment.

2

# Page 29 of 36

Factor 2  Supervisory Controls                          Level 2 - 5        550 pts

The incumbent is under the general supervision of the Web Manager, who provides supervisory, administrative, and policy oversight while making assignments  Plans, work methods, and other aspects of the assignment must be devised by the incumbent  The incumbent has wide latitude in the planning and execution of assignments and comparable freedom in the oversight of others assigned to the work. The results are usually accepted as presented and are reviewed as to the fulfillment of objectives.

Factor 3  Guidelines                                   Level 3 - 5        350 pts

Guidelines consist of Government, Departmental, and Agency regulations on information dissemination, ADP, and communications as well as specified Agency goals. Available studies and vendor manuals are also used. Guidelines are general in nature and may be difficult to interpret or apply. The incumbent must select and interpret the appropriate material and establish guidance that assures conformance to the pertinent areas. Trends and patterns in areas such as workload, types of information, customer needs and usage, research directions, and technological advances must be prepared to develop plans and solutions to maintain an effective web product development program.

Factor 4.  Complexity                                  Level 4 - 6        350 pts

The work involves an unusual depth of analysis in an area where approaches, customer needs, and technology change at a rapid pace and implementation of improvements can cause extensive changes in Agency practices and procedures. In determining implementation and optimization approaches, decisions must be made over lengthy time periods during which assumptions about research directions, customer needs, system usage, major new system implementations, project funding, and advances in technology could change considerably.

Possibilities for change are developed as a result of exploratory studies that generally involve a wide range of Agency outputs that include intermediate and long-term research, reports and indicators, data, and staff analysis, as well as a wide range of technologies and computer software.  These studies require extensive coordination with management, research and technical staff, and vendor representatives; and the evaluation of new approaches and methods is clouded by the lack of similar operational systems available to conduct appropriate studies. Extensive testing, evaluation of results, and incorporating customer feedback vary the pace of implementation.

Factor 5. Scope and Effect                             Level 5 - 2        325 pts

The work involves improvements in existing systems and operations and development of new approaches to match effective electronic dissemination techniques with customer needs.  The incumbent serves as an expert and consultant in the design and management of complex information dissemination systems, specializing in developing methods and approaches for use of Web information delivery and its integration with related dissemination systems. The work affects the basic design and use of automated systems that provide for the efficient and effective delivery of Agency products and the collection and delivery of information and services at the Department level.  Advice and guidance provided by the incumbent affects the work of professional staff and management officials throughout the Agency and in other Agencies in the Department.

3

Factor 6   Personal Contacts and Factor 7.Purpose of Contacts    Level 6 - 3        60 pts

In addition to contacts within the Agency, contacts also take place with computer personnel and officials of the Department  the Government, representatives of vendors and contractors, and with Agency customers.

Factor 7.  Purpose of Contacts                              Level 7 - 3        120 pts

Contacts are to present requirements, gather and obtain information, and identify and resolve problems.  Considerable tact and diplomacy are required in convincing and securing cooperation of parties that may have different points of view.

Factor 8   Physical Demands                              Level 8 - 1        5 pts

The work is sedentary.  It occasionally requires the carrying of light office equipment and materials.

Factor 9.  Work Environment                              Level 9 - 1        5 pts

The work is primarily conducted in a typical office environment

4

Economic Research Service
Information Services Division
Office of the Director
Program / Management Analyst (Web Project Coordinator), GS-0343-14

Position No. _____

I    INTRODUCTION

The Economic Research Service (ERS) conducts broad programs of economic and other social science research and analysis relating to agriculture, food, natural resources, and rural America for use by public and private decision makers  ERS' clients are the executive and legislative branches; environmental, consumer and public interest groups, including farm and industry groups; and the general public.

The Information Services Division provides technical leadership, guidance, training, coordination, and other assistance in computing, editing, and disseminating information in support of the economic research and analysis mission of ERS.

This position is located in the Office of the Director (OD) which has responsibility for coordinating and managing the functions and services performed by the Division and providing administrative, management, and clerical support for the branches.  This position is subject to the provisions of the Fair Labor Standards Act (FLSA).

The incumbent serves as the Agency's senior specialist and project manager for web product development and in this capacity coordinates efforts closely with the Web Manager and Web Editor-in-Chief.  The incumbent plans, organizes, and leads projects that involve high-level policy and program impacts, and require highly sophisticated web development and design processes to meet changing customer needs by effectively communicating agency research.

II.    DUTIES AND RESPONSIBILITIES

1.    Provides leadership on web product development and web project management as a key member of the Division team that is responsible for development and maintenance of the ERS Web site, extranets and employee intranet  This includes a high degree of coordination with program division managers and staff to facilitate effective utilization of utilization of electronic methodologies, including the ERS Web site, in a manner that meets the Agency's strategic objectives for information and data dissemination.

2.    Serves as a web project manager, and in this capacity plans, directs, and coordinates work of the interdisciplinary teams assigned to web projects to ensure that objectives are met and a high degree of effectiveness is maintained. Makes appropriate assignments, sets priorities, monitors progress, and reports on progress in meeting established milestones and deadlines.

3    Independently researches and evaluates new and emerging methods for web product development and web project management.  Assesses these methods with respect to their suitability for: (a) communicating the Agency's research outputs; (b) leveraging use of ERS materials; (c) potential costs and benefits; and (d) adaptability to Agency requirements.

4.    Consults with Agency senior management, the ERS Web Team, and the division management team to identify ERS priorities for web product development and opportunities to improve the Agency's performance of this function. Uses this information to develop new or improved methods, prepares and presents concept and strategy papers and/or presentations, trains Agency staff as needed, and demonstrates and communicates the effectiveness of selected methods in meeting agency goals.

5     Coordinates web product development plans and schedules, and advises Agency staff on product planning, development, design, and implementation. In this capacity, incumbent works closely with the Web Editor-in-Chief to manage the web product development process and associated activities. Prepares process marketing and outreach efforts, and ensures a smooth, consistent and transparent product development process by providing comprehensive support documentation. Provides technical direction and assistance to program division staff who are assigned to develop products for web and electronic information delivery. Reviews final products submitted by Agency Product Development Teams for adherence to Agency web policies, procedures, and guidelines.

6.     Develops, designs, and implements annual and long-range plans to realize the web and electronic product development components of the Agency's strategic goals for information technology, communication, and customer service, and provides project management and leadership for activities that are part of these plans. Provides Agency insight into "best practices" for web and electronic information product development based on research and analysis of these practices in and out of government. Supports the ERS Web Team in developing new web product development and web project management policies, procedures, and guidelines as needed. Serves as a key champion and advocate for web product development and web project management techniques and best practices.

7     Provides Agency liaison with other Federal agencies, universities, task forces, and other groups and organizations on issues related to the development, operation, and management of web and electronic information dissemination programs. Provides leadership as a key Agency representative to Department-wide electronic government initiatives.

8.     Researches technical capabilities of contractors, develops estimated costs, drafts technical requests for proposals, assesses capability of contract experts, provides advice to the Web Manager on final selection, and manages the contract vehicles set in place to deliver requirements.

9.     Estimates, justifies, and communicates budget requirements for projects to executive sponsors and Agency management. Controls expenses to stay within budget guidelines. Identifies and provides for development of generalized systems and structures to achieve economic savings across Agency-wide projects.

10.    Incumbent performs other duties as assigned

III.    EVALUATION FACTORS

Factor 1. Knowledge Required by the Position          Level 1 - 8     1550 pts

Broad knowledge of Agency direction and program outputs, electronic information and data dissemination, web project management, information architecture, usability, content management, Web systems technologies, and system design, including an in-depth knowledge of diverse web design and development specialty areas; to serve as the technical authority on the web and electronic product development process. In-depth knowledge of program analysis and Web systems methodology is used to develop an environment that includes approaches, standards, procedures, and guidelines for the ongoing improvement of ERS web products and their integration into the Agency electronic information dissemination program. Position requires the ability to deal effectively with all levels of management and users to provide leadership in the development of dissemination methods that meet the needs of ERS customers. Proposals and decisions must be justified, and if necessary defended concerning the overall design environment.

2

Factor 2  Supervisory Controls                    Level 2 - 5        650 pts

The incumbent is under the general supervision of the Web Manager, who makes assignments in very general terms. Plans. work methods, and other aspects of the assignment must be devised by the incumbent. The incumbent has wide latitude in the planning and execution of assignments and comparable freedom in the oversight of others assigned to the work. The results are usually accepted as presented and are reviewed as to the fulfillment of objectives.

Factor 3.  Guidelines                             Level 3 - 5        650 pts

Guidelines consist of Government, Departmental, and Agency regulations on information dissemination, ADP, and communications as well as specified Agency goals. Available studies and vendor manuals are also used. Guidelines are general in nature and span the complete spectrum of activity. The incumbent must select and interpret the appropriate material and establish guidance that assures conformance to the pertinent areas. Trends and patterns in areas such as workload, types of information, customer needs and usage, research directions, and technological advances must be prepared to develop new plans and solutions for web product development.

Factor 4.  Complexity                             Level 4 - 6        450 pts

The work involves an unusual depth of analysis in an area where approaches, customer needs, and technology change at a rapid pace and implementation of improvements can cause extensive changes in Agency practices and procedures. In determining implementation and optimization approaches, decisions must be made over lengthy time periods during which assumptions about research directions, customer needs, system usage, major new system implementations, project funding, and advances in technology could change considerably.

Possibilities for change are developed as a result of exploratory studies that generally involve a wide range of Agency outputs that include intermediate and long-term research, reports and indicators, data, and staff analysis, as well as a wide range of technologies and computer software. These studies require extensive coordination with management, research and technical staff, and vendor representatives; and the evaluation of new approaches and methods is clouded by the lack of similar operational systems available to conduct appropriate studies. Extensive testing, evaluation of results, and incorporating customer feedback vary the pace of implementation.

Factor 5  Scope and Effect                        Level 5 - 2        325 pts

The work involves improvements in existing systems and operations and development of new approaches to match effective electronic dissemination techniques with customer needs. The incumbent serves as an expert and consultant in the design and management of complex information dissemination systems, specializing in developing methods and approaches for use of Web information delivery and its integration with related dissemination systems. The work affects the basic design and use of automated systems that provide for the efficient and effective delivery of Agency products and the collection and delivery of information and services at the Department level. Advice and guidance provided by the incumbent affects the work of professional staff and management officials throughout the Agency and in other Agencies in the Department.

Factor 6.  Personal Contacts and Factor 7.Purpose of Contacts   Level 6 - 3        60 pts

In addition to contacts within the Agency, contacts also take place with computer personnel and officials of the Department, the Government, representatives of vendors and contractors, and with Agency customers.

3

<u>Factor 7.  Purpose of Contacts</u>                    Level 7 - 3        120 pts

Contacts are to present requirements, gather and obtain information, and identify and resolve
problems.  Considerable tact and diplomacy are required in convincing and securing cooperation
of parties that may have different points of view.

<u>Factor 8   Physical Demands</u>                       Level 8 - 1        5 pts

The work is sedentary.  It occasionally requires the carrying of light office equipment and
materials.

<u>Factor 9.  Work Environment</u>                       Level 9 - 1        5 pts

The work is primarily conducted in a typical office environment.

4

Yahoo!  My Yahoo!  Mail  Tutorials  More    Make Y! your home page judineandassoc  Sign Out  All-New Mail  Help

**YAHOO! MAIL**
Classic

Search: [                    ]  **Web Search**

University of Phoenix    Higher education. Highly accessible.    View Additional Informa
Thinking ahead.

**LEARN MORE**

| **Mail** | Addresses | Calendar | Notepad | | Mail For Mobile - Mail Upgrades - Options |

**Check Mail**    **Compose**        [        ]    **Search Mail**    **Search the Web**

See your credit
score - free

**Folders**    [Add - Edit]

**Inbox (17)**

Draft

Sent

Bulk    [Empty]

Trash    [Empty]

**My Folders**    [Hide]

**save (1)**

**Search Shortcuts**

My Photos

My Attachments

Netflix
Only $4.99/mo.

Online Degree
Programs

$200K fixed as
low as $1,183/mo.*

Earn credits online
Top schools

Previous | Next | Back to Search Results

**Delete**    **Reply** ▼    **Forward** ▼    **Move...** ▼

This message is not flagged. [ Flag Message - Mark as Unread ]    Printable View

**Date:**  Mon, 5 Feb 2007 20:13:02 -0800 (PST)

**From:**  "Judine Slaughter" <judineandassoc@yahoo.com>  Add to Address
Book  Add Mobile Alert

**Subject:**  Judine's resignation

**To:**  eve.adams@faa.gov

Hi Eve,

Please accept this email as written notification of me asking for my job back. I was emotionally stressed, and prematurely quit out of frustration.

Any way, I have to laugh, because my family asked which "unwelcome" is better -- with a job and a safe roof, or no job and put out into the street.

I'm asking for annual leave tomorrow to take care of myself. Please call me if you don't want to grant it, and I'll just be late.

Judine

Food fight? Enjoy some healthy debate
in the Yahoo! Answers Food & Drink Q&A.

**Delete**    **Reply** ▼    **Forward** ▼    **Move...** ▼

Previous | Next | Search Results

Save Message Text | Full Headers

**Check Mail**    **Compose**        [        ]    **Search Mail**    **Search the Web**

Copyright © 1994-2007 Yahoo! Inc. All rights reserved. Terms of Service - Copyright/IP Policy - Guidelines
NOTICE: We collect personal information on this site.
To learn more about how we use your information, see our Privacy Policy